# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JAMES ANTHONY SMALE, Individually and on Behalf of All Others Similarly Situated,<br><br>         Plaintiff,<br><br>   v.<br><br>SPORTRADAR GROUP AG, CARSTEN KOERL, and CRAIG FELENSTEIN,<br><br>         Defendants. | Case No. 1:26-cv-04112<br><br>**JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff James Anthony Smale ("Plaintiff") alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, including the investigation of Plaintiff's counsel, which included, among other things a review of: Defendants' (defined below) United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by Sportradar Group AG ("Sportradar" or the "Company"); analyst reports and advisories, investment research reports and media reports regarding the Company; judicial filings and opinions; and other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  NATURE OF THE ACTION AND OVERVIEW

1.    This is a federal class action on behalf of a class of all persons and entities who purchased or otherwise acquired Sportradar Class A ordinary shares between November 7, 2024, and April 21, 2026, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2.    Sportradar provides data platforms and services, such as data collection and processing and risk management, to the global sports betting industry.  The Company partners with sports leagues worldwide to facilitate live data collection and analysis in order to supply pre-match and live data and odds to betting operators, which include Bet365, Caesars, DraftKings, Entain, FanDuel, and William Hill. Additionally, Sportradar engages in technology-enabled fraud monitoring for its sports-league partners and distributes sport audiovisual content to sports media and betting operators globally.  Notably, Sportradar partners with prominent international sports organizations such as the National Basketball Association ("NBA"), Major League Baseball ("MLB"), the National Hockey League ("NHL"), the PGA Tour, and the Fédération Internationale de Football Association ("FIFA"), among others.

3.     Sportradar is incorporated in Switzerland with its principal executive offices in St. Gallen, Switzerland.  Its Class A ordinary shares trade primarily on The Nasdaq Global Select Market under the ticker symbol "SRAD."

4.    The Class Period begins on November 7, 2024, when Sportradar filed its third quarter 2024 financial results.  The Company noted in its related press release

that it may be subject to certain risks and outlined various "risk factors" as examples, but the Company also referred investors to the "other risk factors set forth in the section titled 'Risk Factors' in [the Company's] Annual Report on Form 20-F for the fiscal year ended December 31, 2023" (the "2023 Annual Report"). In the 2023 Annual Report, Sportradar noted that it was "subject to a variety of U.S. and foreign laws on sports betting" and acknowledged that "[n]on-compliance with any such legislation or regulations could expose [it] to claims, legal or regulatory proceedings, license reviews, litigation and investigations by regulatory authorities, as well as substantial fines and negative publicity, each of which may materially and adversely affect [its] business" despite its purported "good faith efforts to comply with all local requirements." These and other risk factors were repeated or referenced in substantially similar form in the Company's various annual and quarterly filings issued during the Class Period, which were signed by Defendants Carsten Koerl, the Company's Founder and Chief Executive Officer, and Craig Felenstein, the Company's Chief Financial Officer.

5.      During the Class Period, the Company touted the robustness of its due diligence, Know-Your-Customer ("KYC") process, and overall legal and regulatory compliance. For example, on April 1, 2025, Defendant Koerl appeared on *CNBC*'s "MAD MONEY" with host Jim Cramer and likened the Company to "the SEC or the FBI" for the gambling industry due to its ability to police fraudulent and illicit activity.

6.     A few months later, on November 5, 2025, the Company hosted its third quarter 2025 earnings call.  During the call, a Citizens Bank analyst stated that he "want[ed] to address some of the noise around the business with your exposure to certain markets, whether they're gray or beyond that" (i.e. black markets).  In response, Defendant Koerl assured investors that the Company had a "four-level process" to confirm that it "*only work[s] with licensed operators*,"[1] including by "hav[ing] contracts which are enabling those operators to only work in the territory where they are licensed in."

7.     Moreover, Koerl highlighted that Sportradar had "a global compliance team, which is making an *intensive KYC with every operator, and [it is] insisting on this, that [Sportradar] control[s] it*."  This compliance team, Koerl noted, worked in conjunction with Sportradar's "internal audit" process to identify areas where Sportradar's "content is popping up in markets which are not licensed, which are not covered by the contracts," so that the Company could "go[] on those operators" and prevent the illegal use of its content.  According to Koerl, this "happens for a handful of cases every year," but he underscored that Sportradar was "*monitoring this very closely*."

8.     The Company also published on its website a "Code of Business Conduct and Ethics" (the "Code"), pursuant to which Sportradar claimed that it "place[d] integrity, transparency and professionalism at the heart of all [it] do[es]."  Indeed,

---

[1]     Unless otherwise indicated, all emphasis is added.

Sportradar emphasized that it was "***crucial***" for it to "conduct [its] business in a manner that upholds [its] high standards of ethics and integrity."

9.      Notwithstanding Sportradar's purported commitment to integrity and legal and regulatory compliance, investors learned the truth about the Company's intentional non-compliance with applicable laws and regulations on April 22, 2026, when two market research firms—Muddy Waters Research ("Muddy Waters") and Callisto Research ("Callisto")—separately published investigative reports (collectively, the "Reports") revealing that Sportradar intentionally utilized a network of black-market gambling partners to drive a material portion of its revenues.

10.      Muddy Waters claimed that Sportradar "has actively aided and abetted illegal gambling across the world's black and grey markets – ***not as an accident or an oversight, but as a business strategy***."  To support this conclusion, Muddy Waters detailed discussions between its investigators and Sportradar sales executives at the International Casinos Exhibition (a large, worldwide gaming convention) where its investigators posed as sportsbook operators indicating interest in penetrating illegal markets, including Vietnam, Thailand, Indonesia, and China. According to Muddy Waters, a Sportradar sales executive "bragged that [Sportradar] 'serves everyone' and listed major [business-to-business] clients in Asia, known illegal operators," and then "walk[ed] [the investigators] through key product offerings for each of these illegal markets."  The Sportradar sales executive "also offer[ed] to solicit assistance from his clients . . . so [Muddy Waters's investigators] could quickly set up

operations."   One of the "clients" specifically identified by the Sportradar sales executive was "the infamous Yabo Group," a "notorious" illegal betting operator in China that was also known for "using Cambodian customer service centers engaged in human trafficking, modern slavery, kidnapping and torture of its workforce."  In addition to Sportradar's admitted connection to the Yabo Group, Muddy Waters uncovered numerous other connections between Sportradar and illegal operators in Russia, Turkey, and several Asian markets.

11.    As a result of its investigation, Muddy Waters concluded that Sportradar "intentionally combines a 'check-the-box' KYC review with a 'see nothing, know nothing' approach to illegal markets" that "contrasts sharply with its CEO's recent claims of maintaining a robust KYC process."

12.    Separately, Callisto "examin[ed] . . . hundreds of gambling platforms," through which it "found evidence suggesting that over 270 individual platforms (more than a third of the 800 Sportradar claims to serve) are using Sportradar's products or services, or explicitly claiming to do so, while operating illegally in regulated or prohibited gambling markets."  Former Sportradar employees also told Callisto that one of the Company's largest clients, 1xBet, was "likely to be the world's largest illegal gambling operator by revenue."

13.    Callisto reportedly "shared [its] findings with multiple regulators in North America and Europe," three of which "***have already commenced reviews***" of the Company.  As a result, Callisto reasoned that "Sportradar will have to choose

between surrendering its revenue from illegal operators or losing its licenses in Europe and North America."

14.    On this news, the price of Sportradar Class A ordinary shares plummeted $3.80 per share, or approximately 22.6%, from a close of $16.84 per share on April 21, 2026, to close at $13.04 per share on April 22, 2026.

15.    This Complaint alleges that, pursuant to Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts, about the Company's business and operations.  Specifically, Defendants misrepresented and/or failed to disclose that: (1) Sportradar intentionally worked with black-market gambling operators to increase its revenues, despite its assurances of strict legal and regulatory compliance and claims that ethics and integrity were crucial for Sportradar's operations; (2) the Company's KYC and compliance processes were not as robust as Defendants' had claimed; and (3) as a result, Defendants' statements about the Company's business, operations, and prospects lacked a reasonable basis.

16.    As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's securities, Plaintiff and other members of the Class (defined below) have suffered significant damages.

## II.    **JURISDICTION AND VENUE**

17.    Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

7

18. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa because Sportradar's Class A ordinary shares are traded on The Nasdaq Global Select Market and many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

20. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

21. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Sportradar Class A ordinary shares at artificially inflated prices during the Class Period and has been damaged thereby.

22. Defendant Sportradar Group AG is incorporated in Switzerland and is headquartered at Feldlistrasse 2, CH-9000 St. Gallen, Switzerland.

23. Defendant Carsten Koerl ("Koerl") is the Company's Founder and has served as its Chief Executive Officer at all relevant times.

24. Defendant Craig Felenstein ("Felenstein") has served as the Company's Chief Financial Officer at all relevant times.

25. Defendants Koerl and Felenstein are collectively referred to herein as the "Individual Defendants."

26.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Sportradar's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

27.    Sportradar and the Individual Defendants are collectively referred to herein as the "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

28.    Sportradar provides data platforms and services, such as data collection and processing and risk management, to the global sports betting industry. The Company partners with sports leagues worldwide (such as the NBA, MLB, the NHL, the PGA Tour, and FIFA) to facilitate live data collection and analysis in order to supply pre-match and live data and odds to betting operators. Additionally, Sportradar engages in technology-enabled fraud monitoring for its sports-league partners and distributes sport audiovisual content to sports media and betting operators globally.

29.     The Company's services and solutions are separated into two main product groups: Betting Technology & Solutions ("BTS"); and Sports Content, Technology & Services ("SCTS").

30.     The BTS business takes real-time sports data collected at the match venue and either delivers the data directly to clients or synthesizes that data into pre-match or live, in-play betting odds.  Betting platforms purportedly using Sportradar's services and solutions include Bet365, Caesars, DraftKings, Entain, FanDuel, and William Hill.  BTS also offers 24/7 live streaming coverage of audiovisual sports content (primarily non-televised material) and, further, offers "iGaming" content that "blends live sports, casino games, slots and hybrid content." Notably, the Company's "Managed Betting Services" business, which is part of BTS, incorporates the Company's "Managed Trading Services"—a "sophisticated trading, risk, and liability management solution" that integrates all of Sportradar's products and services into one platform, but which provides the Company's customers with the ability to tailor the platform to their needs—as well as its "Sports Betting & Gaming platform"—a "proprietary" "turnkey betting and gaming platform solution" that encompasses both sports betting and iGaming.

31.     SCTS, on the other hand, has "technology powered solutions for the entire sports ecosystem designed to unlock and maximize client value" and drive fan engagement of sport.  Through SCTS, Sportradar delivers personalized advertising to fans, graphics, statistics, and related content to broadcasters, publishers, and others, and video content and performance analysis to coaches, scouts, and officials.

10

Furthermore, SCTS includes the Company's "Integrity Services" business, which leverages Sportradar's AI-powered Universal Fraud Detection System to monitor and detect suspicious betting activity across global markets. Sportradar has touted its Integrity Services as "a leading provider of monitoring, intelligence, education, consultancy, rights protection, and regulatory solutions for sports organizations, government authorities, and law enforcement agencies."

32.    Sportradar is incorporated in Switzerland with its principal executive offices in St. Gallen, Switzerland. Its Class A ordinary shares trade primarily on The Nasdaq Global Select Market under the ticker symbol "SRAD."

**B.    Defendants' False and Misleading Statements**

33.    The Class Period begins on November 7, 2024, to coincide with Sportradar filing its third quarter 2024 financial results. The Company's press release filed that day noted that it may be subject to various "risk factors," but the Company also referenced "other risk factors set forth in the section titled 'Risk Factors' in [its] Annual Report on Form 20-F for the fiscal year ended December 31, 2023." Defendant Felenstein signed the Form 6-K filed with the SEC that included this press release.

34.    In the 2023 Annual Report, filed on March 20, 2024, Sportradar stated that it was "subject to a variety of U.S. and foreign laws on sports betting," including obtaining and maintaining required licenses in some jurisdictions, and that "[n]on-compliance with any such legislation or regulations could expose [the Company] to claims, legal or regulatory proceedings, license reviews, litigation and investigations

11

by regulatory authorities, as well as substantial fines and negative publicity, each of which may materially and adversely affect [its] business."

35.    Additionally, the Company noted that "[t]he legality of sports betting services in certain jurisdictions is not clear or is open to interpretation." The markets where sports betting is not explicitly illegal, but its legality is questionable, are known as "gray markets." Accordingly, Sportradar claimed that "the legality of sports betting is subject to uncertainties" regarding the varying approaches taken by certain jurisdictions with respect to sports betting, which could open Sportradar to legal and regulatory risks despite the Company's purported "good faith efforts to comply with all local requirements." Critically, Sportradar confirmed in the 2023 Annual Report that, "[t]o date, we have obtained all licenses, authorizations, findings of suitability, registrations, permits and approvals necessary for our current operations." Defendant Koerl signed the 2023 Annual Report and certified its completeness and accuracy.

36.    On March 19, 2025, the Company published its fourth quarter and full year 2024 financial results. The Company's press release noted that it may be subject to various "risk factors" and referenced "other risk factors set forth in the section titled 'Risk Factors'" in the 2023 Annual Report. Defendant Felenstein signed the Form 6-K filed with the SEC that included this press release.

37.    On March 20, 2025, the Company filed its 2024 annual financial report (the "2024 Annual Report"). In the 2024 Annual Report, the Company reiterated that it was "subject to a variety of U.S. and foreign laws on sports betting," including

12

obtaining and maintaining required licenses in some jurisdictions, and that "[n]on-compliance with any such legislation or regulations could expose [the Company] to claims, legal or regulatory proceedings, license reviews, litigation and investigations by regulatory authorities, as well as substantial fines and negative publicity, each of which may materially and adversely affect [its] business." Moreover, Sportradar stated that the legality of sports betting in gray markets was "not clear or [was] open to interpretation," thereby subjecting the Company to "uncertainties" and legal and regulatory risks in certain jurisdictions "despite [its] good faith efforts to comply with all local requirements." Sportradar also confirmed that, "[t]o date, [it has] obtained necessary licenses, authorizations, findings of suitability, registrations, permits and approvals necessary for [its] current operations." Defendants Koerl and Felenstein signed the 2024 Annual Report and certified its completeness and accuracy.

38.    On April 1, 2025, Defendant Koerl appeared on *CNBC*'s "MAD MONEY" with host Jim Cramer. During the segment, Jim Cramer discussed the Company's "Integrity Services" and stated that Sportradar was "in some ways the SEC . . . for gambling." Koerl immediately corrected Jim Kramer, stating that the Company was actually "the SEC or the FBI" for the industry.

39.    On May 12, 2025, the Company published its first quarter 2025 financial results. The Company's press release noted that it may be subject to various "risk factors" and referenced "other risk factors set forth in the section titled 'Risk Factors'" in the 2024 Annual Report. Defendant Felenstein signed the Form 6-K filed with the SEC that included this press release.

13

40.    On August 5, 2025, the Company published its second quarter 2025 financial results.  The Company's press release noted that it may be subject to various "risk factors" and referenced "other risk factors set forth in the section titled 'Risk Factors'" in the 2024 Annual Report.  Defendant Felenstein signed the Form 6-K filed with the SEC that included this press release.

41.    On November 5, 2025, the Company published its third quarter 2025 financial results.  The Company's press release noted that it may be subject to various "risk factors" and referenced "other risk factors set forth in the section titled 'Risk Factors'" in the 2024 Annual Report.  Defendant Felenstein signed the Form 6-K filed with the SEC that included this press release.

42.    During the accompanying earnings call held that same day, Defendants fielded numerous questions from investors about Sportradar's legal and regulatory compliance practices.  For example, a Citizens Bank analyst stated that he "want[ed] to address some of the noise around the business with your exposure to certain markets, whether they're gray or beyond that."  In response, Koerl assured investors that the Company had a "four-level process" to confirm that the Company "**only work[s] with licensed operators**," including by "hav[ing] contracts which are enabling those operators only to work in the territory where they are licensed in."

43.    Koerl also asserted that "we have a global compliance team, which is making an **intensive KYC with every operator, and we are insisting on this, that we control it**."  Koerl further explained that the Company's KYC process worked hand-in-hand with its "internal audit" process to identify areas where

14

Sportradar's "content is popping up in markets which are not licensed, which are not covered by the contracts," so that Sportradar can "go[] on those operators" and shut down those operations.  Koerl noted that it only "happens for a handful of cases every year" and emphasized that "*we are monitoring this very closely*."

44.    On March 3, 2026, the Company published its fourth quarter and full year 2025 financial results.  The Company's press release noted that it may be subject to various "risk factors" and referenced "other risk factors set forth in the section titled 'Risk Factors'" in the 2024 Annual Report.  Defendant Felenstein signed the Form 6-K filed with the SEC that included this press release.

45.    On March 27, 2026, the Company filed its 2025 annual financial report (the "2025 Annual Report").  In the 2025 Annual Report, the Company reiterated that it was "subject to a variety of U.S. and foreign laws on sports betting," including obtaining and maintaining required licenses in some jurisdictions, and that "[n]on-compliance with any such legislation or regulations could expose [the Company] to claims, legal or regulatory proceedings, license reviews, litigation and investigations by regulatory authorities, as well as substantial fines and negative publicity, each of which may materially and adversely affect [its] business."  Moreover, Sportradar stated that the legality of sports betting in gray markets was "not clear or [was] open to interpretation," and as such, "[g]overnmental authorities could view [Sportradar] or [its] clients as having violated local laws despite efforts and good faith attempts to obtain all applicable licenses or local requirements."  According to Sportradar, "[t]o date, we have obtained necessary licenses, authorizations, findings of suitability,

15

registrations, permits and approvals necessary for our current operations." Defendants Koerl and Felenstein signed the 2025 Annual Report and certified its completeness and accuracy.

46. Additionally, at all relevant times during the Class Period, the Company's website included the Code. The Code highlighted that Sportradar "place[d] integrity, transparency and professionalism at the heart of all [it] do[es]." Moreover, the Company acknowledged in the Code that "it is crucial [the Company] conduct[s] [its] business in a manner that upholds [its] high standards of ethics and integrity," which it claims means "more than just complying with laws and regulations – it means leading by example in both [its] business practices and personal conduct."

47. The above statements identified in paragraphs 33-46 were materially false and misleading, and failed to disclose material adverse facts, about the Company's business and operations. Specifically, Defendants misrepresented and/or failed to disclose that: (1) Sportradar intentionally worked with black-market gambling operators to increase its revenues, despite its assurances of strict legal and regulatory compliance and claims that ethics and integrity were crucial for Sportradar's operations; (2) the Company's KYC and compliance processes were not as robust as Defendants' had claimed; and (3) as a result, Defendants' statements about the Company's business, operations, and prospects lacked a reasonable basis.

## C. The Truth Emerges

48. Plaintiff and other investors began to learn the truth about Sportradar's intentional connections with illegal gambling operations on April 22, 2026, when

16

Muddy Waters and Callisto published the Reports revealing Sportradar's ties to a sprawling network of black-market operators.  The allegations in the Reports directly contradicted Defendants' Class Period assurances that the Company focused on ethics and integrity in its business practices and adhered to strict and "intensive" compliance processes to prevent illegal operators from using Sportradar's services and solutions.

49.    Muddy Waters asserted that Sportradar "has actively aided and abetted illegal gambling across the world's black and grey markets – *not as an accident or an oversight, but as a business strategy*."  Critically, Muddy Waters detailed discussions between its investigators and Sportradar sales executives at the International Casinos Exhibition.  According to Muddy Waters, its investigators posed as sportsbook operators who were interested in penetrating illegal markets, including Vietnam, Thailand, Indonesia, and China.  During the investigators' conversation with "an Asia-focused [Sportradar] sales executive," the executive purportedly "walk[ed] [the investigators] through key product offerings for each of these illegal markets, but also offer[ed] to solicit assistance from his clients, the API providers and white label reseller clients, so [Muddy Waters's investigators] could quickly set up operations."  Moreover, Muddy Waters noted that the executive "bragged that [Sportradar] 'serves everyone' and listed major [business-to-business] clients in Asia [that were] known illegal operators."  Muddy Waters also alleged that the executive "offered to introduce [the investigators] to the infamous Yabo Group," which was "notorious as not just China's largest illegal operator, but also for using

17

Cambodian customer service centers engaged in human trafficking, modern slavery, kidnapping and torture of its workforce."

50. According to Muddy Waters, several of Sportradar's other top customers included: Stake.com, a "crypto pioneering sportsbook" that recently lost its gaming license in the United Kingdom "for facilitating licenses for Asian-focused operators, illegal operators in those markets"; 188bet, which operates Crown Sports, "a major player in China"; and FonBet, a Russian gambling operator "closely tied to Vlad[i]mir Putin's Federal Guard Service" (which had ties to sanctioned individuals).

51. Based on Muddy Waters's "dives into [Sportradar]'s system architecture and code," it "found evidence of direct connections between numerous illegal and nefarious operators and [Sportradar]," including connections to Russia and "over 40 clients operating illegally in the large and fast-growing Asian markets: China, India, Japan, S[outh] Korea, Vietnam, and Thailand," as well as operations in Turkey—all of which purportedly "forbid online gaming."

52. Ultimately, Muddy Waters concluded that Sportradar "intentionally combines a 'check-the-box' KYC review with a 'see nothing, know nothing' approach to illegal markets" that "contrasts sharply with its CEO's recent claims of maintaining a robust KYC process."

53. Callisto reported equally troubling issues with respect to Sportradar's connections to illegal gambling interests. It based its findings on the "examination of hundreds of gambling platforms," through which it "found evidence suggesting that over 270 individual platforms (more than a third of the 800 Sportradar claims to

serve) are using Sportradar's products or services, or explicitly claiming to do so, while operating illegally in regulated or prohibited gambling markets." Notably, Callisto claimed that "**Sportradar directly participates in illegal gambling revenues**," and that, according to at least two former Company employees interviewed by Callisto, one of the Company's top ten clients, 1xBet, "is likely to be the world's largest illegal gambling operator by revenue."

54.    Additionally, Callisto contended that Sportradar worked with operators that received fake licenses or that the Company partnered with operators licensed in certain jurisdictions, but not where the players were actually located—meaning that Sportradar's partners were operating illegally. Callisto further stated that the Company "shared [its] findings with multiple regulators in North America and Europe," three of which "*have already commenced reviews*" of the Company. Given its findings, Callisto believed that "Sportradar will have to choose between surrendering its revenue from illegal operators or losing its licenses in Europe and North America."

55.    In response to the publication of the Reports, the price of Sportradar Class A ordinary shares plummeted $3.80 per share, or approximately 22.6%, from a close of $16.84 per share on April 21, 2026, to close at $13.04 per share on April 22, 2026.

## V.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

56.    Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Sportradar Class A ordinary shares during the Class Period (the

"Class"). Excluded from the Class are Defendants, their agents, directors and officers of Sportradar, and their families and affiliates.

57. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

58. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a.    Whether the Defendants violated the Exchange Act;

    b.    Whether the Defendants omitted and/or misrepresented material facts;

    c.    Whether the Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    d.    Whether the Defendants knew or recklessly disregarded that their statements were false and misleading;

    e.    Whether the price of Sportradar Class A ordinary shares was artificially inflated; and

    f.    The extent of damage sustained by members of the Class and the appropriate measure of damages.

59. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

60. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in securities class actions. Plaintiff has no interests that conflict with those of the Class.

61. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

62. Plaintiff, with respect to its claims asserted under the Exchange Act, will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

    a. The Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b. The omissions and misrepresentations were material;

    c. The Company's securities traded in an efficient market;

    d. The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

    e. Plaintiff and the Class purchased Sportradar Class A ordinary shares between the time the Company and the Individual Defendants misrepresented or failed to disclose material facts

21

and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

63.     At all relevant times, the market for the Company's securities was efficient because: (1) as a regulated issuer, the Company filed periodic public reports with the SEC; and (2) the Company regularly communicated with public investors using established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## VII.    NO SAFE HARBOR

64.     Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.  Defendants are liable for any false and/or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that the forward-looking statement was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

22

## VIII.  LOSS CAUSATION/ECONOMIC LOSS

65.    The Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The prices of Company Class A ordinary shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  As a result of their purchases of Sportradar Class A ordinary shares during the Class Period, Plaintiff and the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## IX.    SCIENTER ALLEGATIONS

66.    During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, the Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of Company securities during the Class Period.

## X.    CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violation of Section 10(b) of the Exchange Act and
SEC Rule 10b-5 Promulgated Thereunder
Against All Defendants**

67.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

23

68. During the Class Period, the Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and the Class; and (2) cause Plaintiff and the Class to purchase Company securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

69. Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

70. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

71. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

72. The Individual Defendants acted as controlling persons of Sportradar within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or

awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

73. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular accounting practices giving rise to the securities violations as alleged herein, and exercised the same.

74. As described above, the Company and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Company securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

## XI.    JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 18, 2026

Respectfully submitted,

*S/ Naumon A. Amjed*
Naumon A. Amjed
**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
Ryan T. Degnan
Geoffrey C. Jarvis
Joshua S. Keszczyk
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
namjed@ktmc.com
rdegnan@ktmc.com

26

gjarvis@ktmc.com
jkeszczyk@ktmc.com

*Attorneys for Plaintiff James Anthony Smale*

27

**CERTIFICATION**

I, James Anthony Smale, declare that:

1.       I have reviewed the Class Action Complaint and authorize its filing.

2.       I did not purchase and/or acquire the securities that are the subject of this action at the direction of my counsel nor in order to participate in any private action under the federal securities laws.

3.       I am willing to serve as a representative party on behalf of the class, including giving testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Certification.

4.       My Class Period transaction(s) in the Sportradar Group AG securities that are the subject of this action are attached in Schedule A.  I have complete authority to bring a suit to recover for investment losses for all securities set forth in Schedule A.

5.       During the three years prior to the date of this Certification, I have not sought to serve nor served as a representative party for a class in an action filed under the federal securities laws.

6.       I will not accept any payment for serving as a representative party on behalf of the class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   5/15/2026

Signed by:
James Anthony Smale
F650548B289B4FA...

James Anthony Smale

**SCHEDULE A**

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Class A ordinary shares | Buy | 5/15/2025 | 10 | $23.44 |
| Class A ordinary shares | Buy | 6/16/2025 | 5 | $24.64 |
| Class A ordinary shares | Buy | 7/7/2025 | 10 | $28.16 |
| Class A ordinary shares | Buy | 7/9/2025 | 13 | $29.17 |
| Class A ordinary shares | Buy | 8/7/2025 | 7 | $27.72 |
| Class A ordinary shares | Buy | 9/30/2025 | 19 | $26.32 |
| Class A ordinary shares | Buy | 9/30/2025 | 30 | $27.50 |
| Class A ordinary shares | Buy | 10/3/2025 | 19 | $26.56 |
| Class A ordinary shares | Buy | 10/7/2025 | 60 | $25.33 |
| Class A ordinary shares | Buy | 11/5/2025 | 27 | $23.20 |
| Class A ordinary shares | Buy | 11/26/2025 | 15 | $21.87 |
| Class A ordinary shares | Buy | 1/16/2026 | 50 | $19.00 |
| Class A ordinary shares | Buy | 2/13/2026 | 34 | $15.88 |