**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ARKANSAS PUBLIC EMPLOYEES' RETIREMENT SYSTEM AND ARKANSAS TEACHER RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

SPORTRADAR GROUP AG, CARSTEN KOERL, and CRAIG FELENSTEIN,

Defendants.

Case No. 1:26-cv-04112-GHW

Hon. Gregory H. Woods

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 2

II. JURISDICTION AND VENUE ..... 9

III. PARTIES ..... 10

A. Lead Plaintiff ..... 10

B. Defendants ..... 11

IV. FORMER EMPLOYEES AND PUBLISHED INTERVIEWS ..... 12

V. SUBSTANTIVE ALLEGATIONS ..... 14

A. Background ..... 14

1. The Global Gambling Industry ..... 14

2. The Sports Gambling Business ..... 16

3. Sportradar Provides the Critical Data About Sporting Events That Allows Sports Betting to Flourish ..... 17

B. Sportradar Touts Its Know-Your-Customer Procedures and Presents Itself to Investors as a Leader in Sports Gambling Integrity ..... 20

C. Contrary to Its Representations, Sportradar's Customer Base Includes a Significant Number of Illegal and/or Unlicensed Operators ..... 24

1. Sportradar Boasted of Its Ability to Connect Potential Customers with Entities That Help Them Operate in Markets Where Gambling Is Illegal ..... 25

2. Multiple Analyses of the Source Code Authentication Mechanisms Used by Illegal Gambling Operators Demonstrate That These Operators Were Actively Using Data and Games Provided by Sportradar ..... 29

a. Callisto's Analysis of Sportradar's Links to Illegal Gambling Operations ..... 29

b. Muddy Waters Evaluated the Source Code of Illegal Gambling Sites to Determine Which Had Links to Sportradar ..... 32

c. Gambling Analyst Trace2Trace, Acting on Behalf of Lead Plaintiff, Independently Analyzed the Use of Sportradar Services by Illegal Gambling Websites ........ 35

3. Gambling Operators Targeting Jurisdictions Where Gambling Is Illegal Utilized Sportradar's Data and Games ........ 37

a. China, Thailand, Vietnam and Indoensia Were Targeted by Online Betting Sites That Use Sportradar's Data, Games or Other Products ........ 38

(1) Sportradar Subsidiary Nsoft Facilitated Illegal Gambling ........ 38

(2) Sportradar Client 188Bet Offered Illegal Gambling Services in Indonesia and China ........ 41

(3) IM Sports Used Sportradar Data to Facilitate Illegal Gambling in China ........ 42

(4) Gambling Operator Dafabet Used Sportradar's Products to Facilitate Illegal Gambling in China and India ........ 43

(5) Sportradar Offers Services in Languages for Countries Where Online Gambling Is Illegal ........ 47

b. Sportradar's Client, Stake, Was Sued for Providing Illegal Online Betting in Several U.S. States ........ 48

c. Sportradar Provided Data and Games to Multiple Betting Sites Targeting Turkey ........ 50

(1) Interbahis ........ 51

(2) Safirbet, Imajbet, Meritking, and Betebet ........ 53

(3) Tempobet ........ 56

d. Sportradar Provided Data and Games to Betting Sites Targeting Iran ........ 58

4. Much of Sportradar's Client Base Operates Without Required Licenses ........ 61

5. Sportradar Had Significant Business Relationships with Gambling Operators That Are Based or Operate in Russia, or in Occupied Ukrainian Territory, Belying Its Claims That It Complies with Sanctions Against Russia and Doesn't Work with Illegal or Unlicensed Entities ..... 63

a. After the United States and the European Union Imposed Sanctions on Russia, Sportradar Claimed It Would Cease Any New Business in Russia ..... 63

b. Sportradar Lied About Koerl's Control over a Russian Gambling Operation Prior to the Class Period and Failed to Disclose That Koerl Maintained Ties to the Russian Gambling Operation's CEO After It Divested from the Operation..... 65

c. Sportradar Provides Data and Games to a Variety of Gambling Operators That Are Based or Operate in Russia, or in Occupied Ukrainian Territory ..... 66

(1) Bet-M ..... 67

(2) 1win..... 67

(3) Betboom ..... 69

(4) Fonbet ..... 71

(5) 1xBet ..... 73

(6) Bet City ..... 75

(7) Leonbet.ru ..... 76

D. Sportradar's Unlawful Operations Are the Result of the Company's Aggressive Efforts to Increase Revenue and Lax Approach to Compliance..... 78

E. The Truth Is Revealed..... 80

F. Following the Publication of the Reports, Sportradar Conducted a "Housecleaning" by Severing Its Relationship with at Least One Significant Illegal Gambling Operator..... 81

VI. ALLEGATIONS RELEVANT TO THE EXCHANGE ACT CLAIMS ..... 82

A. Defendants' False and Misleading Statements ..... 82

1. Sportradar's Code of Business Conduct and Ethics ..... 82

2. Sportradar's Global Anti-Money Laundering and Counter-Terrorism Policy ........ 84

3. Sportradar's Website Discussion of Services Provided ........ 84

4. November 7, 2024 Press Release ........ 85

5. March 19, 2025 Press Release and Conference Call ........ 86

6. 2024 Annual Report Filed with the SEC on March 20, 2025 ........ 87

7. April 1, 2025 "MAD MONEY" Interview ........ 90

8. May 12, 2025 Press Release ........ 90

9. July 22, 2025 Statement ........ 91

10. August 5, 2025 Press Release ........ 92

11. November 5, 2025 Press Release ........ 93

12. March 3, 2026 Press Release ........ 94

13. 2025 Annual Report Filed with the SEC on March 27, 2026 ........ 95

14. April 22, 2026 Response ........ 97

15. April 28, 2026 Explanatory Note and First Quarter 2026 Earnings Call ........ 97

B. Loss Causation ........ 99

C. Additional Scienter Allegations ........ 103

1. Individual Defendants Had the Motive and Opportunity to Commit Fraud ........ 103

2. Defendants Explicitly Claimed Deep Knowledge of Its Customers' Actions and Their Compliance with All Applicable Rules and Regulations in the Markets Where Those Clients Solicit Bets ........ 105

3. The Defendants Fostered a Culture Where Increasing Revenue Trumped Concerns About Their Clients' Illegal Activities ........ 108

4. The Business and Markets in Which Sportradar Partners with Unlicensed and Illegal Gambling Sites Is a Core Operation of the Company ........ 110

D. A Presumption of Reliance Applies ........ 110

E. No Safe Harbor ............ 112

VII. ALLEGATIONS RELEVANT TO THE SECURITIES ACT CLAIMS ............ 113

A. The Secondary Offering Documents Contained Inaccurate Statements of Material Fact and Omitted Material Information ............ 113

B. The Registration Statement ............ 114

C. The Prospectus Supplement ............ 117

VIII. CLASS ACTION ALLEGATIONS ............ 118

IX. CLAIMS AGAINST DEFENDANTS ............ 121

X. JURY TRIAL DEMANDED ............ 128

Court-appointed Lead Plaintiff Arkansas Public Employees' Retirement System and Arkansas Teacher Retirement System ("Lead Plaintiff" or the "Arkansas Funds") by and through its undersigned counsel, brings this action individually and on behalf of a class ("Class") consisting of all persons and entities who purchased or otherwise acquired the securities of Sportradar Group AG ("Sportradar" or the "Company"): (i) between November 7, 2024 and July 31, 2026, inclusive (the "Class Period"), for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the rules and regulations promulgated thereunder, including U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and (ii) pursuant or traceable to the registration statement and prospectus, issued in connection with the Company's April 25, 2025 secondary public offering (the "Secondary Public Offering"), for violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief are based upon, among other things, the ongoing investigation undertaken by court-appointed Lead Counsel, which includes, but is not limited to, the review and analysis of: (i) Sportradar's filings with the SEC; (ii) press releases and other public statements issued by Defendants; (iii) research reports issued by securities and financial analysts; (iv) media and news reports and other publicly available information concerning Sportradar and Defendants; (v) transcripts of Sportradar's earnings and other conference calls with investors and analysts; (vi) information provided by former Sportradar employees ("Former Employee(s)" or "FE(s)") and in published transcripts with former employees; (vii) information from experts on the gambling industry retained by Lead Plaintiff; and (viii) information publicly available regarding Sportradar on the internet. Lead

Plaintiff believes that substantial additional evidentiary support is likely to exist for the allegations set forth herein after Lead Plaintiff has had a reasonable opportunity to conduct discovery.

## I. INTRODUCTION

1. This securities fraud class action arises out of Defendants' materially false and misleading statements regarding the Company's Know-Your-Customer ("KYC") efforts, its assurances to investors that it conducts business only with licensed operators in lawful markets, and its claims that it acts with integrity and in compliance with the law.

2. Sportradar is a global sports technology company that provides data, content, and technology services to the sports betting industry. The Company partners with sports leagues worldwide to facilitate live data collection and analysis, which it uses to supply betting operators with pre-match and live data, odds, and related risk-management services. Among Sportradar's customers are many of the world's largest betting operators, including Bet365, Caesars, DraftKings, Entain, FanDuel, and William Hill. Additionally, Sportradar provides partner sports leagues with technology-enabled fraud monitoring—known as its Universal Fraud Detection System—and distributes sport audiovisual content to sports media and betting operators globally. Notably, Sportradar partners with prominent international sports organizations such as the National Basketball Association ("NBA"), Major League Baseball ("MLB"), the National Hockey League ("NHL"), the PGA Tour, and the Fédération Internationale de Football Association ("FIFA"), among others.

3. The Class Period begins on November 7, 2024, when Sportradar filed its third quarter 2024 financial results. In addition to representing that it was committed to "***an integrity-driven environment for all involved***," the Company referred investors to certain "risk factors set forth in the section titled 'Risk Factors' in [the Company's] Annual Report on Form 20-F for the fiscal year ended December 31, 2023" (the "2023 Annual Report"). In the 2023 Annual Report,

Sportradar noted that it was "subject to a variety of U.S. and foreign laws on sports betting" and acknowledged that "[n]on-compliance with any such legislation or regulations could expose [it] to claims, legal or regulatory proceedings, license reviews, litigation and investigations by regulatory authorities, as well as substantial fines and negative publicity, each of which may materially and adversely affect [its] business," despite its purported "good faith efforts to comply with all local requirements." These and other risk factors were repeated or referenced in substantially similar form in the Company's various annual and quarterly filings issued during the Class Period, which were signed by Defendants Carsten Koerl ("Koerl"), the Company's Founder and Chief Executive Officer ("CEO"), and Craig Felenstein ("Felenstein"), the Company's Chief Financial Officer ("CFO"). Sportradar failed to tell investors that these risk factors were not mere theoretical possibilities. Instead, Sportradar actually was engaged in conduct that engendered these very risks.

4. Throughout the Class Period, the Company touted the robustness of its due diligence, "intensive" and "rigid" KYC process, and "strict" legal and regulatory compliance framework. Moreover, on April 1, 2025, Defendant Koerl appeared on *CNBC*'s "MAD MONEY" with host Jim Cramer and likened the Company to "the SEC or the FBI" of the gambling industry, due to its ability to police fraudulent and illicit activity. This statement underscores that Defendants understood the importance not only of compliance, but vigilance toward unlawful gambling operations.

5. A few months later, on November 5, 2025, the Company hosted its third quarter 2025 earnings call. During the call, a Citizens Bank analyst stated that he "want[ed] to address some of the noise around the business with your exposure to certain markets, whether they're gray [online gambling unregulated or not strictly illegal] or beyond that" (i.e., black markets). In response, Defendant Koerl assured investors that the Company had a "4-level process" to confirm

that it "***only work[s] with licensed operators***,"[1] including by "hav[ing] contracts which are enabling those operators only to work in the territory where they are licensed in."

6. Moreover, Defendant Koerl highlighted that Sportradar had "a global compliance team, which is making an ***intensive KYC with every operator, and [it is] insisting [] that [Sportradar] control[s] it***." This compliance team, Koerl noted, worked in conjunction with Sportradar's "internal audit" process to identify areas where Sportradar's "content is popping up in markets which are not licensed, which are not covered by the contracts," so that the Company could prevent the illegal use of its content. Koerl underscored that Sportradar was "***monitoring this very closely***."

7. The Company also published on its website a "Code of Business Conduct and Ethics" (the "Code of Business Ethics"), pursuant to which Sportradar claimed that it "place[d] integrity, transparency and professionalism at the heart of all [it] do[es]." Here again, Sportradar emphasized that it was "***crucial***" for it to "conduct [its] business in a manner that upholds [its] high standards of ethics and integrity." Further, in the Code of Business Ethics, Sportradar flatly stated that it "is committed to complying with all applicable economic and trade sanctions regulations, export controls, and antiboycott laws and regulations."

8. Similarly, Sportradar's "Global Anti-Money Laundering and Counter-Terrorism Policy," assured investors that "Sportradar will not conduct business with individuals or entities whose conduct gives rise to suspicions of involvement with illegal activities."

9. Finally, since prior to the Class Period, Sportradar has told investors and the public that "if a bookmaker [client] engages in illegal behavior, we take prompt action to fact-find,

[1] Unless otherwise indicated, all emphasis is added.

investigate, and remedy the situation" and that the Company "constantly monitor[s] and independently test[s] our clients to ensure they meet these clear requirements."

10. Defendants profited from their claims about the Company and its operations. From the beginning of the Class Period to market close on April 22, 2025, the price of Sportradar's class A ordinary shares ("Shares") had increased by $10.73, or approximately 75%. This was due, in part, to investors' belief that Sportradar's success was built on a foundation of ethics and compliance. On April 22, 2025, the Company announced a Secondary Public Offering, which served little function other than to allow Defendant Koerl to profit from the Company's elevated stock price. The Company, controlled by Defendant Koerl, did not sell any Shares—it instead bought Shares. Defendant Koerl, however, sold more than ten million Shares, or approximately 15% of his holdings, to reap more than $222 million.

11. Unbeknownst to investors, however, Sportradar's purported commitment to integrity and the Company's touted KYC procedures were nothing more than talking points. In truth, far from placing "integrity, transparency and professionalism at the heart" of its business, Sportradar instead built a business out of servicing unlicensed, sanctioned, and criminal operators. Sportradar's clients included a host of unsavory characters. First, the Company sought to monetize the business of known illegal operators who targeted black markets and even enslaved their workforces. Second, the Company routinely made its data and services available to entities that lacked the licenses necessary to operate sportsbooks in the jurisdictions in which they operated. Third, Sportradar's business dealings violated international sanctions against Russia and Iran.

12. The truth about Sportradar's dealing with wholly illegal gambling operations and unlicensed operators reached investors on April 22, 2026, when two market research firms—Muddy Waters Research ("Muddy Waters") and Callisto Research ("Callisto")—separately

published independent investigative reports (collectively, the "Reports") revealing that Sportradar intentionally derived a material portion of its revenues from a network of black-market gambling partners.

13. Muddy Waters reported that Sportradar "has actively aided and abetted illegal gambling across the world's black [] markets—***not as an accident or an oversight, but as a business strategy***." To support this conclusion, Muddy Waters detailed discussions between its investigators and Sportradar sales executives at the International Casinos Exhibition—a large, worldwide gaming convention—held in Barcelona, Spain in early2026 ("ICE 2026") At ICE 2026, Muddy Waters' investigators posed as sportsbook operators with an interest in penetrating illegal markets, including Vietnam, Thailand, Indonesia, and China. According to Muddy Waters, a Sportradar sales executive "bragged that [Sportradar] 'serves everyone' and listed major clients in Asia, known illegal operators," and then "walk[ed] [the investigators] through key product offerings for each of these illegal markets." The Sportradar sales executive "also offer[ed] to solicit assistance from his clients . . . so [Muddy Waters's investigators] could quickly set up operations." One of the "clients" specifically identified by the Sportradar sales executive was "the infamous Yabo Group," a "notorious" illegal betting operator in China that was also known for "using Cambodian customer service centers engaged in human trafficking, modern slavery, kidnapping and torture of its workforce." In addition to Sportradar's admitted connection to the Yabo Group ("Yabo"), Muddy Waters uncovered numerous connections between Sportradar and illegal operators in Russia, Turkey, Iran, and several Asian markets.

14. In total, Muddy Waters identified ***nearly fifty*** Sportradar clients who it deemed to be operating illegally, including seven Russian sportsbooks and four clients in Southeast Asia with links to Cambodian human trafficking operators. A former Sportradar vice president, who was

interviewed by a public company research organization, estimated that 15-20% of Sportradar's overall revenues were attributable to black markets.

15. As a result of its investigation, Muddy Waters concluded that Sportradar "intentionally combines a 'check-the-box' KYC review with a 'see nothing, know nothing' approach to illegal markets" that "contrasts sharply with its CEO's recent claims of maintain[ing] a robust KYC process."

16. In its response, Sportradar did not dispute the damning Muddy Waters reporting that its sales executive agreed to connect Muddy Waters investigators to entities that would facilitate gambling operations in countries where online gambling was strictly illegal, claiming only that the executive was "a relatively young sales employee."

17. Also on April 22, 2026, Callisto issued its report, based on an entirely independent investigation. Callisto "examin[ed] . . . hundreds of gambling platforms," and "found evidence suggesting that ***over 270*** individual platforms (more than a third of the 800 Sportradar claims to serve) are using Sportradar's products or services, or explicitly claiming to do so, while operating illegally in regulated or prohibited gambling markets." Former Sportradar employees also told Callisto that one of the Company's largest clients, 1xBet, was "likely to be the world's largest illegal gambling operator by revenue."

18. Upon publication of the Reports, the price of Sportradar's Shares plummeted $3.80 per share, or approximately 22.6%, from a close of $16.84 per share on April 21, 2026, to close at $13.04 per share on April 22, 2026.

19. Following the publication of the Reports, Sportradar denied any wrongdoing. For instance, during the Company's April 28, 2026 earnings call, Defendant Koerl attempted to assuage investor concerns regarding the Reports by citing the Company's "robust compliance

framework." Koerl denied that the company "work[s] with black market operators" and claimed that Sportradar "only work[s] with licensed operators."

20. In order to examine the veracity of Sportradar's denials of the allegations made in the Reports, Lead Plaintiff retained an experienced international gambling industry consultant who, on Lead Plaintiff's behalf, retained Trace2Trace, an organization based in London with substantial expertise in identifying and ferreting out illegal and unregulated gambling sites, operators that offer gambling services without the necessary licenses, and sites that misuse, copy, or falsely refer to other operators' licenses.

21. At the direction of Lead Plaintiff, Trace2Trace conducted multiple analyses on various illegally operating online gambling sites identified in the Reports and corroborated the conclusions of the Reports that many of those unlawfully operating websites were, in fact, interfacing with Sportradar systems. The nature of the analysis conducted by Trace2Trace and the results of that analysis with respect to multiple sites that use Sportradar data are discussed below. *See infra* Section V.C.

22. Importantly, at least one significant instance, however, Trace2Trace found that such interactions had ceased after publication of the Reports. Thus, in the months after the issuance of the Reports, Sportradar conducted—in the words of one former employee—a "house cleaning" and "shut down a few clients," which made "an impact on the business."

23. Notwithstanding Defendants' denials of the Reports, investors continued to learn the true state of the Company's operations on August 3, 2026, when Sportradar reported its financial results for the second quarter of 2026. Sportradar reported a loss for the quarter and cut its full-year outlook for revenue growth on a constant currency basis. The failure to meet its projections and the reduction in future guidance reflected, at least in part, the Company's taking

steps to scale back its exposure to at least some of the many clients that the Reports demonstrated were operating illegally.

24. On this news, the price of Sportradar Shares plummeted $2.20 per share, or approximately 15.13%, from a close of $14.54 per share on July 31, 2026, to close at $12.34 per share on August 3, 2026.

25. This Complaint alleges that, in violation of the United States Federal Securities Laws, throughout the Class Period, Defendants made materially false and/or misleading statements, and failed to disclose material adverse facts, about the Company's business and operations. Specifically, Defendants misrepresented and/or failed to disclose that: (1) Sportradar knowingly worked with black-market, unlicensed, and sanctioned gambling operators to boost its revenues, despite Defendants' assurances of strict legal and regulatory compliance and their claims that ethics and integrity were at the core of Sportradar's operations; (2) the Company's KYC and compliance processes were not as robust as Defendants had claimed; and (3) as a result, Defendants' statements about the Company's business, operations, and prospects lacked a reasonable basis.

26. As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's securities, Lead Plaintiff and other members of the Class (defined below) have suffered significant damages.

## II. JURISDICTION AND VENUE

27. The claims asserted herein arise under: (i) Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; and (ii) Sections 11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o.

28. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22 of the Securities, Act 15 U.S.C. §77v.

29. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22 of the Securities Act, 15 U.S.C. §77v. Sportradar's class A ordinary shares (previously defined as "Shares") are traded on the Nasdaq Global Select Market (the "Nasdaq") and many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.

30. In connection with the acts, conduct, and other wrongs alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

31. Lead Plaintiff Arkansas Public Employees' Retirement System ("APERS") is an institutional investor that administers multiple retirement plans for public employees in the state of Arkansas. APERS purchased Sportradar Shares, as set forth in the certification attached hereto as Exhibit A, and suffered damages as a result of the federal securities law violations alleged herein. APERS also purchased Shares of Sportradar on April 25, 2025, traceable to Sportradar's Secondary Public Offering.

32. Lead Plaintiff Arkansas Teacher Retirement System ("ATRS") is an institutional investor that manages a pension fund for public education employees in the state of Arkansas.

ATRS purchased Sportradar Shares, as set forth in the certification attached hereto as Exhibit B, and suffered damages as a result of the federal securities law violations alleged herein.

**B. Defendants**

33. Defendant Sportradar Group AG is incorporated in Switzerland and is headquartered at Feldlistrasse 2, CH-9000 St. Gallen, Switzerland. Founded in 2001, Sportradar has become the largest sports data and analytics provider in the world. The Company's Shares trade on the Nasdaq under the ticker symbol "SRAD." During the Class Period, Sportradar, subject to the SEC's regulations for foreign issuers, filed, in pertinent part: on November 7, 2024, a Form 6-K announcing its third quarter 2024 financial results; on March 19, 2025, a Form 6-K announcing its fourth quarter 2024 and fiscal year financial results; on March 20, 2025, a Form 20-F for the fiscal year ended December 31, 2024; on April 25, 2025, a Form 6-K announcing the closing of its April 23, 2025 Secondary Public Offering; on May 12, 2025, a Form 6-K announcing its first quarter 2025 financial results; on August 5, 2025, a Form 6-K announcing its second quarter 2025 financial results; on November 5, 2025, a Form 6-K announcing its third quarter 2025 financial results; on March 3, 2026, a Form 6-K announcing its fourth quarter 2025 financial results; on March 27, 2026, a Form 20-F for the fiscal year ended December 31, 2025; on April 28, 2026, a Form 6-K rebutting the Reports; also on April 28, 2026, a separate Form 6-K announcing its first quarter 2026 financial results; and, on August 3, 2026, a Form 6-K announcing its second quarter 2026 financial results.

34. Defendant Carsten Koerl (previously defined as "Koerl") is the Company's Founder and has served as its CEO at all relevant times. Prior to and throughout the Class Period, Koerl has been the exclusive holder of Sportradar class B ordinary shares, which convey ten times the voting power of class A ordinary shares (previously defined as "Shares"). Accordingly, Koerl maintained approximately 80% of the total voting power of the Company's outstanding share

capital throughout the Class Period and has, accordingly, retained significant influence over the Company.

35. Defendant Craig Felenstein (previously defined as "Felenstein") has served as the Company's CFO at all relevant times. Felenstein joined Sportradar in May 2024.

36. Defendants Koerl and Felenstein are collectively referred to herein as the "Individual Defendants."

37. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Sportradar's reports to the SEC, press releases, website, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the Company's reports (and all exhibits or attachments thereto) alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

38. Sportradar and the Individual Defendants are collectively referred to herein as the "Defendants."

## IV. FORMER EMPLOYEES AND PUBLISHED INTERVIEWS

39. Multiple former Sportradar employees ("FEs")[2] have disclosed directly to Lead Plaintiff's representatives relevant information related to the Company's general operations and

[2] All FEs are referred to using masculine pronouns to protect their anonymity.

purported integrity efforts. The FEs and a summary of their responsibilities and roles with respect to the facts, circumstances, and events alleged herein are set forth in the remainder of this Section.

40. FE-1 was an account manager at Sportradar from the summer of 2024 through the summer of 2025. In this role, he supported Sportradar's consumer-facing gambling operator clients, with responsibility for helping the clients achieve their goals while managing risk to Sportradar stemming from the Company's profit-sharing fee structure. FE-1 had several years of experience at two other companies in the gambling industry prior to joining Sportradar.

41. FE-2 was employed by Sportradar from the summer of 2023 until he left the Company in the spring of 2026. At first, FE-2 was a senior leader in the Integrity Department's engineering unit. Later, he was a senior staff engineer in the Managed Trading Services ("MTS") division of Sportradar, reporting to an Associate Vice President in the engineering department, who reported up to Chief Technology Officer Behshad Behzadi.

42. FE-3 was a manager in a specialized field within the Integrity Department at Sportradar from the summer of 2024, until he was terminated late in the fall of 2024.[3] He possessed more than 10 years of expertise in his specialized field and had worked at major companies prior to joining Sportradar. FE-3 believed that a reason for his termination was his failure to develop plans that would allow Sportradar to monetize illegal activity.

43. In addition to FEs interviewed directly by Lead Plaintiff's representatives, several former employees were interviewed by a public company research organization and transcripts of those interviews were published on AlphaSense, a subscriber-based market intelligence platform. As part of the information it provides, AlphaSense publishes the transcripts of "expert" interviews, detailing information about the interviewee's title and role.

---

[3] FE-3's last day at Sportradar was within the Class Period.

44. A transcript was published on AlphaSense on September 17, 2026, memorializing an interview with a Vice President of business development at Sportradar from March of 2022 until April of 2024 ("INT-1"). At one point during his tenure, INT-1 was asked to lead the Company's business development efforts in the Asian market.

45. A transcript was published on AlphaSense on September 29, 2026, memorializing an interview with a Senior Vice President at Sportradar ("INT-2"). INT-2 was involved in the Company from 2014 through his departure in September of 2024. He was responsible for overseeing operational functions, driving growth, and managing the integration of advanced betting technologies.

## V. SUBSTANTIVE ALLEGATIONS

### A. Background

#### 1. The Global Gambling Industry

46. Individual bettors ("Gambler(s)")—the end-users who place wagers on sporting events—interact with gambling platform operators ("Operators" or "Gambling Operators"), i.e., casino-like entities such as Bet365, DraftKings, FanDuel and many others, which are business-to-consumer, or "B2C" businesses. The Gambling Operator is the entity that registers the Gambler, takes the Gambler's bets, and generally bears the risk: if the Gambler wins, the Operator pays the Gambler; if the Gambler loses, the Operator retains the wager and generates revenue.

47. The global gambling industry has been reshaped in recent years by the adoption of smartphones and advancements in internet technology. As technology has increased the ability of gambling websites to reach Gamblers in their own homes or on the go, the industry has undergone tremendous growth. In 2015, land-based gaming (that is, brick-and-mortar casinos, as opposed to online gaming) accounted for the vast majority—approximately 80%—of the global gambling market, which totaled approximately $438 billion in total annual bets. By 2024, the global

gambling market had grown substantially, to a value of approximately $712 billion, with online gambling accounting for approximately 41% ($293 billion) of that total. In short, while the global market for traditional, land-based gambling has experienced modest growth, online gambling has surged across the world over the past decade.

48. At the same time, the market for offshore gambling has grown. Offshore gambling, in which a Gambler places wagers with a Gambling Operator outside of the Gambler's country, often occurs without legal permission being granted by the Gambler's country. In 2015, the offshore market accounted for approximately $65 billion in total bets. By 2024, offshore gambling accounted for approximately $131 billion. Collectively, Asia and the Middle East are the largest gambling regions in the world, with total gambling revenues (including offshore) accounting for approximately $270 billion in 2024.

49. The laws and regulations surrounding gambling -and particularly online gambling- vary significantly across jurisdictions. Global diversity in cultural and religious views, legal systems, and political philosophies has produced a widely divergent legal and regulatory landscape.[4]

50. For instance, in Asia and the Middle East—the world's largest gambling market by region—there exist many countries that are known as "black markets" because they expressly prohibit gambling. In some countries, such as China, gambling is illegal under national law, with only very limited exceptions.[5] In many majority Muslim countries, such as Iran, gambling is entirely forbidden.

---

[4] Until recently, popular U.S. Operators, such as DraftKings, were not present in all 50 states due to varying state laws and regulations.

[5] In China, there exists a limited number of exceptions to the national prohibition, such as for certain forms of gambling (for instance, state-run lotteries), and for certain administrative region, such as Macau. Due to the enormous demand for gambling, however, offshore gaming is prevalent. *See infra* Section V.C.3.a.

51. In virtually every jurisdiction in which sports gambling is legal, it is nonetheless regulated and Operators must be registered or licensed to operate within that jurisdiction.

52. Against this backdrop, the Council of Europe's Convention on Manipulation of Sports Competitions ("Macolin Convention"), which was signed or ratified by more than fifty nations across the world, defines "illegal sports betting" as "any sports betting activity whose type or operator is not allowed under the applicable law of the jurisdiction where the consumer is located."

53. In 2022, announcing a partnership with the Finnish Center for Integrity in Sports, the Managing Director of Sportradar Integrity Services, Andreas Krannich, expressly described the collaboration as: "in line with the framework of the Council of Europe's Macolin Convention" and added that this was a source of particular pride for Sportradar.

**2. The Sports Gambling Business**

54. Gamblers are registered by, and place their bets with, Gambling Operators. However, Operators typically do not collect the underlying data and set the underlying odds that govern the bets. A Gambler's bet may be based upon any one of thousands of sporting events occurring across the world. With thousands of Operators across the globe, it would be infeasible for each Operator to independently collect data from all these events.

55. Accordingly, Operators rely on other firms, like Sportradar, to supply data and odds. *See infra* Section V.A.3. Moreover, the software that delivers the ultimate gambling experience to the Gambler carries additional content and services beyond data and odds. For instance, data providers may also provide audio-visual feeds of the underlying event (to allow Gamblers to monitor the event within the gambling software), advertising services, and payment-processing services.

### 3. Sportradar Provides the Critical Data About Sporting Events That Allows Sports Betting to Flourish

56. Sportradar provides data platforms and services, such as data collection and processing and risk management, to the global sports betting industry. The Company is a "business-to-business," or "B2B," company, meaning that its clients and customers are other businesses, rather than the Gamblers who actually place wagers.

57. Sportradar partners with sports leagues worldwide (such as the NBA, MLB, the NHL, the PGA Tour, and FIFA) to facilitate live data collection and analysis in order to supply pre-match and live data and odds to Gambling Operators. Additionally, Sportradar engages in technology-enabled fraud monitoring for its sports-league partners and distributes sport audiovisual content to sports media and Operators globally.

58. Sportradar's business has high fixed and ever-increasing costs associated with its acquisition of the rights to data from various sports leagues that it resells and/or uses to create its various betting projects. For example, in 2023 Sportradar recorded approximately €214.2 million in sports rights expenses. In 2024, that figure rose to approximately €352.4 million. In 2025, it reached €404.3 million, against total revenue of approximately €1.29 billion. Sports rights expenses alone represented more than 31% of annual revenue. In addition, in 2025 Sportradar reported approximately a €80.6 million accrued interest expense on license fee payables. Taken together, sports rights expenses—and this financial component directly linked to those rights—exceeds €484 million, equal to approximately 37.6% of 2025 revenue. This is before adding other largely fixed costs (personnel, offices, marketing, etc.) associated with running its business.

59. The Company's services and solutions are separated into two main product groups: Betting Technology & Solutions ("BTS") and Sports Content, Technology & Services ("SCTS").

60. The BTS business takes real-time sports data collected at the match venue and delivers that data directly to clients and synthesizes that data into pre-match or live, in-play betting odds. Betting platforms using Sportradar's services and solutions include Bet365, Caesars, DraftKings, Entain, FanDuel, and William Hill. BTS also offers 24/7 live audiovisual streaming coverage of certain sports content (primarily non-televised material) and, further, offers "iGaming" content that "blends live sports, casino games, slots and hybrid content."

61. The Company's BTS business is not limited to Sportradar simply sending data and content one-way to clients. Its "Managed Betting Services" business, which is part of BTS, incorporates the Company's Managed Trading Services ("MTS"). In its MTS business, Sportradar effectively acts as the bookmaker, taking an active role in bets placed by Gamblers at a Gambling Operator. Sportradar describes its MTS business as a service in which Sportradar "prices your book, screens and settles bets, and manages liability in real time" and notes that "we see every ticket". Thus, the Gambling Operator that uses MTS sends Sportradar the proposed bet, referred to as the bet slip. Sportradar then "has the ability to accept or decline this bet slip." If the bet is accepted, Sportradar may receive a share of the "revenue or loss made by the client on the bet." In fact, Most MTS contracts include a loss participation clause.

62. In its 2025 Investor Presentation, dated April 1, 2025, Sportradar touted the fact that in 2024, there were more than 65 million Gamblers managed by MTS and €87 billion in bets processed by MTS. The Company further noted that, in 2024, there were up to forty-six million MTS tickets processed per day from 250 sportsbooks. The MTS business has grown explosively, experiencing a 63% compound annual growth rate from 2016 to 2024. As a result of the growth of its MTS business, Sportradar regularly describes itself as "a top bookmaker globally."

63. One of Sportradar's key brands is Betradar, which describes itself as "the world's leading supplier of sports betting solutions." Betradar's website states: "For over 25 years we've delivered the data, services, and platform that operators rely on – serving 800+ betting clients with everything they need to succeed, from complete turnkey solutions to specialized services. Our portfolio combines cutting-edge AI technology with deep industry expertise across superior trading, engaging content, and powerful platform capabilities. Whether you're launching a new operation or optimizing an existing one, our modular approach ensures you get exactly what your business needs."

64. Among Sportradar's many subsidiaries is the NSoft Group, comprising NSoft d.o.o., Mostar, Bosnia and Herzegovina ("NSoft") and its wholly-owned subsidiaries STARK Solutions d.o.o., a company incorporated in Bosnia and Herzegovina, and N-Soft Solutions d.o.o. The NSoft Group is a leading provider of betting software and offers a retail portfolio of games to bookmakers operating in the Eastern European market. Until April 28, 2022, Sportradar held 40% of the shares of NSoft. On April 29, 2022, the Company paid €12.0 million to acquire an additional 30%, increasing its ownership to 70%. NSoft was a consolidated entity of Sportradar as of December 31, 2022. As of the end of 2025, Sportradar owned 100% of Nsoft.

65. NSoft states that its "Sportsbook solution utilizes Betradar's MTS, a turnkey trading, risk and live odds management solution."

66. Sportradar's SCTS business delivers personalized advertising to fans; graphics, statistics, and related content to broadcasters, publishers, and others; and video content and performance analysis to coaches, scouts, and officials. Furthermore, SCTS includes the Company's "Integrity Services" business, which leverages Sportradar's AI-powered Universal Fraud Detection System to monitor and detect suspicious betting activity across global markets.

Sportradar has touted its Integrity Services as "a leading provider of monitoring, intelligence, education, consultancy, rights protection, and regulatory solutions for sports organizations, government authorities, and law enforcement agencies." Indeed, throughout the Class Period, the Company touted in its SEC filings the fact that it "safeguards sports through its Integrity Services division and advocacy for ***an integrity-driven environment for all involved***."

**B. Sportradar Touts Its Know-Your-Customer Procedures and Presents Itself to Investors as a Leader in Sports Gambling Integrity**

67. In recognition of the cross-jurisdictional relationships that come into play in sports betting, and the widely varying legal frameworks applicable to gaming transactions, Sportradar presented itself throughout the Class Period as a leader in integrity, distinguishing itself by its robust KYC process. The Company published on its website its Code of Business Ethics, pursuant to which Sportradar claims that it "place[d] integrity, transparency and professionalism at the heart of all [it] do[es]." Indeed, Sportradar emphasized that it was "***crucial***" for it to "conduct [its] business in a manner that upholds [its] high standards of ethics and integrity." It further states, at Section III.6 of its Code of Business Ethics, that "Employees who receive any indication that a relationship or transaction with a client or counterparty may involve [] any of the countries or regions identified in Sportradar's Global Trade Controls Policy (currently Cuba, Venezuela, Iran[)] . . . should put the pending relationship or transaction on hold . . . "

68. Further, in its "Global Anti-Money Laundering and Counter-Terrorism Policy," which is set forth on its website, Sportradar claimed that it:

> has also ***established procedures*** for conducting risk-based due diligence on all Third Parties, including Vendors and Representatives, ***to ensure that such Third Parties that Sportradar enters a business relationship with are appropriate and legitimate for their contemplated role, that they do not have any improper or suspicious connections or ownership interests, and are not likely to engage in any improper, unethical, corrupt, or illegal activities.***

69. Further, going back to at least 2019, Sportradar has consistently asserted that it terminates Gambling Operators operating illegally. In a March 19, 2019 article titled "As Offshore Books Operate Unchecked, Demand For Sports Betting Data Knows No Boundaries. That's An Issue," the online news source *Sportshandle* asked the Company if "Sportradar or any of its subsidiaries have provided data feeds in the past to offshore and/or unregulated markets servicing U.S. customers." The Company responded:

> If a bookmaker engages in illegal behavior, we take prompt action to fact-find, investigate, and remedy the situation—this includes termination of a business relationship.
>
> We constantly monitor and independently test our clients to ensure they meet these clear requirements. We have terminated relationships with several bookmakers who have failed to meet our compliance requirements in recent years.

70. Sportradar's 2024 Annual Report, filed with the SEC on Form 20-F on March 27, 2025 ("2024 Annual Report"), stated that, with respect to its clients' compliance with applicable laws and regulations, "we are monitoring these areas closely to design compliant solutions for our clients and continue to adapt our business practices and strategies to help us comply with current and changing laws and regulations, legal standards and industry practices." The 2024 Annual Report further stated that the Company performs "***due diligence checks that we perform to review our clients' licensing status***."

71. On November 5, 2025, the Company published its third quarter 2025 financial results. During the accompanying earnings call held that same day, Defendants fielded numerous questions from investors about Sportradar's legal and regulatory compliance practices. For example, a Citizens Bank analyst stated that he "want[ed] to address some of the noise around the business with your exposure to certain markets, whether they're gray or beyond that," and Defendant Koerl specifically assured investors that ***the Company had a "4-level process" to confirm that the Company "only work[s] with licensed operators,"*** including ***by "hav[ing]***

***contracts which are enabling those operators only to work in the territory where they are licensed in.”***

72. Moreover, Koerl asserted that ***“we have a global compliance team, which is making an intensive KYC with every operator, and we are insisting on this[,] that we control it.”*** Koerl further explained that the Company’s KYC process worked hand-in-hand with its “internal audit” process to identify areas where Sportradar’s “content is popping up in markets which are not licensed, which are not covered by the contracts,” so that Sportradar can “go[] on those operators” and shut down those operations. Koerl emphasized that ***“we are monitoring this very closely.”***

73. On March 27, 2026, the Company filed its 2025 Annual Report and stated that it performs “due diligence checks” “to review our clients’ licensing status.”

74. On April 22, 2026, Sportradar published a “Statement Regarding Short Seller Reports” in response to the Reports (the “Response”). In the Response, Sportradar “unequivocally challenged” the assertions in the Reports and insisted that it “***follows strict global compliance, and due diligence standards***. . . .”

75. On April 28, 2026, in an explanatory note issued through a Form 6-K, the Company indicated that it “***maintains a robust compliance framework***” and “***employs proactive measures to continuously assess risk, irrespective of licensing jurisdiction***, to support the business. The team is further overseen by dedicated legal, compliance and risk personnel.”

76. That same day, during a conference call held in connection with the Company’s first quarter 2026 earnings release, Defendant Koerl represented that: “To be clear, ***the company maintains a robust compliance framework*** with oversight from the Board of Directors that is

designed to assist the company and its offices to navigat[e] [in]to complex business and regulatory landscape."

77. In that call, an analyst asked about gray market versus black market revenues and Koerl emphatically stated that "***For the gra[y] market, we have a solid compliance structure in place and we only work with licensed operators***." He explained "[t]he [compliance] team is constructed out of legal experts, compliance and risk personnel together with extra advis[o]rs. ***We take this very, very serious and we are running a very rigid KYC process***. . . ."

78. Sportradar specifically acknowledges that it collects a vast array of information about users of websites operated by its various partners. In its Privacy Notice, Sportradar specifically states that:

> You are a Third-Party User when you visit a page of a website or application of one of our Sportradar ad:s partners where Sportradar's or our technology partners' tags, pixels, other similar technology, or content products (widgets) ("**Sportradar Technology**") are installed ("**Partner Sites**"). The Partner Sites belong to online publishers and partners who want to recommend relevant content to their readers or advertisers who want readers to view their content. As such, depending on the ad:s mechanisms in place, Sportradar will rely on consent of the user or legitimate interest in order to conduct its business activities in the context of ad:s.

> When as a Third-Party User you first visit a Partner Site (e.g., LAOLA1.at), Sportradar drops a cookie on your device in order to generate an UUID. We catalog and analyze the content you consume across Partner Sites. Our recommendations are based on: (i) your browsing history; (ii) similar browsing patterns of other Third-Party Users; (iii) recommendations that are generally popular with Sportradar's audience at this time; and (iv) targeting requirements that may be provided or requested by advertisers. As an example, Sportradar may know that UUID 123 (which

Apart from UUID, we also collect the following information from you:

- the internet protocol (IP) address of the device you are using
- cookie ID and other online user identifier(s)
- your device type (e.g., iPhone), your browser type (e.g., Chrome), your operating system (e.g., iOS), your screen resolution
- the language your browser is set to and/or used for our interactive features and respective contents on our Partner Sites
- the date and time of access of our Partner Sites
- your mouse movements, clicks, and location
- referring URLs and other information normally transmitted in HTTP requests (e.g., this information tells us where you arrived on our Partner Sites from)
- location data (country and region)
- information on how you use our Partner Sites (e.g., the web pages visited by you on our Partner Sites) and how you interact with our interactive features and respective contents on our Partner Sites.

79. The preceding disclosure makes clear that Sportradar monitors information about the persons who are visiting the websites of the entities utilizing Sportradar products and services.

### C. Contrary to Its Representations, Sportradar's Customer Base Includes a Significant Number of Illegal and/or Unlicensed Operators

80. On April 22, 2026, two market research organizations—Muddy Waters and Callisto—published Reports, each of which independently revealed, among other things, Sportradar's ties to a sprawling network of black-market, unlicensed, and sanctioned Operators. The two organizations independently learned of potential wrongdoing at Sportradar and conducted separate investigations. The information uncovered by Muddy Waters and Callisto directly contradicted Defendants' Class Period assurances that the Company "place[d] integrity, transparency and professionalism at the heart of" its business practices and adhered to strict and "intensive" compliance processes to prevent illegal operators from using Sportradar's services and solutions.

81. As described in detail below, multiple sources confirmed that Sportradar regularly conducted business with Operators working in jurisdictions where online sports gambling is prohibited, including Thailand, China, Vietnam, Indonesia, Turkey, and Iran. Sportradar also

regularly conducted business with Operators which did not hold adequate licenses to operate sportsbooks in the jurisdictions in which they operated, such as the 100+ Operators identified by Callisto as operating under Anjouan licenses. Furthermore, Sportradar continued to have business relationships with organizations and entities affiliated with countries and individuals subject to sanctions.

### 1. Sportradar Boasted of Its Ability to Connect Potential Customers with Entities That Help Them Operate in Markets Where Gambling Is Illegal

82. The information disclosed in the Reports demonstrates that Sportradar "has actively aided and abetted illegal gambling across the world's black [] markets—not as an accident or an oversight, but as a business strategy."

83. Muddy Waters, as part of its investigation, had two of its investigators go undercover at ICE 2026, the world's premier gambling industry trade show attended by more than 100,000 people, which was held in Barcelona, Spain from January 19 to January 21, 2026.

84. At ICE 2026, Muddy Waters' investigators told Sportradar sales employees that they wanted to establish a sportsbook targeting Vietnam, Thailand, and China, jurisdictions where gambling on sports is widely known to be illegal. Gambling is prohibited in all three countries, subject to limited exceptions, such as for tourists or state-run lotteries.

85. Instead of ending the conversations and telling the investigators that Sportradar did not facilitate illegal gambling, Sportradar's sales personnel introduced Muddy Waters' investigators to an Asia-focused Sportradar sales executive who walked the investigators through key product offerings for each of those illegal markets and offered to solicit the assistance of his existing clients to aid the investigators in quickly setting up their operations. According to Muddy Waters, during those discussions, the Sportradar sales executive stated that Sportradar "serves

everyone" and stated that his major B2B clients could act as an effective backdoor for unlicensed Operators in illegal markets.

86. In messages to Muddy Water's undercover investigators, Sportradar's sales executive confirmed that Sportradar's products were already configured for English and Mandarin, and that Thai and Vietnamese would be available by Q2 2026. The same executive stated that there were ten to twelve B2B brands in Asia, and that Sportradar already worked with nine of them, including: SABA, DB Gaming, Panda Sports, Kaiyun, BK8, SBO 188, Xiaojing, and PlayMatrix [IM Sports]. According to the sales executive, the only reason the other two B2B companies did not use Sportradar was because Sportradar was too expensive and not because of any Sportradar concerns about the compliance or licensing status of those B2B companies.

87. Muddy Waters' investigators observed current Sportradar sales personnel demonstrating a Chinese-language sportsbook and discussing planned Thai and Vietnamese functionality, while Callisto separately identified Sportradar's existing products already configured in Vietnamese and Thai. Chinese, Thai, and Vietnamese are languages whose speakers primarily live in countries where gambling is illegal.

88. When the undercover investigators discussed Thailand—which has stringent anti-gambling laws, carrying harsh penalties, such as imprisonment for up to ten years[6]—the Sportradar sales executive offered to introduce them to the Southeast Asian operator Titan Nets ("Titan"). Titan personnel told the investigators that no gambling license was necessary to use Titan's platform in Asia:

[6] *See* https://www.igamingtoday.com/gambling-regulation-in-thailand/




89. The Sportradar sales executive even provided the Muddy Waters investigators with a quote from Titan to get started in Thailand. Titan quoted the costs in USDT cryptocurrency:



NETS

Package / 配套

| Pricing /价格 | USDT/美金 |
|---|---|
| Monthly IT maintainance fee/ 技术维护月费 | 10,000.00 |
| Monthly Affiliate Backend System maintainance fee/ 代理后台维护月费 | 1,000.00 |
| Security deposit / 信用额度保证金 | 5,000.00 |
| Set up fee /创建费用 | 5,000.00 |
| Provider credit limit / 供应商信用额度比例 | (1:10) |
| Charges per every additional currency/ 每额外添加一个货币 | 500.00 |

Package Information / 配套详情:

Package included Template FE, System maintenance, CDN protection, 24x7 tech support, SSL protection, FOC 2 domain pointing| 配套包括前端模板、系统维护、CDN保护、24x7技术群支持、SSL保护、免费 2 个域名指向。
An additional fee of 500 USDT will be applied for each extra currency./ 每增加一种货币，将收取额外的500 USDT 费用。

A minimum contractual period of 12 months is mandated within the terms of this commercial contract. Failure to comply will result in the forfeiture of the deposit. 根据本商业合同条款规定,最低合约期限为12个月。未能遵守将导致保证金被没收。
All prices will be charged in USDT. 所有价格将以 USDT计费。

All Prices in USDT

Asia rate and Europe rate may be different. 亚洲和欧洲的收费皆有不同。

Summary/ 总结
{Merchant} wishes to engage Titannets for technical maintenance and support services for the Game Software and other online games with website operated by Titannets, and Titannets agrees to provide such services to {Merchant}.

『商家』希望与 Titannets 合作，为游戏软件和其他由Titannets 运营的在线游戏提供技术维护和支持服务，Titannets 同意向商家提供此类服务。

| | | | | |
|---|---|---|---|---|
| Sport/体育 | M8 Sport | 15.00% | 14.00% | THB |
| Sport/体育 | RCB988 | 15.00% | 14.00% | THB |
| Sport/体育 | S128 | 15.00% | 14.00% | THB |
| Sport/体育 | SV388 | 15.00% | 14.00% | THB |
| Sport/体育 | WS Sports | 15.00% | 14.00% | THB |
| Sport/体育 | LB Sports (Betradar) | 13.00% | 12.00% | THB |

Sport Radar's Betradar

90. Sportradar's introduction of the undercover investigators to Titan was particularly problematic because, in addition to online gambling being illegal in Thailand, Titan is licensed

only in Malta, which has no power to license gambling operations in Thailand. Moreover, Titan's Maltese license was under suspension:


TITAN

GAMING | HUB | NETS | GATEWAY

The website is operated by Askott Entertainment (Malta) Limited, a company registered in Malta with registration number C91866. It is licensed and regulated by the Malta Gaming Authority under a Gaming Service License MGA/B2B/743/2019.

Additionally, P2P Entertainment Limited, also registered in Malta with registration number C97400, operates under a license granted by the Malta Gaming Authority, specifically MGA/B2C/879/2021.

Both entities uphold the highest standards of service as mandated by regulatory authorities, ensuring a safe and responsibile gaming environment


MGA

Dynamic Seal Of Authorisation

« Go Back

Licensee Information: Askott Entertainment (Malta) Limited
Address: 64 Excalibur, B.Bontadini Street, Birkirkara, BKR 1737, Malta
Email Address: licensing@igagroup.com
Contact No.: 27050699
Status Of Licence: Voluntary Suspended

Licenses

| Licence Number | Licence Type | Class Type | Status |
|---|---|---|---|
| MGA/B2B/743/2019 | B2B - Critical Supply Licence | Service (B2B) - A licence to provide a supply in a business-to-business capacity | Voluntary Suspended |

91. The Sportradar sales executive also offered to introduce the undercover investigators to the infamous Yabo Group, which was "notorious as not just China's largest illegal operator, but also for using Cambodian customer service centers engaged in human trafficking, modern slavery, kidnapping and torture of its workforce." The Sportradar sales executive warned the investigators, however, that gambling in China was "very illegal" and that he had clients arrested at the Hong Kong airport, and explained that certain clients, including members of Yabo, did not attend the conference (ICE 2026) because they "would be hunted down" by Chinese officials.

92. Despite his acknowledgement that gambling was illegal in China, the sales executive nonetheless remained willing to introduce Muddy Waters' investigators to Yabo because Yabo could provide assistance to the investigators' sportsbook startup in China. According to Muddy Waters, the sales executive told the investigators that they could be operational through Yabo in "two or three weeks." The Sportradar sales exec confirmed in an email his willingness to connect the Muddy Waters investigators with Yabo:




93. Defendant Koerl has since acknowledged the truth of Muddy Waters' investigators' interactions with the Sportradar executives. On April 28, 2026, during Sportradar's first quarter 2026 earnings call, an analyst with Benchmark asked Defendants to respond to the report that Sportradar sales executives took steps to connect Muddy Waters's investigators to black-market operators. Defendant Koerl did not dispute the reporting of these interactions or the authenticity of the messages, and admitted that the Sportradar sales executive was taped "for more than two hours." Defendant Koerl simply attempted to mitigate by claiming that this was a "campaign on a relatively young sales employee."

### 2. Multiple Analyses of the Source Code Authentication Mechanisms Used by Illegal Gambling Operators Demonstrate That These Operators Were Actively Using Data and Games Provided by Sportradar

#### a. Callisto's Analysis of Sportradar's Links to Illegal Gambling Operations

94. The Callisto Report included an analysis showing that Gambling Operators were utilizing Sportradar data in jurisdictions where gambling is illegal or where the Gambling Operators did not possess valid licenses permitting them to operate in the jurisdiction. To identify the jurisdictions in which the Operator primarily operated or targeted customers, Callisto examined the geographic sources of the website traffic, as well as the primary languages and currencies offered by the Operator.

95. Callisto then worked to identify the entities operating the websites of the Operators it identified as operating in jurisdictions where gambling was illegal. According to Callisto, the "vast majority" of the Operators it identified, other than those principally targeting Asian customers, publicly identified the legal entities purporting to operate the websites. Those entities were commonly companies organized in jurisdictions such as Curaçao, Costa Rica, or Belize.

96. Callisto then worked to determine which Gambling Operators were operating illegally. Callisto included in this group Operators that accepted bets from individuals located in a country where gambling was illegal and Operators that accepted wagers from individuals located in a jurisdiction which required a local gambling license, without possessing a valid local license. This methodology identified Operators that did not comply with the Macolin Convention—which Sportradar publicly supports—which has defined illegal sports betting as "any sports betting activity whose type or operator is not allowed under the applicable law of the jurisdiction where the consumer is located."

97. Under this definition, an offshore license does not authorize an Operator to accept bets from individuals everywhere in the world. An Operator possessing a license from Curaçao or Malta, or any other country that purports to offer gambling licenses, is operating illegally if it accepts bets from an individual located in another jurisdiction that required a local gambling license.

98. Callisto then investigated whether the entities operating the identified platforms actually possessed the licenses they claimed to hold and whether those licenses authorized the gambling activity offered in the jurisdictions they targeted. This analysis included purported offshore licenses issued through jurisdictions such as Curaçao and Anjouan.

99. Callisto found two recurring problems with the Operators' claimed licenses. First, some Operators possessed offshore licenses that did not authorize them to accept bets from customers in the jurisdictions where they operated. Second, some Operators purported to rely on licenses whose validity was highly questionable, including licenses purportedly issued under the authority of the Anjouan Offshore Finance Authority ("AOFA"). These questionable licensing schemes are discussed in more detail in Section V.C.4.

100. Finally, Callisto undertook a detailed analysis of the source code and other aspects of many gambling websites to ascertain which of the various gaming sites it had determined were operating illegally had a relationship with Sportradar. Callisto identified Sportradar clients using four criteria:

i. Whether the source code of any pages on their website indicated that they were using Sportradar products;

ii. Whether the back-end of any pages on their website indicated that they were running Sportradar software;

iii. Whether their website offered games developed by Sportradar or its subsidiaries, such as Betradar Virtual Sports; or

iv. Whether their websites stated that they use Sportradar's services or share data with Sportradar.

101. Using these criteria, Callisto examined thousands of gambling websites and identified ***more than 270*** gambling platforms or websites that were linked to Sportradar and either lacked licenses in the regulated markets where they operated or else they targeted customers in jurisdictions where gambling was prohibited altogether. The more than 270 Operators identified as using Sportradar data and operating in jurisdictions where gambling is illegal or without appropriate licenses represented more than one-third of the approximately 800 betting-operator customers Sportradar claimed to serve.

102. Callisto supplemented this technical analysis with interviews of former Sportradar employees. According to Callisto, former Sportradar employees estimated that such illegal operators contributed a double-digit percentage of Sportradar's revenues. One former senior employee, who had a client-facing role, estimated that approximately 30% to 40% of Sportradar's revenue was attributable illegal operators.

103. Another former Sportradar employee who worked with Asian operators described Sportradar's willingness to work with illegal operators directly and confirmed that they "definitely work[ed]" with them. The same former employee explained that if the operator's business was illegal, Sportradar "might not use the same entity," but "[if] it is big enough business, then of course they have a way, the means to do it." This statement was partially corroborated by FE-3, who described a business culture in which the Company was willing to monetize anything, regardless of ethical or moral norms. In addition, a former employee that Callisto interviewed also identified operating under a Curaçao license as a method Sportradar clients used to serve illegal markets.

#### b. Muddy Waters Evaluated the Source Code of Illegal Gambling Sites to Determine Which Had Links to Sportradar

104. Like Callisto, Muddy Waters undertook a detailed technical investigation designed to distinguish, with a high degree of confidence, actual Sportradar customers from gambling websites that merely copied, scraped, or otherwise displayed Sportradar content without authorization. To do so, Muddy Waters retained a third-party cybersecurity expert to analyze Sportradar's system architecture, source code, and online data exchanges. Muddy Waters then confirmed its understanding of Sportradar's code through interviews with two former Sportradar information technology employees, including one very senior former employee "with firsthand knowledge of the system architecture." Significantly, Lead Plaintiff verified the soundness of

Muddy Waters' methodology with FE-2. While FE-2 worked on a different side of the business, he confirmed that each Operator would be issued a client ID and that Sportradar would be able to identify Operators using this key. Muddy Waters used three primary methods to determine whether a Gambling Operator was using Sportradar services and/or games.

105. First, Muddy Waters used a mechanism known as a "widget loader ClientID." Muddy Waters found forty operators' sites with a Sportradar live game tracker via a widgetloader javascript that contained a unique thirty-two-character Client ID that Sportradar issues to its clients. This direct data exchange occurs between Sportradar and sports betting websites and enabled Muddy Waters to assess which Operators are current Sportradar clients.

106. Second, Muddy Waters located gambling sites that used Sportradar's "virtual sports" product. Virtual sports is one of Sportradar's products that allows sports fans to watch and bet on a digitally recreated sequence from historic matches whose outcome is based on a randomly generated number. Virtual sports is like a custom slot machine, featuring star players engaged in competitive matches in various sports. Sportradar assigns each virtual sports customer a unique numerical Client ID and virtual client, which appear in the customers' code and are used to authenticate customers. Muddy Waters tested sequential numerical client IDs against Sportradar servers, which returned identifying information and client aliases for active virtual sports customers, but no results for inactive or nonexistent client IDs. By way of illustration, if client ID 1001 returned information identifying a particular operator, Muddy Waters' investigators would then test Client ID 1002 to determine whether it corresponded to an active customer. By repeating this process with sequential numerical client IDs, Muddy Waters identified active virtual sports customers through this interaction with the Sportradar servers, distinguishing active customers

from Operators that may have obtained Sportradar's services through unauthorized scraping or piracy.

107. Third, Muddy Waters looked for Sportradar code on an Operator's website, where that Operator had been identified by former Sportradar employees but was not identifiable through either of the first two mechanisms. An example of Sportradar code would be a websocket plug-in. Websocket plug-ins facilitate real-time communications between websites and servers but do not necessarily reveal the unique client IDs used to identify Sportradar customers. In this example, Muddy Waters concluded that a websocket plug-in that referenced Sportradar data was evidence that an Operator was a Sportradar client.

108. Muddy Waters further determined that possession of a Sportradar Client ID alone was not sufficient to access licensed Sportradar services. An unlicensed website could copy another operator's source code and could obtain the Client ID appearing in a licensed customer's website code. Sportradar's authentication process, however, contained an additional safeguard in that Sportradar's system could confirm whether the website domain using that Client ID had been authorized by Sportradar. Muddy Waters concluded this process distinguished a website that may have scraped a Sportradar Client ID from a platform with an active contract or customer relationship with Sportradar, from an actual Sportradar client.

109. Specifically, Muddy Waters found that when a website attempted to load Sportradar products, the website sent its Client ID and identifying information concerning the originating domain to Sportradar's platform. A licensing endpoint then determined whether the Client ID was valid for that domain. If the Client ID and domain were authorized, Sportradar's data indicated that the client possessed an active license. If the Client ID was invalid or submitted from an unauthorized domain, the authentication failed.

110. Muddy Waters tested this authentication process using Liga Stavok, a Russian sportsbook with longstanding ties to Defendant Koerl. When the investigators submitted a request to Sportradar's licensing endpoint using Liga Stavok's Client ID from the authorized Liga Stavok domain, ligastavok.ru, Sportradar returned data indicating that an active client license was available. Muddy Waters compared that successful authentication with a failed test involving another website using a Client ID that was either outdated, improperly copied, or otherwise unauthorized. Muddy Waters found that changing the authorized domain or otherwise failing the Client ID and domain checks caused the request to fail. Muddy Waters therefore concluded that its methodology could distinguish an Operator that appeared to have an active relationship with Sportradar from one that had merely scraped a Sportradar Client ID.

111. Based on its analysis, Muddy Waters identified thirty-four Operators that appeared to be operating illegally. Muddy Waters separately identified two Russian Operators with reported connections to sanctioned persons.

112. Muddy Waters estimated that sixteen of these identified customers for which it had revenue information generated approximately €120 million to €150 million in annual revenue for Sportradar, equal to approximately ***11% to 14% of Sportradar's 2024 revenue***. Importantly, these estimates substantially corroborated the information that Callisto independently obtained through its own interviews with former Sportradar employees.

**c. Gambling Analyst Trace2Trace, Acting on Behalf of Lead Plaintiff, Independently Analyzed the Use of Sportradar Services by Illegal Gambling Websites**

113. Lead Plaintiff undertook an independent investigation to determine whether Sportradar continued to actively provide data and other IT services to illegal, sanctioned, and unlicensed Operators.

114. In connection with its investigation, Lead Plaintiff retained an expert on the international gambling industry who, on behalf of Lead Plaintiff, retained JK IT Group, Ltd., a United Kingdom registered company that operates Trace2Trace, a service that uses artificial intelligence and other technology to map the networks behind illegal online gambling websites. As of September 2026, Trace2Trace had information on more than 620,000 on-line gambling domains.

115. To ascertain whether a black-market Operator was utilizing Sportradar's services, Trace2Trace conducted the following general process:

a. The expert, using a Virtual Private Network ("VPN") or similar technology, routed its Internet traffic through a target country (e.g., generally one in which online gambling is prohibited by law);

b. The expert accessed a website belonging to a target Operator (e.g., Dafabet);

c. Where historical addresses no longer led to usable betting websites, the brands were followed through their own links and navigation pages to current addresses;

d. The expert confirmed that the target Operator's website recognized the country through which the VPN was routed, i.e., by confirming that the website's source code was displaying the appropriate country code and currency; and

e. Finally, the expert examined the website's source code for evidence of Sportradar activity.

116. Evidence of Sportradar activity was identified through the following indicators:

a. The presence of Sportradar-labelled client identifiers or authentication requests (e.g., a Sportradar-issued Client ID);

b. The presence of Sportradar or Betradar-labelled data being actively observed in the website's source code during testing; and

c. The presence of references to Sportradar code in the website's source code.

117. This process was conducted on twenty-four target sites, mentioned in the Reports, in late September and early October of 2026. All twenty-four online gambling sites are identified in Section V.C.3, *infra*.

118. Trace2Trace's analysis confirmed that Sportradar data and/or IT services and/or Virtual games created by Sportradar were being provided to most of the twenty-four entities, including: Leon.ru, Tempobet, Betboom, Safirbet, Imajbet, Interbahis, Zeus138, Win313, Indrabet, Meritking, 1win, Fonbet, Bet City, Bet-M, Betebet, Berrybet, and Betfido.

119. In the case of 1xBet, estimated to have generated tens of millions of dollars of revenue for Sportradar, Lead Plaintiff's September/October 2026 investigation was unable to reproduce the results obtained by Muddy Waters and Callisto. It appears that Sportradar is no longer providing services to 1xBet, which is consistent with reports from INT-1 that Sportradar conducted a "house cleaning" following the publication of the Reports. *Infra* Section V.F.

120. Finally, with respect to five websites (Luxiplay, 1888Bet, Crown Sports, Kaiyun, Leyu, IM Sports), Trace2Trace either could not locate the sites or could not gain access, and thus there was not able to confirm interactions between Sportradar and these sites.

### 3. Gambling Operators Targeting Jurisdictions Where Gambling Is Illegal Utilized Sportradar's Data and Games

121. The Callisto and Muddy Waters Reports both identified substantial Sportradar business relationships in numerous jurisdictions where online gambling was prohibited, including China, Vietnam, Thailand, Indonesia, Iran, and Turkey. Callisto identified specific Sportradar products and services being used on gambling platforms targeting the above noted jurisdictions, while Muddy Waters separately identified additional Sportradar customers in those jurisdictions by identifying Sportradar code on those customer's sportsbooks. In addition, Sportradar customer

Stake has been found to be taking bets in many of the above jurisdictions, and has been sanctioned in the United States for illegally taking bets in multiple states.

**a. China, Thailand, Vietnam and Indoensia Were Targeted by Online Betting Sites That Use Sportradar's Data, Games or Other Products**

(1) <u>Sportradar Subsidiary Nsoft Facilitated Illegal Gambling</u>

122. Callisto identified evidence that NSoft, a Sportradar subsidiary, *see supra* Section V.A.3, facilitated illegal gambling. While investigating Luxiplay, an illegal gambling website targeting Indonesia, where gambling is prohibited, Callisto found that the Luxiplay website redirected its investigators to a sportsbook platform branded "Nsoft88." "Nsoft88" draws its source code from 7platform.net:




123. Callisto found that 7platform.net was a company owned by Nsoft.




124. Callisto's investigators also found that the services from 7platform.net (owned by NSoft) were offered through three illegal Asia-focused gambling platforms: Indrabet, Win313, and Zeus138. Moreover, the investigators did not identify a single appropriately-licensed operator offering the Nsoft88 platform. A search of the domain 7platform.net found the domain was registered by "NSoft Doo."

125. Using an Indonesian IP address, Callisto investigators were able to place actual sports wagers through the Nsoft88 platform-despite the fact that gambling is flatly prohibited in Indonesia.

126. Lead Plaintiff's investigation through Trace2Trace confirmed that 7platform.net, Indrabet, Win313, and Zeus138 obtain information from Sportradar. With respect to 7platform.net, Trace2Trace found direct links to Betradar:

| 7platform and 3377 — lines from the scan logs | | 26 September 2026 |
|---|---|---|
| 1 | **7platform.net**<br>the betting platform of NSoft, owned by Sportradar | `20260926_195519_sports_1_RS_https_terminal-prematch.7platform.result.json:31:`<br>`"match": "client_id=betradar"`<br>Scan of terminal-prematch.7platform.net, 26 September 2026. |
| 2 | **3377.com**<br>the widget address in the website's settings | `widget_loader_url=https://animation.naxsjgoz30208.app/090ec44421c9ed9b73a92d044e6983a2/widgetloader`<br>Scan of 3377.com, 26 September 2026. The 32-character code is the customer number. |

**Extract from the recorded visit, reproduced exactly.** Yellow highlighting added. SHA-256 shown for the first file.
Recorded file: **raw_export_20260927-090034_.md · raw_export_20260927-081833_.md** · SHA-256 a6432b38d108113f06267c33f8508b2ebe857ac383e68800102dddb0ba1ad1c0
Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.

127. Trace2Trace found that Zeus138's own server sends the list of sportsbooks on offer and Nsoft is in it, number 143, "maintenance" "0", meaning that the operator lists the product as not under maintenance. Zeus138's settings name the script to load for the NSoft sportsbook, a file called "ignite-parent," and its code includes the route for opening NSoft Sportsbook within the website:

| Zeus138 — NSoft, a Sportradar company, in the sportsbook | | 8 October 2026, 15:45:03 UTC |
|---|---|---|
| 1 | **The website visited**<br>the sports page, from Indonesia | `https://secure-xl55rg.zs138x.com/sports` |
| 2 | **Zeus138's list of sportsbooks**<br>answer of Zeus138's own server | `{"sort":75,"displayed_name":"NSOFT","name":"nsoft","slug":"nsoft","id":143,"maintenance":0,"streaming":false,"promo":false}`<br>"maintenance":0 = the operator lists the product as not under maintenance. |
| 3 | **Zeus138's settings for the NSoft sportsbook**<br>the script to load | `nsoftScriptURLProd:"https://ignite-sdk.nl-ams-1.linodeobjects.com/production/ignite-parent.js"`<br>iGNITE is the name Sportradar gives, in its own documentation, to its toolkit for integrating its games. |
| 4 | **Zeus138's code opens the NSoft sportsbook** | `window.location="nsoft"===t?r.localePath("/play/sport/nsoft")` |

**Extract from the recorded visit, reproduced exactly.** Yellow highlighting added.
Recorded file: **secure-xl55rg.zs138x.com.har** · SHA-256 f9d8db9ba149e736db6e330a1ba1a2007a81afd2bb2889ce690f3f1a81453332
Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.

128. In addition, Trace2Trace made a screenshot of Zeus138, with the NSoft88 sportsbook and the Indonesian connection:




129. Trace2Trace examined WIN313 and found the same software as Zeus138, with the same NSoft settings and NSOFT in the list of sportsbooks”

**WIN313 — NSoft in the sportsbook** 8 October 2026, 15:39:30 UTC

| | | |
|---|---|---|
| 1 | **The website visited** the sports page, from Indonesia | `https://win313maju.com/sports` |
| 2 | **NSoft in the list of sportsbooks** | `alt="NSOFT" data-v-660b2815> <span data-v-660b2815>NSOFT</span>` |
| 3 | **The same NSoft settings as Zeus138** | `nsoftScriptURLProd:"https://ignite-sdk.nl-ams-1.linodeobjects.com/production/ignite-parent.js"` |

**Extract from the recorded visit, reproduced exactly.** Yellow highlighting added.
Recorded file: **win313maju.com.har** · SHA-256 44b7515492fca61ebed0b49f11c1eaf4f60c962da67c509a78665037827f55c4
Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.

130. Finally, Trace2Trace examined Indrabet and found that Indrabet’s sports page offers NSoft88 next to the other sportsbooks, and the website has its own address for the NSoft sportsbook:

**Indrabet — an NSoft sportsbook among its offers** 8 October 2026, 15:19:22 UTC

| | | |
|---|---|---|
| 1 | **The website visited** the sports page, from Indonesia | `https://indrabet31236.com/sportsbook` |
| 2 | **Indrabet's address for its NSoft sportsbook** | `GET https://indrabet31236.com/idnseamless/lobby/nsoft/nsoft_sportsbook → 302` Without login, the website sends the visitor back to its home page. |

**Extract from the recorded visit, reproduced exactly.** Yellow highlighting added.
Recorded file: **indrabet31236.com.har** · SHA-256 0548842009075645c6108c98ee92313af17868c0e22b04a5ef91e9f48a9a2da7
Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.

(2) <u>Sportradar Client 188Bet Offered Illegal Gambling Services in Indonesia and China</u>

131. Muddy Waters investigated 188Bet, a betting company owned by a company called CyberArena. 188Bet was identified by Sportradar in its 2025 Investor Presentation as a Sportradar customer:




132. 188Bet specifically announced the formation of a gambling site in Indonesia, where gambling is illegal:




133. 188Bet was rebranded as “Taptap” in July 2025. Muddy Waters determined that 188Bet also operates Crown Sports, as shown by the fact that Bet188/Taptap and Crown Sports shared the usage of a shared Sportradar widgetloader client ID:

Below: TapTap's 32-character widget loader ClientID: 2370877a0ce04fbfdc9678dae41d4210 matches that used by 188bet, XJ Games, and Crown Sports indicating they are all connected as one SRAD customer. Its "client alias" is also listed as "188bet".



134. In conversations with Muddy Waters undercover investigators at ICE 2026, a Sportradar sales executive stated that Crown Sports is a major gambling provider in China, where gambling is illegal:

> SRAD Sales Exec: You guys may have heard of Crown.
>
> MW investigators: Oh, Crown Gaming?
>
> SRAD Sales Exec: Yeah, Crown Sports.
>
> MW investigators: Oh, Crown Sports,
>
> SRAD Sales Exec: Okay. So, they are the largest credit market* in China. If you've ever looked at their website, it's from 1995 or something… Yeah, they turn over 2 billion per EPL match. English Premier League. Incredible.

(3) <u>IM Sports Used Sportradar Data to Facilitate Illegal Gambling in China</u>

135. Muddy Waters identified IM Sports, also known as Inplay Matrix, as another Sportradar customer distributing sportsbook products and services into China and Southeast Asia. IM Sports does business directly with Sportradar, then repackages Sportradar's data and services to be sold to Gambling Operators. Investigators identified a unique Sportradar Client ID associated with IM Sports.

136. Muddy Waters found that IM Sports offered products and services through brands associated with Yabo KM, including Kaiyun and Leyu, that targeted Gamblers in China and

Southeast Asia. Muddy Waters found that Sportradar data was used by Leyu in offering gambling in China:

Client ID#: b8b1e37591e951674647e26f875a954



137. Muddy Waters similarly found links to Yabo's Kaiyun site:

Below: IM Sports, accessed via Kaiyun (visible in the background), displays a SRAD widget loader client ID b8b1e37591e951674647e26f875a954 (video is a Glive feed, not SRAD).



(4) <u>Gambling Operator Dafabet Used Sportradar's Products to Facilitate Illegal Gambling in China and India</u>

138. Muddy Waters investigated Dafabet, a Gambling Operator licensed by the United Kingdom Gambling Commission but controlled by SCGO Limited, a company based in Malta. While legally licensed to operate in the UK under the domain dafabet.co.uk, Dafabet has been operating clone websites serving Gamblers in India, China, and Southeast Asia under a Curaçao license since 2004.

139. Muddy Waters investigators found that the Asian websites such as sports.indiadafa.com used the same Sportradar widget loader and the same Client ID as sports.dafabet.com. According to Muddy Waters, this confirms that they are one company and direct customers of Sportradar.

Below: Dafabet Client ID#: 25ba028d902b018fc2dc915fc5385962
Covering an NCAA basketball match between the Michigan State Spartans and the UCLA Bruins




Below: sports.indiadafa.com, Client ID#: 25ba028d902b018fc2dc915fc5385962
covering a match between Bangladesh A and Malaysia




140. The same Client ID was also found on erlingerer.com, Dafabet's clone website in China, which also shows it is a client of Sportradar.

Below: Dafa bet's Chinese facing site sports.erlingerer.com shares the same Client ID#: 25ba028d902b018fc2dc915fc5385962




141. Online gambling is illegal in China and highly regulated in India. In fact, despite its continued presence in India through the site sports.indiadafa.com, in 2023, Dafabet was banned by India's Ministry of Electronics and IT because Dafabet was caught disguising money transfers as online footwear sales.

Below: The India Central Bureau of Investigation (CBI) found Dafabet was behind illegal online gaming and money transfers


NATIONAL

**Losing game. CBI books Delhi-based online firm for unauthorised sports betting**

**Betrue Ecom Solutions Pvt Ltd was indulging in online sports betting and gambling with the connivance of Philippines-based Dafasports though on record it had declared that it was into virtual trading of footwear, says CBI**

*By BL New Delhi Bureau*

*Updated - October 03, 2022 at 09:56 PM. | New Delhi, October 3*

142. According to Muddy Waters' conversations with a former Sportradar account manager, Dafabet generated €10 million a year in revenue and was probably Sportradar's largest customer in Asia.

Below: Dialogue with a former SRAD sales executive reveals Dafabet was doing ~€10 million in revenue per year with SRAD

*MW: So, if we could, in terms of like how much revenue was coming from some of these guys like Dafa, I think you said they're the biggest. So, like, what would that have been?*

*Expert: Yeah, that was about 10 million a year. So about 10% of the total Asian income [as reported in the financials].* But then that's because that's a bit though, like I said, they're more European in their approach. So, they were a bit more open to taking on the risk management solutions…

*MW: And then like Dafa, because they're European based, so is that like that 10 million a percent of like the total business, and like some gets allocated to Europe and some gets allocated to Asia, or how do I think about that?*

*Expert: It was just all being taken under Asia. So yeah, that was a win for Asia. But like I said, it wasn't like the Asia side of the Bet365 income was being declared as Asia. So, it was a trade-off really. But they were originally a Manila-based operation. And it was only in 2024 that Manila got shut down by the government as a hub for offshore operators. So, they've moved elsewhere now. I think they're in Vietnam.*

143. Lead Plaintiff's investigation through Trace2Trace confirmed that Dafabet obtains information from Sportradar for its China-facing website at erlingerer.com. Trace2Tracelooked at Dafabet's legal site in Denmark to see how it identified Sportradar. It accessed Sportradar through ws-cdn001.akamaized.net.

| Dafabet — the website's own settings | | 28 September 2026, 13:17:39 UTC |
|---|---|---|
| 1 | **Dafabet names Sportradar's delivery address**<br>in the page's own settings | `"NEXT_PUBLIC_BETRADAR_SPORTRADAR_URL":"https://ws-cdn001.akamaized.net"`<br>Dafabet itself labels this address "Betradar / Sportradar". |
| 2 | **A second Sportradar address**<br>in the same settings | `"NEXT_PUBLIC_BETRADAR_LIVE_URL":"//ls.sir.sportradar.com/sblive"` |
| 3 | **The "Live Scores" menu**<br>where it sends the customer | `"logged_out_title":"Live Scores","logged_in_link":"https://statshub.sportradar.com/sblive/en"` |
| 4 | **Where Dafabet places the visitor**<br>answer of Dafabet's own location service | `"request_country_code": "DK"`<br>DK = Denmark. From https://sports.dafabet.com/api/v2/geo_data. A tracking script on the same page records the city as Copenhagen. |

**Extract from the recorded visit, reproduced exactly.** Yellow highlighting added.
Recorded file: **dafabet_1.har (page https://sports.dafabet.com/en/live/sport/240-FOOT)** · SHA-256 381addf8c1d25196fb0738def7bb661121292ef8023c7d4a7b53e19ebffefde0
Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.

144. Trace2Trace then determined the Dafabet Sportradar customer number that was accessed through ws-cdn001.akamaized.net (see line 1 below) and found that erlingerer.com (the Chinese site) used that same customer number:

| Dafabet — three websites, one Sportradar customer number | | 28–29 September 2026 |
|---|---|---|
| 1 | **sports.dafabet.com**<br>28 September 2026, 13:17:41 UTC | `GET https://ws-cdn001.akamaized.net/25ba028d902b018fc2dc915fc5385962/licensing`<br>`Referer: https://sports.dafabet.com/`<br>`→ 200 OK …"valid":true}` |
| 2 | **sports.godafa.com**<br>29 September 2026, 07:04:35 UTC | `GET https://ws-cdn001.akamaized.net/25ba028d902b018fc2dc915fc5385962/licensing`<br>`Referer: https://sports.godafa.com/`<br>`→ 200 OK …"valid":true}` |
| 3 | **sports.erlingerer.com**<br>29 September 2026, 07:11:05 UTC | `GET https://ws-cdn001.akamaized.net/25ba028d902b018fc2dc915fc5385962/licensing`<br>`Referer: https://sports.erlingerer.com/`<br>`→ 200 OK …"valid":true}` |

**Extract from the recorded visit, reproduced exactly.** Yellow highlighting added. SHA-256 shown for the first file; the other two are in the list of files.
Recorded file: **dafabet_1.har · 111112her2sports.godafa.com.har · sports.erlingerer.com.har** · SHA-256 381addf8c1d25196fb0738def7bb661121292ef8023c7d4a7b53e19ebffefde0
Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.

145. This demonstrates that erlingerer.com was an authorized user of Sportradar products and/or services.

146. Further, Trace2Trace found that Dafabet's website keeps a list of the live videos it can show. In a Trace2Trace visit to Dafabet, the list had 659 entries, of which seventy are marked as supplied by Betradar, each with a Betradar match number and a video number. Every one of the seventy carries a list of "allowed countries" (see below.). Fifty-four carry the same twenty-one countries: Afghanistan, Bangladesh, Brunei, Brazil, Bhutan, Indonesia, India, Cambodia, South

Korea, Laos, Sri Lanka, Myanmar, Mongolia, Maldives, Malaysia, Nepal, the Philippines, Pakistan, Thailand, Timor-Leste, and Vietnam. The other sixteen carry the same list without Afghanistan, Bhutan, India, and South Korea.

| Dafabet — Betradar live video and the countries where it is allowed | | 28 September 2026, 13:17:40 UTC |
|---|---|---|
| 1 | **Dafabet's list of live video**<br>address on Dafabet's own website | `GET https://sports.dafabet.com/napi/video_streams?ms=true → 200 OK`<br>659 video entries in the answer; 70 are marked as supplied by Betradar. |
| 2 | **One Betradar video, as listed**<br>supplier, Betradar match number, video number, countries | `"provider":"betradar_v2","betradar_id":75090812,"stream_id":"av:stream:33126235","allowed_countries":["AF","BD","BN","BR","BT","ID","IN","KH","KR","LA","LK","MM","MN","MV","MY","NP","PH","PK","TH","TL","VN"]` |
| 3 | **Countries attached to the Betradar videos**<br>54 videos carry this list | AF BD BN BR BT ID IN KH KR LA LK MM MN MV MY NP PH PK TH TL VN<br>Afghanistan, Bangladesh, Brunei, Brazil, Bhutan, Indonesia, India, Cambodia, South Korea, Laos, Sri Lanka, Myanmar, Mongolia, Maldives, Malaysia, Nepal, Philippines, Pakistan, Thailand, Timor-Leste, Vietnam. |
| 4 | **Second list**<br>16 videos carry this list | BD BN BR ID KH LA LK MM MN MV MY NP PH PK TH TL VN<br>The same without Afghanistan, Bhutan, India and South Korea. |

**Extract from the recorded visit, reproduced exactly.** Yellow highlighting added.
Recorded file: **dafabet_1.har** · SHA-256 381addf8c1d25196fb0738def7bb661121292ef8023c7d4a7b53e19ebffefde0
Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.

147. The list includes India, where Dafabet has been blocked since February 2023, and Brazil, where Dafabet supposedly ceased operating in October 2024, after being left out of the authorized operators. It also includes Indonesia and Pakistan, where betting is prohibited by law, as well as Bangladesh, Brunei, and Afghanistan.

(5) Sportradar Offers Services in Languages for Countries Where Online Gambling Is Illegal

148. Callisto found that Sportradar offered its StatsHub product in Vietnamese, Chinese, and Thai through Sportradar's "betting entertainment tools." These languages are predominantly used in jurisdictions such as China, Thailand, and Vietnam where gambling is strictly illegal. Sportradar's website states:

sportradar

**Languages**

Please specify your default language. You may also add other languages that you wish to be included in your version of StatsHub. Please tick the box beside all languages that you want to be included. When more than one language is required, a language selector will automatically appear within the solution.

Default: Click here to enter your primary language

| | | | |
|---|---|---|---|
| ☐ Albanian | ☐ English | ☐ Japanese | ☐ Serbian |
| ☐ Arabic | ☐ Estonian | ☐ Korean | ☐ Serbian Latin |
| ☐ Azerbaijan | ☐ Finnish | ☐ Latvian | ☐ Slovakian |
| ☐ Bosnian | ☐ French | ☐ Lithuanian | ☐ Slovenian |
| ☐ Bulgarian | ☐ Georgian | ☐ Macedonian | ☐ Spanish |
| ☐ Chinese (Simplified) | ☐ German | ☐ Montenegrin | ☐ Swedish |
| ☐ Chinese (Traditional) | ☐ Greek | ☐ Norwegian | ☐ Thai |
| ☐ Croatian | ☐ Hebrew | ☐ Portuguese | ☐ Turkish |
| ☐ Czech | ☐ Hungarian | ☐ Polish | ☐ Ukrainian |
| ☐ Danish | ☐ Indonesian | ☐ Romanian | ☐ Vietnamese |
| ☐ Dutch | ☐ Italian | ☐ Russian | |

149. Similarly, Muddy Waters, when interacting with a Sportradar sales executive as described above, received a text message flatly stating that Sportradar was or would soon be providing language availability in Mandarin, Thai, and Vietnamese:

> Localisation: we only have English & Mandarin available right now. Thai & Vietnamese will be coming by end of Q2, we have localisation teams on it.

**b. Sportradar's Client, Stake, Was Sued for Providing Illegal Online Betting in Several U.S. States**

150. Stake is a crypto-based online gaming company owned by two Australian billionaires. Sportradar disclosed in its 2025 Investor Presentation, *see supra* ¶ 131, that Stake is one of its customers.

151. Multiple U.S. jurisdictions have taken action against Stake for operating illegally, including: Illinois, Arizona, Maryland, and the City of Los Angeles:

**Arizona Department of Gaming Issues Several Cease-and-Desists**

PHOENIX – This week, the Arizona Department of Gaming ("ADG") took enforcement action against several unlicensed and unregulated gambling operators, both within the U.S. and abroad, that have been illegally targeting Arizona residents. In line with its commitment to protecting the public and enforcing state gaming laws, ADG issued multiple cease-and-desist orders to entities engaged in unauthorized gambling activities.

The identified operators are reportedly offering access to illegal online gambling platforms, including slot-style casino games, "sweepstakes" models, sports betting, horse race wagering, and peer-to-pee betting exchanges. These operations are not licensed by the State of Arizona and do not comply with its stringent regulatory standards, posing serious risks to consumer protection and financial security across the state.

**The following unlicensed operators have been issued cease-and-desist orders:**

- Event Wagering Sportsbook:
  - ReBet
- Peer-to-Peer Exchange:
  - Novig
- Raffles:
  - Dallas Safari Club
  - Fanthem
- Sweepstakes:
  - Stake.US
- Offers Multiple Types:
  - BettorEdge
  - High 5

**ILLINOIS GAMING BOARD**
JB Pritzker • *Governor* Dionne R. Hayden • *Chairperson* Marcus D. Fruchter • *Administrator*
160 North LaSalle ♦ Suite 300 ♦ Chicago, Illinois 60601 ▼ Tel: 312/814-4700 ♦ Fax: 312/814-4602

February 4, 2026

<u>**Via Email**</u>: ***support@stake.us***

Stake (stake.us)
7 Patrikiou Loumoumba, Block A, Office A13 7560
Perivolia, Larnaka, Cyprus

**RE: Suspected Illegal Online Casino Operation by Stake (stake.us)**

To Whom It May Concern:

The Illinois Gaming Board (the "IGB") has reason to believe that Stake (stake.us) is engaged in the operation of an illegal online casino in violation of the Illinois Criminal Code. 720 ILCS 5/28-1(a)(12). On January 12, 2026, the IGB observed that you offered Illinois users the ability to play slots, table games, and sports wagering ("Games") through both the internet and mobile devices. The Games gave users the opportunity to win cash and crypto currency in violation of Illinois law.

Illinois has only authorized gambling at riverboats or casinos holding an owners license, a racetrack holding an organization gaming license, an Illinois sportsbook holding a license under the Sports Wagering Act, or at an establishment licensed under the Video Gaming Act. 230 ILCS 10/3; 230 ILCS 40/1 *et seq*. It is unlawful to knowingly establish, maintain, or operate an Internet site that permits a person to play a game of chance or skill for money or other thing of value via the Internet, or that permits a person to make a wager upon the result of any sport, game, contest, political nomination, appointment, or election via the Internet, without an IGB-issued license. 720 ILCS 5/28-1(a)(12); 230 ILCS 10/18(a)(1); 730 ILCS 5/5-4.5-55. Under Illinois law no exceptions are permitted under the Illinois Prizes and Gifts Act. 815 ILCS 525/1 *et seq*.

The IGB has neither licensed nor authorized Stake (stake.us) to engage in online gambling activity. Consequently, Stake (stake.us)'s activity constitutes illegal gambling in violation of Illinois law. **Accordingly, the IGB demands that you block Illinois residents from accessing your services or discontinue offering cash and crypto currency through your service. Failure to do so may subject you, your affiliates, and business partners to civil or criminal penalties.**

Please contact the IGB Legal Division at IGB.Legal@illinois.gov should you have any questions.

Kind regards,

Marcus D. Fruchter
Administrator

cc: IGB Legal Division

**LA City Attorney Hydee Feldstein Soto Files Lawsuit Against Online Gambling Enterprise, Stake.us**

Posted on 09/04/2025

(LOS ANGELES) – Los Angeles City Attorney Hydee Feldstein Soto announced today that her office has filed a lawsuit against the owners, operators and aiders and abettors of Stake.us, one of the largest and most profitable illegal gambling enterprises in California. The lawsuit alleges that the entity is unlicensed and is operating in violation of State law.

**Maryland Lottery and Gaming Control Agency**

**Wes Moore, Governor • John Martin, Director**

MARYLAND

Montgomery Park Business Center
1800 Washington Blvd., Ste. 330
Baltimore, Maryland 21230

Tel: 410-230-8800
TTY users call Maryland Relay
www.mdlottery.com

*SENT VIA REGULAR MAIL and EMAIL to: support@stake.us*

May 7, 2024

Sweepstakes Limited
d/b/a Stake.us
28 Oktovriou
313 Omrania BLD
Limassol, CY-3105
Cyprus

**RE: Stake.us' Business in Maryland**

Dear Legal Counsel:

It has come to the Maryland Lottery and Gaming Control Agency's ("MLGCA") attention that Stake.us, is offering and conducting online gaming activity in Maryland without legal authority to do so. Maryland has enumerated laws in order to offer gambling in the State, if the game does not fit within one of those enumerated provisions, then that game is not permitted in the State. The laws and regulations governing the operation of sports wagering in Maryland are found at State Government Article ("SG") § 9-1E-01, Annotated Code of Maryland, and Code of Maryland Regulations ("COMAR") 36.10 and 36.11. The laws and regulations governing the operation of casino gaming in Maryland are found in SG §§ 9-1A *et seq.* and COMAR 36.03. The laws and regulations governing the operation of fantasy competitions in Maryland are found at SG §§ 9-1D-01 *et seq.*, and COMAR 36.09.

152. Muddy Waters also found that Stake was operating in Asian markets where online sports gambling was prohibited, including Japan, Korea, India, Vietnam, and China. In these markets, Stake offered localized versions of its website in languages spoken in these markets and accepted deposits in local currencies, including Vietnamese Dong and Indian Rupee. It also was taking deposits in Turkish Lira, and Chilean Pesos, where online gaming is prohibited by private operators.

### c. Sportradar Provided Data and Games to Multiple Betting Sites Targeting Turkey

153. Callisto and Muddy Waters identified evidence showing that Sportradar data was fueling illegal gambling websites in Turkey. Online gambling in Turkey is strictly illegal, except for state-monitored platforms like the National Lottery and the official sports betting operator İddaa.

154. A former Europe-based Sportradar sales executive interviewed by Muddy Waters described Turkey as one of the markets in which operators commonly purported to rely on Malta or Curaçao licenses despite those licenses not providing any local authorization necessary to offer gambling in Turkey.

155. Callisto separately identified evidence of Sportradar providing services to operators in Turkey. According to Callisto, in December 2025, a witness in a criminal proceeding concerning illegal Turkish gambling identified Sportradar, under its Betradar brand, as one of the three principal foreign suppliers to Turkey's illegal gambling industry.

(1) <u>Interbahis</u>

156. Despite the ban on online gambling in Turkey, Callisto nonetheless found that "interbahis1836," a mirror site for Interbahis, an operator illegally targeting Turkey, was running a Betradar widget:




157. Sportradar's website indicates that it only allows its licensed "widgets" to be used by online gambling websites with domain names that are "whitelisted" (i.e., approved) by Sportradar, indicating that Sportradar approved Interbahis's use of its widget:




158. Lead Plaintiff's investigation through Trace2Trace confirmed that Interbahis obtains information from Sportradar. Trace2Trace found that the current Turkish site, interbahis1892.com, is announced on the website itself. On a live match page, Uganda v Zambia, the page loaded Sportradar's match software from Sportradar's delivery address, Sportradar's license server answered "valid": true to customer number c4ef95dc5825aee2b38acbacd82b39ad, and 39 requests for live match data followed:

**Interbahis — licence check answered by Sportradar** 8 October 2026, 14:46:23 UTC

| | | |
|---|---|---|
| 1 | **The website visited**<br>a live match page, in Turkish | `https://interbahis1892.com/tr/sport/live/detail/88234961` |
| 2 | **The page loads Sportradar's match software**<br>from Sportradar's delivery address | `GET https://ws-cdn001.akamaized.net/c4ef95dc5825aee2b38acbacd82b39ad/widgetloader → 200 OK`<br>ws-cdn001.akamaized.net is the address Sportradar uses to deliver its match widgets (first part, section 4). |
| 3 | **The betting website's page asks Sportradar's licence server**<br>the long code is the customer number | `GET https://ws-cdn001.akamaized.net/c4ef95dc5825aee2b38acbacd82b39ad/licensing` |
| 4 | **Sent from**<br>the address the request came from | `Referer: https://interbahis1892.com/` |
| 5 | **Sportradar's licence server answers**<br>200 = request accepted | `200 OK {"text":"U2FsdGVkX1/aWXWjHRMckxLwJ…[encrypted part, left unopened]…","valid":true}` |
| 6 | **Live match data arrive** | `GET https://lt-fn-cdn001.akamaized.net/common/en/Etc:UTC/gismo/stats_match_situation/71889870 → 200 OK`<br>39 requests for live data in the visit. The match: Uganda v Zambia. |

**Extract from the recorded visit, reproduced exactly.** Yellow highlighting added.
Recorded file: **interbahis1892.com.har** · SHA-256 cb84e5cc2ac2bc541e309c814599c3122e50357ac8f1a5987ade286ab7adfc04
Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.

159. In addition, Trace2Trace found that Interbahis's website's own settings name Betradar for the match display, link the statistics to statshub.sportradar.com and take the virtual-football statistics from betradar.com:

**Interbahis — the website's own settings name Betradar** 8 October 2026, 14:46:21 UTC

| | | |
|---|---|---|
| 1 | **Sportradar's match display**<br>address set in Interbahis' settings | {"parameter":"**Betradar**MatchTrackerV3","parameterDescription":"**Betradar**MatchTrackerV3","value":"https://ws-cdn001.akamaized.net/<CLIENTID>/**widgetloader**"} |
| 2 | **Statistics**<br>Sportradar's StatsHub | {"parameter":"betradar-statics-url","parameterDescription":"Betradar Statics servisi URL","value":"https://**statshub.sportradar.com**/statscenter"} |
| 3 | **Virtual football**<br>statistics from betradar.com | {"parameter":"betradar-virtual-football","parameterDescription":"Virtual Football Statisctics URL","value":"http://vfl3.**betradar.com**/s4/?**clientid**=903&language="} |
| 4 | **Betradar account** | {"parameter":"betradar-partner-id","parameterDescription":"**Betradar Partner Account** Id","value":"1"} |

**Extract from the recorded visit, reproduced exactly.** Yellow highlighting added.
Recorded file: **interbahis1892.com.har (answer of interbahis1892.com/odin/api/generic/getApplicationParameters)** · SHA-256 cb84e5cc2ac2bc541e309c814599c3122e50357ac8f1a5987ade286ab7adfc04
Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.

(2) Safirbet, Imajbet, Meritking, and Betebet

160. Callisto investigators also identified Sportradar software or Virtual Sports games on at least four illegal gambling websites targeting Turkey: Safirbet, Imajbet, Meritking, and Betebet.




*Betradar Virtual Sports, a Sportradar product, offered on Betebet's website*

161. Lead Plaintiff's investigation through Trace2Trace confirmed that Safirbet, Imajbet, Meritking, and Betebet obtain information from Sportradar. With respect to Safirbet, Trace2Trace found that, on the address safirbet2008.com, the ordinary statistics button on a live match opened a window on Sportradar's own website: statshub.sportradar.com/statscenter/tr/match/74551120:



162. In September 2026, Safirbet was among many Gambling Operators explicitly blocked by the Istanbul Chief Public Prosecutor. Still, Safirbet's website continued to feature a statistics button that directed Gamblers to a Turkish language webpage hosted by Sportradar. Despite the fact that Safirbet is an illegal Operator, the Sportradar webpage remained accessible and functional without any restrictions preventing users referred from Safirbet's website from accessing it.

163. On imajbet1644.com, the ordinary statistics button on a live match opened the same Sportradar page, for the same match, as for Safirbet above.

164. Meritking's is another Operator targeting Turkey. According to Trace2Trace's analysis, the technology that accepts and places bets (i.e., player authentication, wallet storage, etc.) runs on the NSoft cloud.

| | | |
|---|---|---|
| **Meritking — the NSoft sportsbook switched on; NSoft's script points bet acceptance to NSoft's cloud** | | 8 October 2026, 14:31:14 UTC |
| 1 | **The website visited**<br>Meritking, in Turkish | `https://mrking10056.com/`<br>Reached through Meritking's own Telegram channel. The website placed the visitor in Romania. |
| 2 | **Meritking's list of sportsbooks**<br>answer of Meritking's own server | `{"id":45,"name":"sportsbook_nsoft","display_name":"Nsoft","currency":"EUR","description":"Nsoft Sportsbook","extra_info":null,"is_enabled":1}`<br>"is_enabled":1 = switched on. |
| 3 | **The NSoft script is loaded** | `GET https://ignite-sdk.nl-ams-1.linodeobjects.com/production/ignite-parent.js → 200 OK` |
| 4 | **Production address for bet acceptance specified in the loaded software** | ``production:`https://sxg-betting-acceptance.${l}.nsoft.cloud` ``<br>nsoft.cloud is NSoft's own cloud. The same software specifies NSoft cloud addresses for player authentication and wallet functions. |
| 5 | **Inside the script: NSoft's platform** | `B.storageKeyPrefix="SevenClientSDK:FeSession"`<br>Seven is the name of NSoft's betting platform (7platform). |

**Extract from the recorded visit, reproduced exactly.** Yellow highlighting added.
Recorded file: **meritking_2.har (filed by Trace2Trace as 03_FUN88_THAILAND/2.har)** · SHA-256 0a303bd801a23fc1d46e426f0992e48857a16f4ef35998db9783da42f03df52a
Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.

165. Trace2Trace further found that the Betebet website contains a section titled "Betradar Widget Shared Styles", used by a "betradar-match-tracker":



(3) <u>Tempobet</u>

166. Callisto also identified Tempobet, an unlicensed gambling platform targeting Turkish Gamblers, as a Sportradar customer. Sportradar's own website appeared to host a sportsbook mock-up for Tempobet.




*Tempobet Sportsbook mock-up hosted on Sportradar's website*

167. Tempobet's website (offered only in Turkish) also reported that it used Sportradar services.




168. Callisto reported that Tempobet falsely claimed to have a Curaçao gambling license through Thorner B.V. and had been blacklisted by gambling regulators in Greece, Latvia, Bulgaria, Switzerland, and Slovakia.

169. Despite the regulatory blacklists in multiple European jurisdictions, Callisto investigators identified source code indicating that Tempobet remained a Sportradar customer at the time of the Callisto Report.

170. Lead Plaintiff's investigation through Trace2Trace confirmed that Tempobet obtains information from Sportradar. Trace2Trace found that Sportradar's license server answers "valid": true to Tempobet's website, and Sportradar's data server sends the page live match data, timeline, markets and statistics, through an address that carries Tempobet's name (rows 5 and 6 below):

**Tempobet — licence check answered by Sportradar** 27 September 2026, 10:11:08 UTC

| | | |
|---|---|---|
| 1 | **The website visited** | https://www.**tempobet.com**/ |
| 2 | **The page loads Sportradar's software**<br>from Sportradar's own address | GET https://widgets.sir.**sportradar.com**/db413ccb0a92006383a7f66ee5b41a63/**widgetloader** → 200 OK |
| 3 | **The betting website's page asks Sportradar's licence server**<br>the long code is the customer number | GET https://widgets.sir.sportradar.com/**db413ccb0a92006383a7f66ee5b41a63**/**licensing** |
| 4 | **Sent from**<br>the address the request came from | Origin: **https://www.tempobet.com**<br>Referer: **https://www.tempobet.com**/ |
| 5 | **Sportradar's licence server answers**<br>200 = request accepted | **200 OK** {"text":"U2FsdGVkX19PNHpLyLgLCU5j2…[encrypted part, left unopened]…",**"valid":true**} |
| 6 | **Sportradar's data server uses Tempobet's name**<br>live match data sent to the page | GET https://lmt.fn.**sportradar.com**/**tempobet**/en/Etc:UTC/gismo/**match_markets**/74557478 → 200 OK<br>28 requests to this Sportradar server in the visit: match timeline, markets, statistics. |

**Extract from the recorded visit, reproduced exactly.** Yellow highlighting added.
Recorded file: **www.tempobet.com.har** · SHA-256 a7b0c0a56803b53e69a6f6b644a93aa4ee8dec3012530b5f42483c5a817a4740
Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.

171. In the above image, Row 1 is the website a customer sees. Row 2 shows that page fetching Sportradar's software from Sportradar's own address, quoting a customer number. Row 3 is the question to the license server. Row 4 shows who is asking: the request arrives marked as coming from www.tempobet.com. Row 5 is Sportradar's answer: accepted, valid. Row 6 shows Sportradar's server then sending live match data to the page, at an address that contains the name "tempobet".

172. Like Muddy Waters, Trace2Trace found that Sportradar's own website hosts a Tempobet page, with Tempobet's logo and colors, which Sportradar itself titles "Tempobet - Soccer":




173. Trace2Trace also found that Tempobet's own list of betting markets contains a market labelled "Betradar".

### d. Sportradar Provided Data and Games to Betting Sites Targeting Iran

174. Gambling is strictly prohibited under Iranian law. Furthermore, doing business with Iran is prohibited by U.S. sanctions.

175. The United States has maintained extensive economic sanctions against Iran for decades. In May 1995, President Clinton issued Executive Order 12959, which generally prohibited U.S. persons from engaging in transactions involving Iran, including supplying technology and services to Iranian entities, except for specific exceptions. These restrictions were subsequently expanded through additional legislation, executive orders, and regulations administered by OFAC. The Iranian Transactions and Sanctions Regulations, 31 C.F.R. § 560.204, generally prohibits U.S. persons from transacting with Iranian entities.

176. On August 6, 2018, President Trump issued Executive Order 13845, which reimposed and consolidated sanctions authorities concerning Iran. As part of the November 5, 2018 reimposition of sanctions, OFAC added or returned more than 700 individuals and entities to the SDN List.

177. In its Code of Business Ethics, Sportradar flatly states that it "is committed to complying with all applicable economic and trade sanctions regulations, export controls, and antiboycott laws and regulations (collectively, 'Trade Controls'), including those administered by Switzerland, the European Union and its Member States, the United States, and the United Kingdom." The Code further states that "Employees who receive any indication that a relationship or transaction with a client or counterparty may involve [] any of the countries or regions identified in Sportradar's Global Trade Controls Policy (currently Cuba, Venezuela, ***Iran***[])] . . . should put the pending relationship or transaction on hold . . ."

178. Despite Sportradar's claims that it complies with existing sanctions against Iran and does not support gambling in jurisdictions where it is banned, Callisto found that Sportradar products and services were available to Iranian Gamblers. Using an Iranian IP address through a VPN, Callisto accessed Betradar Virtual Sports on Berrybet, a Persian-language gambling website.




*Betradar Virtual Sports offered on Persian-language Berrybet*

179. Berrybet permitted deposits through Iranian payment providers and referred Gamblers to Iranian cryptocurrency exchanges, including Nobitex.




*Berrybet's instructions to Iranian customers regarding which Iranian crypto exchanges to use*

180. Testimony before the United States Senate Committee for Banking, Housing, and Urban Affairs identified Nobitex as Iran's largest digital asset exchange with ties to the Islamic Revolutionary Guard Corps.

181. Callisto identified another Persian-language Operator, Betfido, offering Sportradar's Virtual Sports games. The Betfido website has a Persian language (Farsi) option:




182. Lead Plaintiff's investigation through Trace2Trace confirmed that Berrybet and Betfido obtain information from Sportradar. Trace2Trace found that both websites have a virtual-sports page for "BRV", their short name for Betradar virtual sports; "BetRadar" is in their list of game suppliers; and their software includes a part called "SportRadarTracking":

**Berrybet and Betfido — Betradar and Sportradar named in the websites' software** 28 September 2026

| | | |
|---|---|---|
| 1 | **berrybet.com**<br>28 September 2026, 18:26:59 UTC | `GET https://www.berrybet.com/fa/virtual-sports/home?provider=BRV → 200 OK`<br>`"BetConstruct JackPot":"جکپات BetConstruct","BetRadar":"BetRadar"`<br>`assets/js/SportRadarTracking.LqS2VuFF.js`<br>`Visitor recorded by the site: "countryCode":"ID"`<br>Persian-language page (/fa/). BRV is the short name these sites use for Betradar virtual sports. ID = Indonesia. |
| 2 | **bet-fido.com**<br>28 September 2026, 18:31:03 UTC | `GET https://www.bet-fido.com/fa/virtual-sports/home?provider=BRV → 200 OK`<br>`"BetConstruct JackPot":"جکپات BetConstruct","BetRadar":"BetRadar"`<br>`assets/js/SportRadarTracking.DWisEAv6.js`<br>`Visitor recorded by the site: "countryCode":"ID"`<br>Persian-language page (/fa/). BRV is the short name these sites use for Betradar virtual sports. ID = Indonesia. |

**Extract from the recorded visit, reproduced exactly.** Yellow highlighting added. SHA-256 shown for the first file.
Recorded file: **berrybet_historical_BRV_retest.har · betfido_historical_BRV_retest.har** · SHA-256 03166b4566d103e43eb661681300a201701482214d3d33a5af3eadf3bd913b1a
Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.

### 4. Much of Sportradar's Client Base Operates Without Required Licenses

183. The Reports found that Sportradar's exposure to illegal gambling was not limited to jurisdictions imposing blanket bans on private online gambling. Both Reports also identified substantial Sportradar business with Operators serving regulated jurisdictions without the licenses required to accept bets from Gamblers located there.

184. Callisto found two recurring problems with the claimed licenses of Operators who did business with Sportradar. First, many Operators purported to rely on licenses that were not properly issued, including licenses purportedly issued under the authority of the AOFA. Second, even valid licenses held by Operators often did not authorize them to accept bets from customers in jurisdictions where they operated. Operators that relied on offshore licenses to conduct business in jurisdictions that did not recognize the validity of those licenses were unlicensed operators. As described below, Sportradar regularly worked with unlicensed operators.

185. Callisto identified a fundamental problem with purported licenses issued in Anjouan, one of the constituent islands of the Union of the Comoros. Multiple media outlets have reported that, according to the Central Bank of the Comoros, the purported licensing agency—AOFA—did not exist. Therefore, it had no authority to issue any gambling licenses. Callisto further reported that gambling, itself, appeared to be prohibited under the Comorian Penal Code.

186. Callisto found that at least 100 of the more than 270 platforms identified in its investigation purported to operate under Anjouan licenses. Thus, more than one-third of the Sportradar-connected platforms identified by Callisto purported to rely on non-existent licenses.

187. Callisto identified BetHog as an example of a purported Anjouan license holder that received Sportradar services. Sportradar publicly announced an MTS partnership with BetHog, a cryptocurrency-based casino founded in 2024. Before it ceased operation in 2026,

BetHog claimed to rely on Anjouan official registration License No. ALSI-142406011-FI1. Unlike a partnership limited to supplying sports data, an MTS partnership involves Sportradar directly managing the betting risk for the Operator. Callisto further reported that MTS is provided on a revenue-sharing basis, giving Sportradar a direct economic interest in increasing the gambling revenue generated through the service.

188. The licensing deficiencies identified by the Reports were not limited to Anjouan. Callisto identified multiple Sportradar-connected platforms purporting to operate under Curaçao sub-licenses issued through master license holders such as Antiellephone, despite Callisto finding that Curaçao had prohibited that sublicensing practice years earlier.

189. A gambling license from one jurisdiction does not authorize an Operator to offer gambling worldwide. Rather, the Operator may offer gambling services only if the Operator is permitted to provide those services under the applicable law in the jurisdiction where the Gambler is located. *See supra* ¶ **Error! Reference source not found.** (Macolin Convention).

190. According to Muddy Waters, a former Sportradar sales executive based in Europe who worked at Sportradar through 2023, similarly explained that offshore licenses from jurisdictions such as Curaçao and Anjouan were treated as providing Operators "carte blanche" to operate everywhere, even where the operator lacked authorization from the jurisdiction in which it actually accepted wagers.

191. Another former Sportradar sales executive interviewed by Muddy Waters explained that major Operators frequently maintained numerous subsidiary brands. Although a parent company might hold some form of license, the individual brands through which wagers were accepted could lack the required licenses in the jurisdictions they targeted. According to the former executive, Sportradar management was aware of this distinction but would nevertheless

say "these guys have licenses" because the subsidiary revenue ultimately would pass through the primary Operator.

**5. Sportradar Had Significant Business Relationships with Gambling Operators That Are Based or Operate in Russia, or in Occupied Ukrainian Territory, Belying Its Claims That It Complies with Sanctions Against Russia and Doesn't Work with Illegal or Unlicensed Entities**

**a. After the United States and the European Union Imposed Sanctions on Russia, Sportradar Claimed It Would Cease Any New Business in Russia**

192. The United States imposed significant economic sanctions on Russia following Russia's 2014 annexation of Crimea. The U.S. government subsequently expanded those sanctions through legislation and additional executive orders. The Countering America's Adversaries Through Sanctions Act of 2017 ("CAATSA") authorized sanctions against persons engaged in specified activities involving Russia.

193. In September 2018, Executive Order 13849 authorized the implementation of sanctions provided for by the CAATSA, including blocking the property and interests in property of designated persons and restricting their access to the U.S. financial system. Generally, U.S. persons were prohibited from engaging in transactions with persons or entities subject to sanctions. These restrictions could also extend to entities with 50% of ownership, directly or indirectly, by one or more blocked person. Sportradar is included within the U.S. Department of the Treasury definition of U.S. persons, which is defined as all U.S. citizens and permanent residents, all individuals and entities within the United States, and all entities incorporated in the U.S., as well as their foreign branches.

194. Following Russia's invasion of Ukraine in February 2022, the United States designated additional Russian individuals, financial institutions, state-owned enterprises, and other entities for sanctions and imposed additional restrictions on financial transactions and investment.

Within a year, Treasury's Office of Foreign Assets Control ("OFAC") added more than 2,500 Russia-related targets to its Specially Designated Nationals and Blocked Persons ("SDN") List, including, for instance, Tatyana Nesterenko and Sergey Samsonenko. *See infra* ¶¶ 210, 228.

195. The European Union similarly imposed sanctions against Russia following Russia's annexation of Crimea. In March 2014, the European Union adopted Council Regulation (EU) No. 269/2014, which imposed restrictive measures against persons responsible for actions undermining or threatening the territorial integrity, sovereignty, and independence of Ukraine. The Regulation required the freezing of all funds and economic resources belonging to, owned by, held by, or controlled by designated persons and entities. It further prohibited funds or economic resources from being made available, directly or indirectly, to, or for the benefit of, designed persons and entities. Accordingly, EU citizens and companies were generally prohibited from conducting business with persons or entities designated under the Regulation.

196. Following Russia's invasion of Ukraine in February 2022, the European Union substantially expanded its existing sanctions against Russia and the number of designated Russian individuals. On February 25, 2022, the European Union reported that its restrictive measures applied to 654 individuals and fifty-two entities. By April 8, 2022, the restrictions applied to 1,091 individuals and eighty entities, and by December 16, 2022, they applied to 1,386 individuals and 171 entities. In addition to these individual designations, the European Union imposed broader economic restrictions targeting, among other things, Russia's technology sector.

197. On May 27, 2022, in the wake of the Russian invasion and the adoption of these sanctions, Sportradar announced "its suspension of all new investments in Russia, including signing new customers" and asserted that the Company was "continuing to comply with sanctions." As indicated *supra* ¶ 177, Sportradar also "committed to complying with all applicable

economic and trade sanctions . . . including those administered by . . . the European Union and . . . the United States[.]"

**b. Sportradar Lied About Koerl's Control over a Russian Gambling Operation Prior to the Class Period and Failed to Disclose That Koerl Maintained Ties to the Russian Gambling Operation's CEO After It Divested from the Operation.**

198. At the time Sportradar made the announcement concerning Russia in May 2022, Koerl had a longstanding relationship with Russian bookmaker Liga Stavok. Sportradar's own SEC filings disclosed that, through May 2022, Koerl held a 23% ownership interest in PMBK, OOO ("PMBK"), which has been identified as the operating company behind Liga Stavok.

199. In May 2022, following the Russian invasion of Ukraine, Sportradar released a statement confirming that "over 10 years ago, Carsten Koerl invested in a company that owns a Russian sportsbook, Liga Stavok," and asserted that he had divested his interest in that entity in compliance with sanctions against Russia. Sportradar denied, however, that Koerl previously had "any operational responsibilities or authority in the company." This statement was false, as confirmed by evidence identified by Callisto contradicting Sportradar's characterization of Koerl's role. For instance, according to Callisto, PMBK stated in its 2021 accounts that "Carsten Markus Koerl exerts not formal, but fundamental influence over the actions and decisions taken by PMBK [] on all matters relating to the conduct of its financial and economic activities and therefore is the ultimate beneficial owner of the company."

200. According to the Callisto Report, Koerl maintained business ties with Liga Stavok's CEO Yury Krasovskiy after any 2022 divestment from PMBK. Specifically, Callisto reported that Koerl and Krasovskiy remained co-owners of a Malta-based company, Interactive Sports Holdings Limited. Although a resolution to dissolve the company was adopted in December 2024, Callisto

reported that Maltese corporate records showed that the company had not yet been dissolved as of April 22, 2026.

#### c. Sportradar Provides Data and Games to a Variety of Gambling Operators That Are Based or Operate in Russia, or in Occupied Ukrainian Territory

201. Both Muddy Waters and Callisto identified extensive and longstanding business relationships between Sportradar and Russian gambling operators who had significant criminal, sanctions and/or compliance red flags. These relationships were significant sources of revenue for Sportradar. A former Sportradar salesperson interviewed by Muddy Waters estimated that Russian customers accounted for approximately ***11% to 12%*** of Sportradar's total revenue in 2024. As discussed below, Lead Plaintiff's investigation confirmed these relationships.

202. Despite Sportradar's claim that it had suspended "all new investments in Russia, including signing new customers"—an admission that its business in Russia was unlawful—and the Company's assertions that it complies with U.S. and EU sanctions, Sportradar nevertheless continued to maintain a substantial Russian business. Muddy Waters reported that Sportradar continued to maintain a Moscow office, and as late as 2025, posted job advertisements seeking to hire Russian-speaking employees to serve as "client partners."

203. Norwegian online sports website Josimar, which has extensively investigated illegal match fixing and gambling and has investigated Sportradar's connections with both, separately reported in July 2025 that Sportradar maintained offices in Moscow and that Sportradar data continued to appear on Russian gambling platforms, including Liga Stavok.

204. Multiple sources have identified Sportradar connections with Russian gambling operators, including Bet-m.ru, 1win, Betboom, 1xBet,Fonbet, Bet City, and Leonbet.

(1) Bet-M

205. Bet-M is a gambling site operator that formerly was known as OOO Sportradar. Among other sites, it operated the Russian-licensed site bet-m.ru, which began operating in 2025. Bet-M.ru lists Sportradar as one of its sources of information, contradicting Sportradar's claim that is stopped taking on new Russian clients in 2022. The bet-m.ru website states:




206. Lead Plaintiff's investigation through Trace2Trace confirmed that Bet-M obtains information from Sportradar. Betradar is written into the software of the Bet-M website as data supplier number forty-one, the software checks whether a match comes from Betradar, and the website has a page address for Betradar games, next to its other game pages:

| Bet-M — Betradar written into the website's software | | 28 September 2026, 12:45:59 UTC |
|---|---|---|
| 1 | **The website visited** | `http://bet-m.ru/` |
| 2 | **Bet-M's software lists its data providers**<br>Betradar is provider number 41 | `{GRID_STATISTICS:31,BET_RADAR:41}`<br>From https://sportcdn.bet-m.ru/latino-view/13.8.34-hotfix.7/latino-view.min.js |
| 3 | **The software checks whether a match comes from Betradar** | `…Provider)===T.lq3.BET_RADAR…`<br>From https://sportcdn.bet-m.ru/latino-view/13.8.34-hotfix.7/jsChunks/6112.c05c6337.chunk.js |
| 4 | **The website has a page for Betradar games**<br>next to its other game pages | `FAST_GAMES:"/fast-games",GLOBAL_BET:"/global-bet",BETRADAR:"/betradar/:game?"`<br>From https://cdn-ya.bet-m.ru/version/0.8.7/main.js |

**Extract from the recorded visit, reproduced exactly.** Yellow highlighting added.
Recorded file: **bet-m_2.har** · SHA-256 583d515f80b4ae34f2f678dd3f1bbb6fe823700ee0721532aadf3c87999b11d2
Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.

(2) 1win

207. 1win is an illegal gambling platform run by persons subject to criminal prosecutions in multiple jurisdictions. In 2025, multiple Russian and Ukrainian individuals who claimed to be co-owners of 1win were placed on Kazakhstan's wanted list for money laundering and illegal

gambling. One of these individuals, Sergey Chernykh, is also currently the defendant in a criminal case in Mexico.

208. Callisto found Sportradar Virtual Sports games offered through its Betradar brand on 1win and reported that Sportradar provided those games through revenue-sharing arrangements:




209. Lead Plaintiff's investigation through Trace2Trace confirmed that 1Bet obtains information from Sportradar. Trace2Trace found that 1win's own list of game suppliers contains "BetradarVS", Betradar Virtual Sports, with twelve games:

**1Win — Betradar Virtual Sports in 1Win's own list of suppliers** 7 October 2026, 07:59:26 UTC

| | | |
|---|---|---|
| 1 | **1Win's list of game suppliers**<br>answer of 1Win's own website | `GET https://1win.io/api/CASINO-3/bff-v0-providers?localeId=1 → 200 OK` |
| 2 | **One line of the list**<br>supplier name and number of games | `{"name":"BetradarVS","amount":12,…`<br>BetradarVS = Betradar Virtual Sports. 12 games listed. |

**Extract from the recorded visit, reproduced exactly.** Yellow highlighting added.
Recorded file: **04_1WIN_RUSSIA_SESSION_2026-10-07.har** · SHA-256 1ddff53599334a3010160d6fb5c1c9f7a6d4615a31396ccd69cc00399277e517
Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.




(3) <u>Betboom</u>

210. Betboom is a Russian bookmaker owned by Marina Danilova. Danilova is the daughter of former Russian deputy finance minister Tatyana Nesterenko, who is sanctioned by OFAC. According to Callisto, directories indicate that Betboom has physical betting locations in Russian-occupied Donetsk and Crimea. Betboom was previously known as BingoBoom.

211. Betboom's website indicates that it collaborates with Sportradar.

| | |
|---|---|
| Организатор может использовать и другие источники информации (в том числе информацию, предоставленную его скаутами и/ или международными спортивными информационными источниками, получающими официальную информацию через скаутов, к примеру, одной из таких компаний является «Бетрадар» (www.betradar.com), с которой сотрудничает не только Организатор, но и большинство влиятельных международных букмекерских компаний). Скауты – спортивные эксперты, которые, находясь | The Organizer may also use other sources of information (including information provided by its scouts and/or international sports information sources that receive official information through scouts, for example, one such company is Betradar (www.betradar.com), with which not only the Organizer cooperates, but also most influential international bookmaking companies). Scouts are sports experts who, being |

212. Muddy Waters IT investigation also found a thirty-two-character client ID from Sportradar on Betboom's Russian gambling site—Betboom.ru:



213. According to Muddy Waters, a former Sportradar salesperson familiar with the Betboom account estimated that Betboom generated several million euros in annual revenue for Sportradar.

214. Lead Plaintiff's investigation through Trace2Trace confirmed that Betboom.ru obtains information from Sportradar. Trace2Trace accessed the BetBoom.ru website and found that, inside the site a statistics window opens for the match Mexico v Peru. The page that came back calls itself StatsHub and names the customer as "bingoboom". This is the operator's website calling Sportradar's service:

<table>
<tr><th colspan="2">BetBoom — the website itself opens Sportradar's StatsHub</th><th>27 September 2026, 10:13:21 UTC</th></tr>
<tr><td>1</td><td>The website visited</td><td><code>https://betboom.ru/</code></td></tr>
<tr><td>2</td><td>BetBoom's page opens a statistics window<br>request sent by BetBoom's own page</td><td><code>GET https://st-cdn001.akamaized.net/bingoboom/ru/match/m5965890</code><br><code>Referer: https://betboom.ru/</code><br><code>Sec-Fetch-Dest: iframe</code><br>BingoBoom is the former name of BetBoom. "iframe" means a window opened inside the page.</td></tr>
<tr><td>3</td><td>The page that comes back<br>200 = delivered</td><td><code>200 OK https://sh-cdn001.akamaized.net/bingoboom/ru/match/m5965890</code></td></tr>
<tr><td>4</td><td>It calls itself StatsHub<br>and names the customer</td><td><code><meta property="og:site_name" content="StatsHub"/> "clientId":"bingoboom"</code><br>Page title: "Мексика - Перу | Обзор | StatsHub" (Mexico v Peru, overview, StatsHub).</td></tr>
<tr><td colspan="3">Extract from the recorded visit, reproduced exactly. Yellow highlighting added.<br>Recorded file: betboom.ru.har · SHA-256 7d920d83ea93bb51d0451dd4a6714ef08370ad3652a2d3b1f8827dc199c181e5<br>Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.</td></tr>
</table>

215. BetBoom's betting software lists Sportradar among its suppliers, checks on the betting slip whether a match is supplied by Sportradar, and has a live channel named after Sportradar:

<table>
<tr><th colspan="2">BetBoom — Sportradar inside the betting software</th><th>27 September 2026, 10:12:54 UTC</th></tr>
<tr><td>1</td><td>Sportradar is in the list of suppliers<br>in BetBoom's betting software</td><td><code>…SPORTRADAR:"sportradar"…</code></td></tr>
<tr><td>2</td><td>The betting slip checks whether a match is supplied by Sportradar</td><td><code>…provider&&[Ho.SPORTRADAR,Ho.LSPORTS].includes(e.match?.info?.provider)…</code></td></tr>
<tr><td>3</td><td>A message for bets on Sportradar matches<br>shown on the betting slip</td><td><code>betIncompatibleSportradarSystem:</code><br><code>{id:"coupon.betIncompatibleSportradarSystem",defaultMessage:"Unavailable to the system"}</code><br>"coupon" is the betting slip.</td></tr>
<tr><td>4</td><td>A live channel named after Sportradar<br>"bb" = BetBoom</td><td><code>"bb.sportradar_stream_events_ws.v1.common.Error"</code><br>A channel through which live match events reach the page.</td></tr>
<tr><td colspan="3">Extract from the recorded visit, reproduced exactly. Yellow highlighting added.<br>Recorded file: betboom.ru.har (files from sportbook.sporthub.bet, BetBoom's sportsbook) · SHA-256 7d920d83ea93bb51d0451dd4a6714ef08370ad3652a2d3b1f8827dc199c181e5<br>Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.</td></tr>
</table>

216. Sportradar's website also hosts a page under the name "betboom", with BetBoom's logo:




(4) <u>Fonbet</u>

217. Fonkor LLC is the official corporate legal entity operating Fonbet, one of the largest and most lucrative sports betting operators and bookmakers in Russia. Fonbet is a Russian bookmaker that explicitly states on its website that it obtains match data from Sportradar, and, according to Muddy Waters, has multiple betting shops in Russian-occupied Ukrainian territory, including in the Crimean cities of Simferopol, Sevastopol and Kerch, and Armyansk. In its investor presentation in December 2024, Sportradar explicitly identified Fonbet as one of its "deep customer relationships."




218. According to the Organized Crime and Corruption Project, a global network of investigative journalists, Fonbet has a longstanding history of reported connections to illegal gambling, organized crime, corruption, and money laundering. Russian investigators opened a criminal investigation after finding that Fonbet provided online betting through a foreign-registered website at a time when online sports betting was illegal in Russia.

219. A former Sportradar employee familiar with the Fonbet account told Muddy Waters that Fonbet purchased a broad suite of Sportradar products and generated approximately €20 million in annual revenue for Sportradar.

220. Lead Plaintiff's investigation through Trace2Trace confirmed that Fonbet obtains information from Sportradar. Trace2Trace, accessing the site through Russia, found that the software of Fonbet's website contains a type of match statistics called "SportRadar" and a button that records the click with the value "SportRadar":




221. Lead Plaintiff's investigation through Trace2Trace confirmed that Bet City obtains information from Sportradar. Directly supporting Callisto's findings, Trace2Trace also found that Bet City's own published rules list the suppliers of the information on which bets are settled, and name "Betradar" and "Real Time Sportscast" among them




(5) <u>1xBet</u>

222. Among the most significant Russian-linked customers identified by both Muddy Waters and Callisto, as well as several online news sources, is 1xBet. 1xBet is an online betting company, formerly based in Russia and currently domiciled in Cyprus, that is believed to be owned by a group of Russian citizens wanted by Russian authorities for illegal gambling. It has been

referred to as the “Wagner Group of Sports Betting” by the president of the Group of Copenhagen, an intergovernmental sports integrity body, and is banned in the United States, the United Kingdom, France, Spain, Germany, Russia, and the Ukraine.

223. Muddy Waters independently obtained evidence from four former Sportradar employees concerning whether 1xBet was merely obtaining Sportradar data without Sportradar’s authorization. According to an interview transcript published by Muddy Waters, a former Sportradar sales executive who worked directly with 1xBet confirmed that 1xBet was a customer of Sportradar. Another former Sportradar employee expressly confirmed that the relationship was ongoing as of 2026.

224. Muddy Waters investigated links between Sportradar and 1xBet using its IT consultant. The IT consultant examined the source code for 1xBet and found that 1xBet was using a websocket plug-in from Sportradar’s Betradar brand:



225. This Websocket plug-in is commonly employed in online streaming, sports, and gaming and is unlikely to have been scraped.

226. Callisto separately reached the same conclusion. Two former Sportradar employees interviewed by Callisto identified 1xBet as one of Sportradar's largest customers.




227. That relationship with 1xBet was significant for Sportradar. The former Sportradar sales executive interviewed by Callisto explained that, taking into account all of the brands associated with 1xBet, 1xBet was a larger Sportradar customer than Sportradar's purported largest customer, Bet365. The same sales executive estimated that 1xBet accounted for €25 to €35 million in revenue annually for the Company.

(6) Bet City

228. Bet City is a Russian bookmaker that, according to Callisto, was partly owned by Russian businessman Sergey Samsonenko until early 2025. Samsonenko was sanctioned by OFAC in 2023. According to Bet City's rules, it calculates odds based on data from Betradar: "[t]he basis for calculating the bet is . . . made on the basis of official sources . . . and/or from the event provider (RunningBall, ***Betradar,*** Real Time Sportscast, Betgenius, SportLevel, Megafeed, etc.)." Bet City's customer service confirmed to Callisto that it works with Betradar:




(7) <u>Leonbet.ru</u>

229. Muddy Waters found that Russian gambling site Leonbet.ru, an affiliate of international gambling operator Leonbet, utilized Sportradar data based on its in-code analysis:




230. Lead Plaintiff's investigation through Trace2Trace confirmed that Leonbet obtains information from Sportradar. Using a VPN, Trace2Trace accessed Leon appearing as a Gambler in Kazakhstan. Leon's own settings placed the visitor in Kazakhstan and set the currency to the Kazakhstani tenge. The same settings switch on Sportradar's live match display, name

"BETRADAR" as the supplier of the virtual games, and take those games from an address on betradar.com:

**Leon — the website's own settings** 28 September 2026, 14:00:42 UTC

| | | |
|---|---|---|
| 1 | **Where Leon places the visitor**<br>country and currency set by Leon | "countryCode":**"KZ"** "defaultUICurrency":**"KZT"**<br>KZ = Kazakhstan. KZT = Kazakhstani tenge. |
| 2 | **Sportradar's live match display**<br>switched on in Leon's settings | "**sportradar**LiveMatchTrackerEnabled":**true** "iframeUrl":"https://lintwidget.com/iframe-widgets" |
| 3 | **Virtual games: supplier named**<br>Betradar = Sportradar's betting brand | {"sportFamily":"VirtualSoccer","config":{"widgetType":"**BETRADAR**"… |
| 4 | **Virtual games: where they come from**<br>an address on betradar.com | "virtualSport":{"isEnabled":true,"providerUrl":"//**vsw.betradar.com**/ls/mobile/?/**leongaming**/{lang}/page/vsmobile"<br>"leongaming" is Leon's name inside the Betradar address. |

**Extract from the recorded visit, reproduced exactly.** Yellow highlighting added.
Recorded file: **leon_2.har (answer of https://leon.bet/api-1)** · SHA-256 b0e46c0fe2ee4affadfcc27727b6c4c981c4d08fce67aa3b48559cf1fd92cb2f
Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.

231. Half a minute after the initial access, Sportradar's license server answered "valid": true:

**Leon — licence check answered by Sportradar** 28 September 2026, 14:01:14 UTC

| | | |
|---|---|---|
| 1 | **The website visited** | https://**leon.bet**/ |
| 2 | **Leon's page opens the Sportradar match display**<br>through the address set in Leon's settings | GET https://**lintwidget.com**/iframe-widgets/dark/**sportradarLiveMatchTracker**?matchId=74931222… → 200 OK |
| 3 | **The betting website's page asks Sportradar's licence server**<br>the long code is the customer number | GET https://ws-cdn001.akamaized.net/**a0bd4b1f62d3a0dc5dcbe245fdfde440**/**licensing** |
| 4 | **Sent from**<br>the address the request came from | Origin: **https://lintwidget.com**<br>Referer: **https://lintwidget.com**/ |
| 5 | **Sportradar's licence server answers**<br>200 = request accepted | **200 OK** {"text":"U2FsdGVkX1/HhjdbioALTGXj7…[encrypted part, left unopened]…",**"valid":true**} |

**Extract from the recorded visit, reproduced exactly.** Yellow highlighting added.
Recorded file: **leon_2.har** · SHA-256 b0e46c0fe2ee4affadfcc27727b6c4c981c4d08fce67aa3b48559cf1fd92cb2f
Recorded by Trace2Trace (JK IT GROUP LTD). All times are UTC.

232. This shows that Leon knew it was serving a visitor in Kazakhstan, and in that same visit Sportradar delivered a live display and a betting product, virtual sports, and its license server approved.

233. In Kazakhstan, while sports betting is legal, it is subject to a strict licensing regime, overseen by the Committee for the Regulation of the Gambling Business and Lotteries. Leonbet only claims a license from Curaçao and does not appear to have a license from Kazakhstan.

### D. Sportradar's Unlawful Operations Are the Result of the Company's Aggressive Efforts to Increase Revenue and Lax Approach to Compliance

234. The revelations about Sportradar's involvement with illegal gambling operations contained in the Reports shocked investors, but were unsurprising to individuals with first-hand exposure to Sportradar's business and given the way the business operated.

235. FEs describe Sportradar's attitude toward working with illegal gambling operators. For instance, FE-3 described a pervasive attitude within the Company that no potential revenue source was to go untapped. In August 2024, FE-3 was tasked to develop a plan to monetize the piracy of Sportradar's audiovisual streams. In FE-3's experience, this was a highly unusual endeavor. As FE-3 described, each of his prior employers had endeavored to ***stop*** piracy, not to monetize it.

236. This observation was corroborated by statements from senior executives at the Company, who estimated that material portions of Sportradar's overall revenue were attributable to black markets.

237. For instance, in his AlphaSense interview, INT-2 stated that 15-20% of Sportradar's overall revenues were attributable to black markets. INT-2 stated that the Company "know[s] it's the black market, but they somehow explain" these markets away as "gray market[s]." When asked to clarify whether gambling in these purported gray markets was actually illegal, INT-2 did not equivocate: "It's illegal market[s]." He said that the Company's attitude was: "I will provide you the software, don't tell me where you install it. I will provide you data, don't tell me where you

will use it[.]" He concluded that, "in the end, [Sportradar] know[s] that [its] client[s are] working [in an] illegal way."

238. In that same interview, when asked if he believed there were any problems with ethics at Sportradar, INT-2 stated that the Company "had huge problems." Seemingly referring to the "relatively young" sales employee which Defendant Koerl blamed for the Muddy Waters allegations, *see* ¶ 93, INT-2 said that "[i]n the end, they found one guy to blame it [on] from [] sales, and he's not with the [C]ompany anymore." However, according to INT-2, Sportradar "had huge issues internally." INT-2 further stated: "For me, in the end, they just explain to themselves [that] it's [the] gray market. I can call it [the] black market easily."

239. In his AlphaSense interview, INT-1 stated that he was aware of the legal issues involved in conducting a gambling business in Asia, citing "legal issues[] and a lot of black and gray operators" as the reason he declined the Company's invitation "to take over the Asian market." With respect to Asian operators, INT-1 stated that "they all do shady business."

240. Furthermore, Sportradar has deep-seated control issues affecting its financial controls and reporting. These issues reflect a lax attitude towards controls and compliance. The Company has reported material weaknesses in its internal controls over financial reporting in all of its annual reports since its IPO, which it has failed to remedy. Sportradar's primary auditor, KPMG, does not perform audits on many of its subsidiaries. At least eight different accounting firms—all much smaller than KPMG—audit Sportradar subsidiaries. Sportradar has cycled through five CFOs since 2019, many of whom had no prior experience in that role for a publicly traded company. The resume of one, Alexander Girsh, includes experience with a company—Cazoo—that had listed via a Special Purpose Acquisition Company before its stock price fell to

$0.00 and a company called Betfair Plc which was fined 2.2 million GPB for Anti-Money Laundering violations during his tenure.

### E. The Truth Is Revealed

241. Investors learned the truth about Sportradar's dealings with Gambling Operators who are operating where online gambling is flatly illegal or without a license for a jurisdiction where they accept bets, as well as Sportradar's actions violating sanctions imposed by OFAC and others, on April 22, 2026. On that date, Muddy Waters and Callisto published the Reports asserting that the Company had significant ties to illegal gambling operations. Muddy Waters, for instance, reported that Sportradar "has actively aided and abetted illegal gambling across the world's black [] grey markets – not as an accident or an oversight, but as a business strategy." As discussed above, Muddy Waters's investigation included undercover investigators engaging in multiple discussions with Sportradar sales teams while posing as sportsbook operators attempting to penetrate markets that ban gambling (such as Vietnam, Thailand, Indonesia, and China). Based on its investigation, Muddy Waters found that Sportradar "intentionally combines a 'check-the-box' KYC review with a 'see nothing, know nothing' approach to illegal markets" that "contrasts sharply with its CEO's recent claims of maintaining a robust KYC process—including the targeting and removal of illegal market operators from its customer rolls." In fact, as described in detail above, one Company sales executive offered to introduce Muddy Waters's investigators to Yabo Group, which is "notorious as not just China's largest illegal [gambling] operator, but also for using Cambodian customer service centers engaged in human trafficking, modern slavery, kidnapping and torture of its workforce." Numerous former Company employees interviewed by Muddy Waters confirmed that "Yabo continues to use SRAD-powered sports betting."

242. Similarly, Callisto reported that, "[t]hrough examination of hundreds of gambling platforms, we found evidence suggesting that over 270 individual platforms (more than a third of

the 800 Sportradar claims to serve) are using Sportradar's products or services, or explicitly claiming to do so, while operating illegally in regulated or prohibited gambling markets." Callisto concluded that it believes "Sportradar will have to choose between surrendering its revenue from illegal operators or losing its licenses in Europe and North America."

### F. Following the Publication of the Reports, Sportradar Conducted a "Housecleaning" by Severing Its Relationship with at Least One Significant Illegal Gambling Operator

243. As noted *supra* ¶ 44, Lead Plaintiff's investigation uncovered a transcript from an interview with INT-1. While that individual left Sportradar in 2024, his interview transcript indicates that he continued to follow Sportradar and remained in contact with his former colleagues, even indicating that he knew the person who the Muddy Waters investigators had dealt with at ICE 2026. When asked about the impact of the Reports on Sportradar, INT-1 stated that "[a]fter that report came out, they did some house cleaning. They shut down a few clients that they were suspicious of. It did make an impact on them, on the business."

244. Through Trace2Trace, Lead Plaintiff, as noted above, sought to identify illegal gambling sites that continued to have a relationship with Sportradar to corroborate both the information from Muddy Waters and Callisto and also the "housecleaning" identified by INT-1. Trace2Trace found that one major Gambling Operator website identified in the Reports, 1xBet, no longer appear to offer Sportradar's products and services, consistent with the report that Sportradar undertook a "house cleaning" of its customer relationships in the wake of the Reports' revelations.

245. Trace2Trace examined fourteen websites associated with 1xBet, which both Callisto and Muddy Waters, and the journalists at Josimar, had concluded was a Sportradar customer, despite 1xBet's longstanding connections to illegal gambling. *See supra* Section V.C.5.c.(5). Lead Plaintiff's investigators found no visible references to Sportradar on any of the fourteen websites examined. These findings suggest that Sportradar discontinued providing at least

certain products and services to 1xBet following the publication of the Reports, supporting the allegation that Sportradar had engaged in "house cleaning."

# VI. ALLEGATIONS RELEVANT TO THE EXCHANGE ACT CLAIMS

## A. Defendants' False and Misleading Statements

### 1. Sportradar's Code of Business Conduct and Ethics

246. Both of the Company's Form 20-Fs filed during the Class Period refer to its Code of Business Ethics During the Class Period, the Code of Business Ethics highlighted that Sportradar "place[d] integrity, transparency and professionalism at the heart of all [it] do[es]." Moreover, the Company acknowledged in the Code of Business Ethics that "it is ***crucial [the Company] conduct[s] [its] business in a manner that upholds [its] high standards of ethics and integrity***," which it claims means "***more than just complying with laws and regulations – it means leading by example in both [its] business practices*** and personal conduct."

247. The statements emphasized above in ¶ 246 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements gave investors the false impression that the Company complied with applicable rules and regulations and also acted with ethics and integrity. The true facts known to Defendants were that Sportradar: (1) offered products and services to entities operating in jurisdictions where online gambling was prohibited, *see supra* Sections V.C.1, V.C.3; (2) sales executives offered to facilitate prospective customers' entry into those markets through existing customers, *see supra* Section V.C.1; (3) provided data, games, and other services where gambling was prohibited, including in China, Thailand, Vietnam, and Indonesia, *see supra* Section V.C.3; (4) treated offshore licenses, including those purportedly issued by Anjouan, as sufficient to authorize Gambling Operators to accept wagers in jurisdictions without local authorization, *see supra* Section V.C.4, ¶ 90 (Operator relying on suspended Maltese license to operate in Thailand), ¶ 154 (relying on Maltese and Curaçaoan

licenses to operate in Turkey); (5) lacked the robust KYC controls Sportradar claimed to prevent its products and services from being used by illegal or unlicensed Operators; and (6) provided services to entities owned by persons subject to OFAC sanctions, *see supra* Sections V.C.5, V.C.3.d.

248. During the Class Period, the Code of Business Ethics at Section III.6, stated that Sportradar "***is committed to complying with all applicable economic and trade sanctions regulations, export controls, and antiboycott laws and regulations*** (collectively, "Trade Controls"), including those administered by Switzerland, the European Union and its Member States, the United States, and the United Kingdom."

249. The statements emphasized above in ¶ 248 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements gave investors the false impression that the Company was complying with sanctions against Iran and Russia. The true facts known to Defendants were that: (1) Sportradar's Betradar Virtual Sports products were available on Berrybet and Betfido, Persian-language gambling websites accessible to customers in Iran, *see supra* Section V.C.3.d; (2) Berrybet accepted deposits through Iranian payment providers and directed customers to Iranian cryptocurrency exchanges, including Nobitex, which has been linked by the U.S. Government to the Islamic Revolutionary Guard Corps, *see supra* Section V.C.3.d; (3) Sportradar continued to provide its data, products, and services to known Russian Gambling Operators 1xBet, 1win, Betboom, Fonbet, Bet city, Bet-M, and Leonbet.ru, *see supra* Section V.C.5.c; and (4) Sportradar continued to provide its data, products, and services to Gambling Operators with ties to Russian persons and entities subject to sanctions by OFAC, *see supra* Section V.C.5.c.

### 2. Sportradar's Global Anti-Money Laundering and Counter-Terrorism Policy

250. Sportradar's Code of Business Ethics referred to the Company's "Global Anti-Money Laundering and Counter-Terrorism Policy" ("Policy"). During the Class Period, the Policy stated in Section 1 that "***Sportradar will not conduct business with individuals or entities whose conduct gives rise to suspicions of involvement with illegal activities***."

251. The statements emphasized above in ¶ 250 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements gave investors the false impression that the Company did not conduct business with individuals or entities associated with illegal activities. The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

252. In Section 4.4 of the Policy, Sportradar further claims that it "***has committed to not doing business with individuals or entities who are sanctioned by OFAC or appear on the Specially Designated Nationals (SDN) or EU/UK asset-freeze sanctions lists.***"

253. The statements emphasized above in ¶ 252 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements gave investors the false impression that the Company did not conduct business with individuals or entities sanctioned by OFAC, designated on the SDN List, or subject to EU or UK sanctions. The true facts that were known to Defendants are as summarized in ¶ 249, *supra*.

### 3. Sportradar's Website Discussion of Services Provided

254. During the Class Period, Sportradar's website states that one of the services it claims to offer is the prevention of illegal gambling:




255. The statements above in ¶ 254 were false and misleading and/or omitted material facts necessary to make them not misleading. These statements gave investors the false impression that the Company's products and services were designed to identify and prevent illegal gambling. The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

**4. November 7, 2024 Press Release**

256. On November 7, 2024, the Company issued a press release to coincide with Sportradar filing its third quarter 2024 financial results. The Company's press release filed referenced "risk factors set forth in the section titled 'Risk Factors' in [its] Annual Report on Form 20-F for the fiscal year ended December 31, 2023" (previously defined as the "2023 Annual Report"). In the 2023 Annual Report, stated as risk that it was "subject to a variety of ***U.S. and foreign laws on sports betting," including obtaining and maintaining required licenses in some jurisdictions***, and that "[n]on-compliance with any such legislation or regulations could expose [the Company] to claims, legal or regulatory proceedings, license reviews, litigation and investigations by regulatory authorities, as well as substantial fines and negative publicity, each of which may materially and adversely affect [its] business." Additionally, the Company confirmed in the 2023 Annual Report that, ***"[t]o date, we have obtained all licenses, authorizations, findings of suitability, registrations, permits and approvals necessary for our current operations."*** The press release also touted the Company's commitment to integrity, stating that Sportradar "safeguards sports through its Integrity Services division and advocacy for ***an integrity-driven***

***environment for all involved***." Defendant Koerl signed the 2023 Annual Report and certified its completeness and accuracy.

257. The statements emphasized above in ¶ 256 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements gave investors the false impression that the Company complied with applicable rules and regulations and also acted with ethics and integrity. The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

**5. March 19, 2025 Press Release and Conference Call**

258. On March 19, 2025, the Company published its fourth quarter and full year 2024 financial results. The Company's press release referenced "risk factors set forth in the section titled 'Risk Factors' in the 2023 Annual Report."). In the 2023 Annual Report, stated as risk that it was "subject to a variety of ***U.S. and foreign laws on sports betting," including obtaining and maintaining required licenses in some jurisdictions***, and that "[n]on-compliance with any such legislation or regulations could expose [the Company] to claims, legal or regulatory proceedings, license reviews, litigation and investigations by regulatory authorities, as well as substantial fines and negative publicity, each of which may materially and adversely affect [its] business." Additionally, the Company confirmed in the 2023 Annual Report that, ***"[t]o date, we have obtained all licenses, authorizations, findings of suitability, registrations, permits and approvals necessary for our current operations."*** The press release also touted the Company's commitment to integrity, stating that Sportradar "safeguards sports through its Integrity Services division and advocacy for ***an integrity-driven environment for all involved***." Defendant Koerl signed the 2023 Annual Report and certified its completeness and accuracy. Defendant Felenstein signed the Form 6-K filed with the SEC that included this press release.

259. The statements emphasized above in ¶ 258 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements gave investors the false impression that none of these factors and yet occurred, that Defendants were committed to integrity, and that Sportradar had obtained all licenses, authorizations, findings of suitability, registrations, permits and approvals necessary for our current operations. The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

260. During Sportradar's earnings call with investors and analysts for the fourth quarter and full-year 2024, held on March 19, 2025, Defendant Felenstein furthered the narrative that the Company was achieving growth through "strong execution":

> As Carsten highlighted, 2024 was a year of ***strong execution as we generated continued operating and financial momentum by leveraging our best-in-class content and robust product portfolio across our broad global customer base***.
>
> The significant value we are delivering to our league, media and sports book partners is translating into record financial results, and we have clearly reached an inflection point of strong top-line growth translating into margin expansion and cash flow generation.
>
> ***
>
> Our growth was broad-based, with strength across our product portfolio, including betting and gaming content.

261. The statements emphasized above in ¶ 260 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements gave investors the false impression that its broad global customer base the fueled its growth was from legitimate sources that were legal and sustainable. The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

**6. 2024 Annual Report Filed with the SEC on March 20, 2025**

262. On March 20, 2025, the Company filed its 2024 annual financial report (previously defined as the "2024 Annual Report"). In the 2024 Annual Report, the Company reiterated as risk

factors that it was ***"subject to a variety of U.S. and foreign laws on sports betting," including obtaining and maintaining required licenses in some jurisdictions***, and that "[n]on-compliance with any such legislation or regulations could expose [the Company] to claims, legal or regulatory proceedings, license reviews, litigation and investigations by regulatory authorities, as well as substantial fines and negative publicity, each of which may materially and adversely affect [its] business." Sportradar also stated that, ***"[t]o date, [it has] obtained necessary licenses, authorizations, findings of suitability, registrations, permits and approvals necessary for [its] current operations."*** Defendants Koerl and Felenstein signed the 2024 Annual Report and certified its completeness and accuracy.

263. The statements emphasized above in ¶ 262 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that the risk factors were mere possibilities and Sportradar had obtained necessary ***licenses, authorizations, findings of suitability, registrations, permits and approvals necessary for our current operations.*** The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

264. The 2024 Annual Report further stated that:

> Our failure, or certain of our clients' or ***service providers' failure, to comply with any of these laws, regulations, or rules or their interpretation could result in regulatory action, the imposition of civil and criminal penalties, including fines and restrictions on our ability to offer services or products,*** the suspension, revocation or non-renewal of, or placing of a restriction on, a license, registration, or other authorization required to provide our services or products, the limitation, suspension, or termination of services or products, changes to our business model, loss of consumer confidence, litigation, including private class action litigation, the seizure or forfeiture of our assets and/or reputational damage.

265. The statements emphasized above in ¶ 264 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that Sportradar's clients were fully compliant with local

regulations governing online gambling. The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

266. The 2024 Annual Report further stated that:

> In jurisdictions where the provision of B2B supply services to the betting industry is not subject to holding a license, ***we operate our business based on approvals or certifications granted by the appropriate governmental or regulatory authority or via agreements in which our clients warrant and represent that their respective B2C gambling and betting offer is in line with the applicable local legislation. . .***

267. The statements emphasized above in ¶ 266 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that Sportradar's clients were fully compliant with local regulations governing online gambling. The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

268. The 2024 Annual Report further stated that:

> Any ***adverse changes to the regulation of sports betting***, the interpretation of these laws, regulations, government action and licensing requirements by relevant regulators or the revocation of our operating licenses or those of our clients could materially adversely affect our ability to conduct our operations and generate revenue in the relevant jurisdiction. In particular, ***it may become commercially undesirable or impractical for us to provide sports betting services in certain jurisdictions as the local license or approval costs increase, our returns from or scope of service in such jurisdictions may be reduced or we may be forced to withdraw from such jurisdictions entirely, with a material financial loss due to restrictions to our clients located in these jurisdictions.*** Further, to expand into new jurisdictions, we may need to be licensed and obtain approvals of our product and service offerings.

269. The statements emphasized above in ¶ 268 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that Sportradar's clients were fully compliant with local regulations governing online gambling. The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

270. The 2024 Annual Report further stated that:

> ***We determine whether to permit clients in a given jurisdiction to access any one or more of our products and services and whether to engage in various types of marketing activity and client outreach based on a number of factors, including but not limited to: the laws and regulations of the jurisdiction.***

271. The statements emphasized above in ¶ 270 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that Sportradar's active clients were fully compliant with local regulations governing online gambling. The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

**7. April 1, 2025 "MAD MONEY" Interview**

272. On April 1, 2025, Defendant Koerl appeared on *CNBC*'s "MAD MONEY" with host Jim Cramer. During the segment, Jim Cramer discussed the Company's "Integrity Services" and stated that Sportradar was "in some ways the SEC . . . for gambling." ***Koerl immediately corrected Jim Kramer, stating that the Company was actually "the SEC or the FBI."***

273. The statements emphasized above in ¶ 272 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements gave investors the false impression that Sportradar's acted as the equivalent of a respected law enforcement agency in preventing illegal gambling. The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

**8. May 12, 2025 Press Release**

274. On May 12, 2025, the Company published its first quarter 2025 financial results. The Company's press release referenced "risk factors set forth in the section titled 'Risk Factors'" in the 2024 Annual Report. In the 2024 Annual Report, the Company reiterated as risk factors that it was ***"subject to a variety of U.S. and foreign laws on sports betting," including obtaining and***

***maintaining required licenses in some jurisdictions***, and that "[n]on-compliance with any such legislation or regulations could expose [the Company] to claims, legal or regulatory proceedings, license reviews, litigation and investigations by regulatory authorities, as well as substantial fines and negative publicity, each of which may materially and adversely affect [its] business." Sportradar also stated that, ***"[t]o date, [it has] obtained necessary licenses, authorizations, findings of suitability, registrations, permits and approvals necessary for [its] current operations."*** The press release also touted the Company's commitment to integrity, stating that Sportradar "safeguards sports through its Integrity Services division and advocacy for ***an integrity-driven environment for all involved***." Defendant Felenstein signed the Form 6-K filed with the SEC that included this press release.

275. The statements emphasized above in ¶ 274 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that Defendants were committed to integrity, that the risk factors were mere possibilities and Sportradar had obtained necessary ***licenses, authorizations, findings of suitability, registrations, permits and approvals necessary for our current operations.*** The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

**9. July 22, 2025 Statement**

276. On or about July 22, 2025, in response to questions from Norway-based online magazine Josimar regarding Sportradar's dealings with Russia, Sportradar provided a reply that they required Josimar to print unedited. In that statement, Sportradar referenced its May 27, 2022 announcement, in which it indicated ***"its suspension of all new investments in Russia, including signing new customers"*** and asserted that ***"[w]e are continuing to comply with sanctions."*** In response to Josimar, Sportradar stated that ***"'With reference to Russia, Sportradar announced***

***[on May 27, 2022] its suspension of all new investments in Russia, including signing new clients and divestment of business interests, immediately following the outbreak of war with Ukraine.'"***

277. The statements emphasized above in ¶ 276 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements reaffirmed to investors the false impression that, following Russia's invasion of Ukraine, Sportradar had ceased making new investments, signing new customers, and had divested its Russian business interests immediately following the outbreak of war with Ukraine. The true facts known to Defendants were that Sportradar: (1) continued to provide its data, products, and services to known Russian Gambling Operators 1xBt, 1win, Betboom, Fonbet, Bet city, Bet-M, and Leonbet.ru; (2) continued to provide its data, products, and services to Gambling Operators with ties to Russian persons and entities subject to sanctions by OFAC; (3) maintained a Moscow office, and as late as 2025, posted job advertisements seeking Russian-speaking "client partners" to service new and existing Russian customers; (4) provided its data, products, and services to new Russian Gambling Operators such as Bet-M, who only began operating in 2025; and (5) continued to derive substantial revenues from its Russian business, which a former Sportradar sales employee estimated accounting for approximately 11% to 12% of Sportradar's total revenue in 2024.

**10. August 5, 2025 Press Release**

278. On August 5, 2025, the Company published its second quarter 2025 financial results. The Company's press release referenced "risk factors set forth in the section titled 'Risk Factors'" in the 2024 Annual Report. In the 2024 Annual Report, the Company reiterated as risk factors that it was ***"subject to a variety of U.S. and foreign laws on sports betting," including obtaining and maintaining required licenses in some jurisdictions***, and that "[n]on-compliance with any such legislation or regulations could expose [the Company] to claims, legal or regulatory proceedings, license reviews, litigation and investigations by regulatory authorities, as well as

substantial fines and negative publicity, each of which may materially and adversely affect [its] business." Sportradar also stated that, ***"[t]o date, [it has] obtained necessary licenses, authorizations, findings of suitability, registrations, permits and approvals necessary for [its] current operations."*** The press release also touted the Company's commitment to integrity, stating that Sportradar "safeguards sports through its Integrity Services division and advocacy for ***an integrity-driven environment for all involved***." Defendant Felenstein signed the Form 6-K filed with the SEC that included this press release.

279. The statements emphasized above in ¶ 278 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that Defendants were committed to integrity, that the risk factors were mere possibilities and Sportradar had obtained all ***licenses, authorizations, findings of suitability, registrations, permits and approvals necessary for our current operations.*** The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

**11. November 5, 2025 Press Release**

280. On November 5, 2025, the Company published its third quarter 2025 financial results. The Company's press release referenced "risk factors set forth in the section titled 'Risk Factors'" in the 2024 Annual Report. March 20, 2025, the Company filed its 2024 annual financial report (the "2024 Annual Report"). In the 2024 Annual Report, the Company reiterated as risk factors that it was ***"subject to a variety of U.S. and foreign laws on sports betting," including obtaining and maintaining required licenses in some jurisdictions***, and that "[n]on-compliance with any such legislation or regulations could expose [the Company] to claims, legal or regulatory proceedings, license reviews, litigation and investigations by regulatory authorities, as well as substantial fines and negative publicity, each of which may materially and adversely affect [its] business." Sportradar also stated that, ***"[t]o date, [it has] obtained all licenses, authorizations,***

***findings of suitability, registrations, permits and approvals necessary for [its] current operations."*** The press release also touted the Company's commitment to integrity, stating that Sportradar "safeguards sports through its Integrity Services division and advocacy for ***an integrity-driven environment for all involved***." Defendant Felenstein signed the Form 6-K filed with the SEC that included this press release.

281. The statements emphasized above in ¶ 280 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that Defendants were committed to integrity, that the risk factors were mere possibilities and Sportradar had obtained necessary ***licenses, authorizations, findings of suitability, registrations, permits and approvals necessary for our current operations.*** The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

**12. March 3, 2026 Press Release**

282. On March 3, 2026, the Company published its fourth quarter and full year 2025 financial results. The Company's press release referenced "risk factors set forth in the section titled 'Risk Factors'" in the 2024 Annual Report. In the 2024 Annual Report, the Company reiterated as risk factors that it was ***"subject to a variety of U.S. and foreign laws on sports betting," including obtaining and maintaining required licenses in some jurisdictions***, and that "[n]on-compliance with any such legislation or regulations could expose [the Company] to claims, legal or regulatory proceedings, license reviews, litigation and investigations by regulatory authorities, as well as substantial fines and negative publicity, each of which may materially and adversely affect [its] business." Sportradar also stated that, "***[t]o date, [it has] obtained all licenses, authorizations, findings of suitability, registrations, permits and approvals necessary for [its] current operations.***" The press release also touted the Company's commitment to integrity, stating that Sportradar "safeguards sports through its Integrity Services division and advocacy for ***an integrity-***

***driven environment for all involved***." Defendant Felenstein signed the Form 6-K filed with the SEC that included this press release.

283. The statements emphasized above in ¶ 282 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that Defendants were committed to integrity, that the risk factors were mere possibilities and Sportradar had obtained all ***licenses, authorizations, findings of suitability, registrations, permits and approvals necessary for our current operations.*** The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

### 13. 2025 Annual Report Filed with the SEC on March 27, 2026

284. On March 27, 2026, the Company filed its 2025 annual financial report (previously defined as the "2025 Annual Report"). In the 2025 Annual Report, the Company reiterated that it was ***"subject to a variety of U.S. and foreign laws on sports betting," including obtaining and maintaining required licenses in some jurisdictions***, and that "[n]on-compliance with any such legislation or regulations could expose [the Company] to claims, legal or regulatory proceedings, license reviews, litigation and investigations by regulatory authorities, as well as substantial fines and negative publicity, each of which may materially and adversely affect [its] business." According to Sportradar, ***"[t]o date, we have obtained all licenses, authorizations, findings of suitability, registrations, permits and approvals necessary for our current operations."*** Defendants Koerl and Felenstein signed the 2025 Annual Report and certified its completeness and accuracy.

285. The statements emphasized above in ¶ 284 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that it had obtained all licenses, authorizations, findings of

suitability, registrations, permits and approvals necessary for our current operations. The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

286. The 2025 Annual Report further stated that:

> Our failure, or certain of our clients' or ***service providers' failure, to comply with any of these laws, regulations, or rules or their interpretation could result in regulatory action, the imposition of civil and criminal penalties, including fines and restrictions on our ability to offer services or products***, the suspension, revocation or non-renewal of, or placing of a restriction on, a license, registration, or other authorization required to provide our services or products, the limitation, suspension, or termination of services or products, changes to our business model, loss of consumer confidence, litigation, including private class action litigation, the seizure or forfeiture of our assets and/or reputational damage.

287. The statements emphasized above in ¶ 286 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that Sportradar's clients were fully compliant with local regulations governing online gambling. The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

288. The 2025 Annual Report further stated that:

> In jurisdictions where the provision of B2B supply services to the betting industry is not subject to holding a license, ***we operate our business based on approvals or certifications granted by the appropriate governmental or regulatory authority or via agreements in which our clients warrant and represent that their respective B2C gambling and betting offer is in line with the applicable local legislation. . .***

289. The statements emphasized above in ¶ 288 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that Sportradar's clients were fully compliant with local regulations governing online gambling. The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

290. The 2025 Annual Report further stated that:

> Any ***adverse changes to the regulation of sports betting*** or the revocation of our operating licenses or those of our clients could materially adversely affect our ability to conduct our operations or may become commercially undesirable or ***it may become commercially undesirable or impractical for us to provide sports betting services in certain jurisdictions***.

291. The statements emphasized above in ¶ 290 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that Sportradar's clients were fully compliant with local regulations governing online gambling. The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

**14. April 22, 2026 Response**

292. On April 22, 2026, Sportradar published a "Statement Regarding Short Seller Reports" in response to the Reports (previously defined as the "Response"). In this Response, Sportradar "unequivocally challenged the[] assertions" in the Reports and asserted that it does not do business with illegal or unlicensed Gambling Operators. The Company specifically stated that it ***"works exclusively with licensed operators,*** and ***"conduct[s] [its] business with the highest ethical standards.***"

293. The statements emphasized above in ¶ 292 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements gave investors the false impression that Sportradar did not work with illegal or unlicensed Gambling Operators. The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

**15. April 28, 2026 Explanatory Note and First Quarter 2026 Earnings Call**

294. On April 28, 2026, in an explanatory note issued through a Form 6-K, the Company indicated that "[f]or 25 years***, Sportradar has maintained regulatory licenses in jurisdictions across the globe.***" The Company further stated "***[w]e maintain a strict policy of working with***

***licensed operators****, and* ***our contracts require clients to obtain all necessary licenses*** and to notify us of any changes in their licensing status**.** ***Sportradar is committed to taking all reasonable steps to ensure its products and services are delivered in accordance with applicable laws and regulations.”*** The Company also stated that "***Sportradar does not tolerate illegal operations or engagement with operators that are known sources of illegal activities, including criminal misconduct.***"

295. The statements emphasized above in ¶ 294 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements gave investors the false impression Sportradar worked only with licensed Operators, did not tolerate illegal gambling operations or relationships with Operators known to engage in illegal activity. The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

296. That same day, during a conference call held in connection with its first quarter 2026 earnings release, Defendant Koerl touted Sportradar's commitment to integrity: "As the global leader in sports technology trusted by leagues, operators and regulators around the world, [***we***] ***place integrity[ and] transparency[] at the heart of everything we do***." Defendant Koerl further emphasized the Company's commitment to "***uphold the highest levels of integrity and transparency***. . . ."

297. An analyst with the Craig-Hallum Capital Group asked Defendants if they could "quantify and say with confidence what [the Company's] revenue mix is for operators in black [il]legal markets" because "there's a big difference between licensed gray market operators and black market [il]legal operators." Koerl responded that:

> The first point is the black market [and] the gray market. ***We do not work with black market operators.*** *** And the measurements which we apply here is the risk assessment, and irrespective of licensing and jurisdictions, ***we support only business which has a license***.

298. Also during that call, in response to a question regarding Sportradar's sales team's engagement with operators from illegal markets, Defendant Koerl highlighted the Company's purportedly robust vetting and KYC processes, stating that "when the sales guy is telling something, ***there is a kickoff of a very intensive KYC process***. . . ."

299. The statements emphasized above in ¶¶ 296-298 were materially false and misleading, and failed to disclose material adverse facts, about the Company's business and operations. These statements gave investors the false impression Sportradar worked only with licensed Operators and did not tolerate illegal gambling operations or relationships with Operators known to engage in illegal activity. The true facts that were known to Defendants are as summarized in ¶ 247, *supra*.

**B. Loss Causation**

300. As alleged herein, Defendants engaged in a scheme to deceive investors by misrepresenting and omitting material facts concerning: (i) Sportradar's KYC procedures; (ii) Sportradar's work with Gambling Operators that were operating illegally or were not validly licensed in the jurisdictions where they operated; and (iii) the Company's reputation, integrity, and compliance with applicable laws and regulations.

301. Defendants' materially false or misleading statements and omissions of material facts alleged above in Section VI.A caused the price of Sportradar's Shares to be artificially inflated and/or maintained artificial inflation in the price of Sportradar Shares, and operated as a fraud or deceit upon Class Period purchasers of Sportradar's Shares.

302. Lead Plaintiff and other Class members suffered actual economic loss and were damaged when the foreseeable risks—including, but not limited to, the risks of governmental investigation, the loss of significant Sportradar customers, and reputational and other associated harm—created and concealed by Defendants' misstatements and omissions materialized through

the disclosure of new information concerning the fraud alleged herein on April 22, 2026 and August 3, 2026.

303. On April 22, 2026, both Callisto and Muddy Waters published independently-researched Reports detailing the extent of Sportradar's exposure to illegal, unlicensed, sanctioned, and criminal Operators, as well as the Company's knowledge of such exposure.

304. In response, on April 23, 2026, UBS published a report titled *Placing SRAD Rating and PT Under Review*, announcing it was "placing . . . SRAD Under Review" to assess the risks highlighted by the Reports. Previously, on December 8, 2025, UBS had credited Defendants' claims that the Company "only sell[s] data to licensed [O]perators," that it conducts KYC "checks every year" to ensure that this is the case, and that Sportradar "get[s] no revenue from black markets."

305. Benchmark Equity Research, on April 22, 2026, in a same-day report titled *Sportradar: Integrity Under Scrutiny*, called the Muddy Waters report "difficult to dismiss." It further reported that "even a partial overlap could still be financially material." Benchmark noted Sportradar's revenue exposure could warrant "more conservative" growth assumptions.

306. In response to the publication of the Reports, the price of Sportradar Shares plummeted $3.80 per share, or approximately 22.6%, from a close of $16.84 per share on April 21, 2026, to close at $13.04 per share on April 22, 2026.

307. In an April 24, 2026 report titled *The Quest For Truth Can Have a Lengthy Path; Downgrade to Hold*, Jefferies downgraded Sportradar from buy to hold and reduced its price target from $30 to $14 "given the persistence of the questions" raised by the Reports and questions concerning Sportradar's "customer management and controls."

308. On August 3, 2026, Sportradar announced its second quarter 2026 financial results. The results were disappointing. Sportradar announced a quarterly ***loss*** of $0.01 per share, relative to expected earnings of $0.06 per share. In addition, the Company also announced that it was lowering guidance for 2026 revenue by approximately 2.8% and guidance for Adjusted EBITDA by approximately 7.8%.

309. In a report issued on August 3, 2026, titled *Weaker Quarter And Outlook but 7x EBITDA is Not Justified Considering the Cash Flow Growth*, Citizens wrote that Sportradar's "underlying fundamentals have weakened since the start of the calendar year." Citizens further explained that the Company's management "appears frustrated" with pressure from short-seller allegations. As a result, Citizens lowered its price target for Sportradar from $24 to $20.

310. In an August 3, 2026 report titled *2Q25 First Take: Miss with lowered FY guide likely keeps discounted valuation vs. growth*, Morgan Stanley reported that "SRAD has materially underperformed YTD on the back of weaker results and ***concerns around unregulated market exposure***." It further explained it applied a "50% haircut to base case multiple" because its estimated exposure to unregulated betting markets.

311. While the Company reiterated its denials of the wrongdoing alleged in the Reports, as explained above, *see supra* Section V.F, following the issuance of the Reports, Sportradar had privately engaged in "house cleaning," which resulted in the removal of at least one of the Company's most significant customers.

312. As a result of these disclosures, the price of Sportradar Shares dropped $2.20 per share, or approximately 15.1%, from a close of $14.54 per share on July 31, 2026, to close at $12.34 per share on August 3, 2026.

313. Defendants' wrongful conduct directly and proximately caused the damages suffered by Lead Plaintiff and other Class members. Throughout the Class Period, the prices at which Lead Plaintiff and other Class members purchased or otherwise acquired Sportradar Shares were artificially inflated as a result of Defendants' materially false or misleading statements and omissions of material fact identified herein at Section VI.A. Specifically, the material misrepresentations and omissions detailed above had the effect of causing the price of Sportradar Shares to be artificially inflated and/or maintained artificial inflation in the price of Sportradar Shares throughout the Class Period.

314. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Sportradar Shares at the artificially inflated prices that they paid. It was entirely foreseeable to Defendants that misrepresenting and concealing these material facts and risks from the public would cause the prices of Sportradar Shares to be artificially inflated or would maintain artificial inflation in the price of Sportradar Shares. It was also foreseeable that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Sportradar Shares to decline, as the inflation resulting from and/or maintained by Defendants' earlier materially false or misleading statements and omissions of material fact was removed from the Share price. Accordingly, Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Lead Plaintiff and to the other members of the Class who purchased or otherwise acquired Sportradar Shares during the Class Period.

315. In summary, the economic losses, i.e., damages, suffered by Lead Plaintiff and other Class members are direct and foreseeable results of: (i) Defendants' materially false or

misleading statements and omissions of material fact, which caused the price of Sportradar Shares to be artificially inflated and/or maintained artificial inflation in the price of Sportradar Shares; and (ii) the subsequent significant decline in the price of Sportradar Shares when the truth was revealed, removing portions of the artificial inflation from the price of Sportradar Shares.

### C. Additional Scienter Allegations

316. Numerous facts, including those detailed above, demonstrate that Defendants knew or recklessly disregarded that their statements (*see* Section VI.A) were materially false and misleading. In addition to the facts alleged in Section V, detailed above, the facts support both that (a) the Individual Defendants possessed the motive and the opportunity to commit fraud and (b) Defendants deliberately or recklessly disregarded the falsity of their statements.

#### 1. Individual Defendants Had the Motive and Opportunity to Commit Fraud

317. As a result of their positions as senior executives within the Company, both Defendants Koerl and Felenstein possessed the opportunity to commit fraud. Koerl is Sportradar's founder and served as the Company's CEO at all relevant times. Moreover, Koerl exercised extraordinary influence over Sportradar's Board of Directors. Throughout the Class Period, Koerl possessed approximately 80% of Sportradar's voting power held in outstanding shares, due in large part to Koerl's exclusive ownership of the Company's class B shares.

318. Similarly, Defendant Felenstein was Sportradar's CFO at all relevant times, and, accordingly, delivered prepared remarks at the Company's earnings calls and reviewed and certified the accuracy of its financials in its SEC filings.

319. Moreover, Defendants Koerl and Felenstein obtained concrete personal benefits as a result of the fraud.

320. ***First***, the value of the compensation awarded to the Individual Defendants was directly linked to the price of the Company's Shares and Sportradar's Adjusted EBITDA. Defendant Felenstein was awarded Sportradar Shares as a sign-on grant when he joined the Company on June 1, 2024, just six months prior to the start of the Class Period. Likewise, Defendant Koerl was awarded a performance-based stock unit grant ***for the first time*** in 2025. Also in 2025, Koerl and Felenstein were both incentivized by cash bonuses tied directly to Adjusted EBITDA, revenue, and cash flow metrics.

321. ***Second***, on April 22, 2025, Sportradar announced the Secondary Public Offering, which served little function other than to allow Defendant Koerl to profit from the Company's elevated stock price. From the beginning of the Class Period to market close on April 22, 2025, the price of Sportradar's Shares had increased by $10.73, or approximately 75%. Pricing for the Secondary Public Offering was announced on April 24, 2025, at $22.50 per Share—a price approximately 57% higher than the price at the beginning of the Class Period. The Secondary Public Offering closed on April 25, 2025.

322. Notably, Sportradar, itself, did not sell any Shares and therefore did not raise any capital from the event. To the contrary, the Company, controlled by Defendant Koerl, instead ***bought*** Shares during the Secondary Public Offering. Sportradar purchased 3,000,000 Shares in an offering that was comprised almost entirely of shares held by Koerl and two other private parties.

323. Defendant Koerl reaped the reward of his fraud while Sportradar's stock price was artificially inflated. In the Secondary Public Offering, Koerl sold more than ten million Shares—an amount equal to 15% of his Sportradar holdings—to reap more than $222 million. By contrast, Koerl had previously ***never sold any*** Sportradar stock since the Company made its IPO in

September 2021. Moreover, the Shares sold by Koerl accounted for ***nearly half*** of the total Shares sold in the Secondary Public Offering.

### 2. Defendants Explicitly Claimed Deep Knowledge of Its Customers' Actions and Their Compliance with All Applicable Rules and Regulations in the Markets Where Those Clients Solicit Bets

324. The Individual Defendants regularly spoke about the Company's due diligence efforts to ensure its clients were properly licensed in the jurisdictions where they operated and were not engaged in illegal behavior. *See generally supra* Section V.B.

325. In Section 4.2 of its Global Anti-Money Laundering and Counter-Terrorism Policy Sportradar states that it has "established procedures" "to ensure that such Third Parties that Sportradar enters a business relationship with are appropriate and legitimate for their contemplated role, that they do not have any improper or suspicious connections or ownership interests, and are not likely to engage in any improper, unethical, corrupt, or illegal activities."

326. In its 2024 Annual Report, Sportradar claimed that "we are monitoring these areas closely to design compliant solutions for our clients and continue to adapt our business practices and strategies to help us comply with current and changing laws and regulations, legal standards and industry practices" and that they were performing "due diligence checks" to review the Company's "clients' licensing status." The 2024 Annual Report further stated: "We determine whether to permit clients in a given jurisdiction to access any one or more of our products and services and whether to engage in various types of marketing activity and client outreach based on a number of factors, including but not limited to: the laws and regulations of the jurisdiction."

327. The Company made equivalent statements in its 2025 Annual Report.

328. The Individual Defendants also directly claimed deep knowledge about their customers' activities in multiple media interviews and investor conference calls.

329. On April 1, 2025, Defendant Koerl appeared on CNBC's "MAD MONEY" with host Jim Cramer. During the segment, Jim Cramer discussed the Company's "Integrity Services" and stated that Sportradar was "in some ways the SEC . . . for gambling." Koerl immediately corrected Jim Kramer, stating that the Company was actually "the SEC or the FBI."

330. In an investor call on November 5, 2025, a Citizens Bank analyst stated that he "want[ed] to address some of the noise around the business with your exposure to certain markets, whether they're gray or beyond that." In response, Koerl assured investors that the Company had a "4-level process" to confirm that the Company "only work[s] with licensed operators," including by "hav[ing] contracts which are enabling those operators only to work in the territory where they are licensed in." Moreover, Koerl asserted that "we have a global compliance team, which is making an intensive KYC with every operator, and we are insisting on this[,] that we control it." Koerl further explained that the Company's KYC process worked hand-in-hand with its "internal audit" process to identify areas where Sportradar's "content is popping up in markets which are not licensed, which are not covered by the contracts," so that Sportradar can shut down those operations. Koerl emphasized that "we are monitoring this very closely."

331. On April 22, 2026, in response to the Reports issued by Muddy Waters, Sportradar asserted that it does not do business with illegal or unlicensed gambling operators. The Company specifically stated that it "works exclusively with licensed operators, follows strict global compliance, and due diligence standards," and "conduct[s] [its] business with the highest ethical standards."

332. On April 28, 2026, in an explanatory note issued through a Form 6-K, the Company indicated that ***"the [C]ompany maintains a robust compliance framework."*** The Company further stated "***[w]e maintain a strict policy of working with licensed operators****, and* ***our contracts***

***require clients to obtain all necessary licenses*** and to notify us of any changes in their licensing status**.** The Company also stated that "***Sportradar does not tolerate illegal operations or engagement with operators that are known sources of illegal activities, including criminal misconduct. Sportradar thus employs proactive measures to continuously assess risk, irrespective of licensing jurisdiction***, to support the business. The team is further overseen by dedicated legal, compliance and risk personnel."

333. In a conference call with investors held on April 28, 2026 in connection with its release of its financial results for the first quarter of 2026, Defendant Koerl represented that: "To be clear, ***the company maintains a robust compliance framework*** with oversight from the Board of Directors that is designed to assist the company and its offices to navigat[e] [in]to complex business and regulatory landscape." Koerl further emphasized the Company's commitment to ***"uphold the highest levels of integrity and transparency*** . . . ***"***

334. Koerl further noted, in response to an analyst's question, "***We do not work with black market operators"*** and ***"we have a solid compliance structure in place and we only work with licensed operators***. He explained that Sportradar's compliance team "is constructed out of legal experts, compliance and risk personnel together with extra advis[o]rs. ***We take this very, very serious and we are running a very rigid KYC process***. . . ."

335. In addition to its claims that it does not deal with black market operators or those operating without a license, Sportradar acknowledges that it collects a vast array of information about users of websites operated by its various partners. *See supra* Section V.B. This disclosure makes clear that Sportradar has the ability to monitor information about the persons who are visiting the websites of the entities utilizing Sportradar products and services.

### 3. The Defendants Fostered a Culture Where Increasing Revenue Trumped Concerns About Their Clients' Illegal Activities

336. FEs and other knowledgeable parties allege that an improper tone at the top permeated the entire Company, creating a culture in which the Company would make any sales it could, irrespective of moral or ethical concerns.

337. For instance, FE-3 described his experience with the Company as unlike his experience at reputable media companies at which he'd also worked. In particular, FE-3 was directed to develop a plan to monetize piracy of Sportradar's audiovisual streams. Such piracy infringed not only on Sportradar's rights, but the rights of the underlying rightsholder (i.e., sports leagues) as well. In FE-3's experience, it was extraordinary for a company to take any approach to piracy other than an aggressive effort to shut it down. In contrast, Sportradar's initiative to induce pirates to pay the Company for content they were already stealing was emblematic, in FE-3's view, of Sportradar's pervasive attitude that no potential revenue source was to go untapped.

338. FE-3's experience was corroborated by former senior executives at Sportradar in interviews published on AlphaSense. For instance, in his interview, INT-2 flatly stated that Sportradar "know[s] it's the black market." *See* ¶ 237. In that same interview, INT-2 noted Sportradar's lack of concern with its actual KYC rules, stating that the Company's attitude was: "I will provide you the software, don't tell me where you install it. I will provide you data, don't tell me where you will use it[.]" These statements corroborate Muddy Waters' view of Sportradar's claimed compliance efforts: that Sportradar followed "a 'see nothing, know nothing' approach to illegal markets."

339. In his interview published on AlphaSense, INT-1 stated that his decision to leave the Company was motivated, in part, by Sportradar's request that he take over the Asian market. In INT-1's words, he was put off by "legal issues, [] a lot of black and gray operators," the fact

that "you are not dealing with the best players on the Asian markets", and "they all do shady business, to be honest." Defendants' tone at the top—which prioritized profits over compliance—permeated the culture of the Company.

340. Further, Sportradar's efforts to silo business units further contribute to a strong inference of scienter. As described by FE-2, the Company is divided into a number of verticals that are not integrated, creating a web of distinct micro-businesses across global geographies. As a result, FE-2 stated that Sportradar's environment was one in which the right hand would not know what the left hand was doing. FE-1 corroborated this aspect of the Company's management style, saying that Sportradar would keep its employees in the dark regarding any aspects of the business that did not directly bear on their job duties.

341. With limited knowledge-sharing across teams, Sportradar relied on a select group of senior leaders, including Defendants Koerl and Felenstein, to make decisions. All information at lower levels of the Company flowed up to this group. For instance, FE-1 stated that he had virtually zero contact with Sportradar employees outside his team, which was unusual based upon his prior experience working at two other companies in the gambling space. His knowledge of goings-on at the Company was derived from whatever was relayed to him from the leader of his team, who attended quarterly meetings among the C-Suite and vice presidents, at which all key areas of the Company's business, including expansion into new markets, were discussed.

342. Finally, Sportradar's decision to divide audit responsibilities for its main business and its subsidiaries demonstrates an intent to hide its dealings with illegal and unlicensed Operators. Sportradar's primary auditor, KPMG, does not perform audits on many of its subsidiaries. Instead, at least eight different accounting firms—all much smaller than KPMG—audit Sportradar subsidiaries.

#### 4. The Business and Markets in Which Sportradar Partners with Unlicensed and Illegal Gambling Sites Is a Core Operation of the Company

343. The Individual Defendants' knowledge, or reckless disregard, of Sportradar's exposure to illegal gambling operations can be inferred because these were core operations at the Company. Sportradar provided services Gambling Operators operating illegally or without a valid license as part of its BTS business. BTS accounted for eighty percent of Sportradar's revenues in each of 2023, 2024, and 2025. Moreover, Sportradar's operations in the markets, and with the Gambling Operators identified by Muddy Waters and Callisto, are extremely important to the Company's success. Muddy Waters estimated that the revenue reduction which would ensue should the Company "clean up its customer rolls" would fall within the range of 20-40%. Likewise, Callisto estimated that Sportradar's revenue generated directly from illegal gambling amounted to 18% of the Company's total revenues.

344. Further, the Company's claims that it is like the "FBI" for detecting illegality in the sports betting world, its constant refrain that its "integrity" is a key aspect of its corporate identity, and its consistent claims that it will not and does not do business with illegal/black market gambling operators, demonstrate the importance to the Company of its claimed integrity efforts, making them a core operation of the Company.

### D. A Presumption of Reliance Applies

345. At all relevant times, the market for Sportradar's Shares was efficient for the following reasons, among others:

a. Sportradar's Shares met the requirements for listing, and were listed and actively traded on the Nasdaq, a highly efficient electronic market, under the ticker symbol "SRAD";

b. As a registered and regulated issuer of securities, Sportradar filed periodic public reports with the SEC, in addition to the Company's frequent voluntary public dissemination of information;

c. Sportradar regularly communicated with public investors via established market communication mechanisms, including conference calls, regular disseminations of press releases on the national circuits of major newswire services, the Company's website, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Sportradar was followed by securities analysts employed by major brokerage firms, including UBS, Deutsche Bank, JP Morgan, and Guggenheim Securities, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

346. As a result of the foregoing, the market for Sportradar Shares promptly digested current information with respect to Sportradar from all publicly-available sources and reflected such information in the price of these securities. Under these circumstances, all purchasers of the Company's publicly-traded common stock during the Class Period suffered similar injury through their purchases of Sportradar Shares at artificially inflated prices, and a presumption of reliance applies.

347. Further, at all relevant times, Lead Plaintiff and all other members of the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Lead Plaintiff and the other members of the Class would not have purchased or otherwise acquired Sportradar's common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

**E. No Safe Harbor**

348. The PSLRA's statutory safe harbor and/or the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and/or misleading statements alleged herein.

349. None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

350. To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement. As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

351. To the extent that the statutory safe harbor may apply to any materially false or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false

or misleading forward-looking statement because at the time such statement was made, the speaker actually knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Sportradar who actually knew that the statement was false or misleading.

352. Moreover, to the extent that Sportradar or the Individual Defendants issued any disclosures purporting to "warn" or "caution" investors of certain "risks," those disclosures were also materially false or misleading because they did not disclose that the risks that were the subject of such warnings had materialized or Sportradar and the Individual Defendants had actual knowledge of undisclosed material adverse facts that rendered such purportedly "cautionary" disclosures materially false or misleading.

## VII. ALLEGATIONS RELEVANT TO THE SECURITIES ACT CLAIMS

353. The allegations set forth above in Sections I-V are incorporated by reference herein, except to the extent they sound in fraud. The Securities Act allegations herein are based in strict liability and negligence, and Lead Plaintiff expressly disclaims any allegation or inference of fraud or scienter for these allegations. The only statements and omissions actionable under Sections 11 and 15 of the Securities Act are those in the Prospectus Supplement dated April 22, 2025, filed with the SEC on pursuant to Rule 424(b)(7) Registration No. 333-286679 ("Prospectus Supplement") and the Registration Statement, dated April 22, 2025, filed with the SEC on Form F-3 ("Registration Statement"). The Registration Statement and Prospectus Supplement are collective referred to herein as the "Secondary Offering Documents."

### A. The Secondary Offering Documents Contained Inaccurate Statements of Material Fact and Omitted Material Information

354. The Secondary Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact, omitted to state other facts necessary to make the

statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

**B. The Registration Statement**

355. The Registration Statement incorporated by reference Sportradar's Annual Report for 2024 on Form 20-F, filed with the SEC on March 20, 2025. In the 2024 Annual Report, the Company reiterated as risk factors that it was ***"subject to a variety of U.S. and foreign laws on sports betting," including obtaining and maintaining required licenses in some jurisdictions***, and that "[n]on-compliance with any such legislation or regulations could expose [the Company] to claims, legal or regulatory proceedings, license reviews, litigation and investigations by regulatory authorities, as well as substantial fines and negative publicity, each of which may materially and adversely affect [its] business." Sportradar also stated that, ***"[t]o date, [it has] obtained necessary licenses, authorizations, findings of suitability, registrations, permits and approvals necessary for [its] current operations."*** Defendants Koerl and Felenstein signed the 2024 Annual Report and certified its completeness and accuracy.

356. The statements emphasized above in ¶ 355 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that it had obtained all ***licenses, authorizations, findings of suitability, registrations, permits and approvals necessary for our current operations*** The true facts known to Defendants were that Sportradar: (1) offered products and services to entities operating in jurisdictions where online gambling was prohibited, *see supra* Sections V.C.1, V.C.3; (2) sales executives offered to facilitate prospective customers' entry into those markets through existing customers, *see supra* Section V.C.1; (3) provided data, games, and other services where gambling was prohibited including China, Thailand, Vietnam, and Indonesia, *see supra* Section V.C.3; (4) treated offshore licenses, including those purportedly issued by Anjouan, as sufficient

to authorize Gambling Operators to accept wagers in jurisdictions without local authorization, *see supra* Section V.C.4, ¶¶ 90 (Operator relying on suspended Maltese license to operate in Thailand), 154 (relying on Maltese and Curaçaoan licenses to operate in Turkey); and (5) provided services to entities owned by persons subject to OFAC sanctions, *see supra* Sections V.C.5, V.C.3.d.

357. The 2024 Annual Report further stated that:

> Our failure, or certain of our clients' or ***service providers' failure, to comply with any of these laws, regulations, or rules or their interpretation could result in regulatory action, the imposition of civil and criminal penalties, including fines and restrictions on our ability to offer services or products,*** the suspension, revocation or non-renewal of, or placing of a restriction on, a license, registration, or other authorization required to provide our services or products, the limitation, suspension, or termination of services or products, changes to our business model, loss of consumer confidence, litigation, including private class action litigation, the seizure or forfeiture of our assets and/or reputational damage.

358. The statements emphasized above in ¶ 357 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that Sportradar's clients were fully compliant with local regulations governing online gambling. The true facts known to Defendants were that Sportradar: (1) offered products and services to entities operating in jurisdictions where online gambling was prohibited, *see supra* Sections V.C.1, V.C.3; (2) sales executives offered to facilitate prospective customers' entry into those markets through existing customers, *see supra* Section V.C.1; (3) provided data, games, and other services where gambling was prohibited including China, Thailand, Vietnam, and Indonesia, *see supra* Section V.C.3; (4) treated offshore licenses, including those purportedly issued by Anjouan, as sufficient to authorize Gambling Operators to accept wagers in jurisdictions without local authorization, *see supra* Section V.C.4, ¶ 90 (Operator relying on suspended Maltese license to operate in Thailand), ¶ 154 (relying on Maltese and Curaçaoan licenses to operate in Turkey); (5) lacked the robust KYC controls Sportradar claimed to prevent its products and services from being used by illegal or unlicensed Operators; and (6) provided

services to entities owned by persons subject to OFAC sanctions, *see supra* Sections V.C.5, V.C.3.d.

359. The 2024 Annual Report further stated that:

> In jurisdictions where the provision of B2B supply services to the betting industry is not subject to holding a license, ***we operate our business based on approvals or certifications granted by the appropriate governmental or regulatory authority or via agreements in which our clients warrant and represent that their respective B2C gambling and betting offer is in line with the applicable local legislation*** and certain ***due diligence checks that we perform to review our clients' licensing status***. Sportradar Annual Report 2024 at 104 of 304 incorp by ref into Prospectus Supp.

360. The statements emphasized above in ¶ 359 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that Sportradar's clients were fully compliant with local regulations governing online gambling and that Sportradar performed due diligence checks to ensure compliance with applicable gambling regulations. The true facts known to Defendants were as set forth in ¶ 358, *supra*.

361. The 2024 Annual Report further stated that:

> Any ***adverse changes to the regulation of sports betting***, the interpretation of these laws, regulations, government action and licensing requirements by relevant regulators or the revocation of our operating licenses or those of our clients could materially adversely affect our ability to conduct our operations and generate revenue in the relevant jurisdiction. In particular, ***it may become commercially undesirable or impractical for us to provide sports betting services in certain jurisdictions as the local license or approval costs increase, our returns from or scope of service in such jurisdictions may be reduced or we may be forced to withdraw from such jurisdictions entirely, with a material financial loss due to restrictions to our clients located in these jurisdictions.*** Further, to expand into new jurisdictions, we may need to be licensed and obtain approvals of our product and service offerings.

362. The statements emphasized above in ¶ 361 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that Sportradar's clients were fully compliant with local

regulations governing online gambling. The true facts known to Defendants were as set forth in ¶ 358, *supra*.

363. The 2024 Annual Report further stated that:

> ***We determine whether to permit clients in a given jurisdiction to access any one or more of our products and services and whether to engage in various types of marketing activity and client outreach based on a number of factors, including but not limited to: the laws and regulations of the jurisdiction.***

364. The statements emphasized above in ¶ 363 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that Sportradar's active clients were fully compliant with local regulations governing online gambling and that Sportradar was monitoring clients to ensure compliance with applicable gambling regulations The true facts known to Defendants were as set forth in ¶ 358, *supra*.

**C. The Prospectus Supplement**

365. In the Prospectus Supplement at S-1, Sportradar stated that "[w]e have approximately 800 betting operator clients to which we provide pre-match data and odds, live data and odds, as well as sports audiovisual content."

366. The statements above in ¶ 365 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements continued to give investors the false impression that Sportradar's 800 clients were all operating legally and were fully compliant with local regulations governing online gambling. The true facts known to Defendants were as set forth in ¶ 358, *supra*.

367. In the Prospectus Supplement at S-2, Sportradar stated that: "Sports betting is the fastest growing category within the broader gambling market. . . . [T]he global sports betting market is projected to grow from $94.1 billion in 2024 to $150.0 billion in 2029, representing a

compound annual growth rate [] of 10%. The same source projects growth in the following markets: APAC and the Middle East are projected to grow from $32.2 billion in 2024 to $41.1 billion in 2029, representing a CAGR of 5.0%[.]"

368. The statements above in ¶ 367 were false and misleading and/or omitted to state material facts necessary to make them not misleading. These statements give investors the false impression that there were massive markets for growth in the Middle East and Asia and that Sportradar and its clients were providing and could in the future provide additional services that were legal and not in violation of local laws and regulations. The true facts known to Defendants were as set forth in ¶ 358, *supra*.

369. The Prospectus Supplement is incorporated by reference into Sportradar's Annual Report for 2024.

370. The statements in the Annual Report for 2024 that are incorporated in the Prospectus Supplement are the same statements that were incorporated by Reference in the Registration Statement and are false for the same reasons as set forth above.

## VIII. CLASS ACTION ALLEGATIONS

371. Lead Plaintiff brings this action on behalf of itself and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired Sportradar's Shares: (i) during the Class Period with respect to claims under the Exchange Act and (ii) pursuant of traceable to the Secondary Public Offering with respect to claims under the Securities Act. Excluded from the Class are (i) Defendants (as set forth herein), (ii) present or former executive officers of Sportradar, members of Sportradar's Board of Directors, and members of the immediate families of each of the foregoing (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)), (iii) any of the

foregoing individuals' and entities' legal representatives, heirs, successors or assigns, and (iv) any entity in which Defendants have or had a controlling interest or any affiliate of Sportradar.

372. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sportradar's Shares were actively traded on the Nasdaq. While the exact number of Class members is unknown to Lead Plaintiff at this time and could only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members in the proposed Class. During the Class Period, Sportradar had approximately 220 million Shares outstanding and available for trading on the Nasdaq. In the Secondary Public Offering, Sportradar offered 23,000,000 Shares to the investing public. Record owners and other members of the Class may be identified from records maintained by Sportradar and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

373. Lead Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class purchased or otherwise acquired Sportradar's Shares during the Class Period or in the Secondary Public Offering at artificially inflated prices and were similarly affected by Defendants' wrongful conduct that violated the federal securities laws, as complained of herein.

374. Lead Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class action and securities litigation. Lead Plaintiff has no interests that are adverse or antagonistic to the interests of other Class members.

375. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for

Class members individually to seek redress for the wrongful conduct alleged herein. Lead Plaintiff knows of no difficulty that will be encountered in managing this litigation that would preclude maintaining it as a class action.

376. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether Defendants violated the federal securities laws through the acts alleged herein;

b. Whether Defendants' statements to the investing public during the Class Period and in the documents related to the Secondary Public Offering misrepresented or omitted material facts;

c. Whether and to what extent the market prices of Sportradar's Shares, were artificially inflated and/or distorted during the Class Period due to the misrepresentations or omissions of material facts complained of herein;

d. Whether the Defendants named under Section 10(b) of the Exchange Act acted with scienter;

e. Whether reliance may be presumed with respect to Exchange Act claims pursuant to the fraud-on-the-market doctrine or the *Affiliated Ute* presumption; and

f. Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

377. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other Class members who are not parties to the adjudications or substantially impair their ability to protect their interests.

378. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## IX. CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants**

379. Lead Plaintiff incorporates by reference the allegations in the preceding paragraphs.

380. During the Class Period, the Defendants carried out a plan, scheme, and course of conduct pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Lead Plaintiff and the Class; (2) cause Lead Plaintiff and the Class to purchase Company securities at artificially inflated prices; and (3) artificially inflate and maintain the market price of Sportradar Shares. In furtherance

of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

381. Pursuant to the above plane, scheme, and conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the Quarterly and Annual Reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Sportradar Shares. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Sportradar's operations, finances, and business prospects.

382. By virtue of their positions at Sportradar, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

383. As a result of the dissemination of the aforementioned false and misleading public statements, the market price for Sportradar Shares was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Sportradar's business, which were concealed by Defendants, Plaintiff and other members of the Class purchased or otherwise acquired

Sportradar Shares at artificially inflated prices and relied upon the price of securities, integrity of the market for the securities, and/or statements disseminated by Defendants and were damaged thereby.

384. As the senior managers and/or directors of Sportradar, the Individual Defendants had knowledge of the details of Sportradar's internal affairs. During the Class Period, Sportradar Shares were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Sportradar Shares at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Sportradar Shares was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Sportradar Shares declined sharply upon public disclosure of the facts alleged herein damaging Plaintiff and the Class. By reason of the conduct alleged herein, Defendants have knowingly or recklessly—directly or indirectly—violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

385. As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

386. Lead Plaintiff incorporates by reference the allegations in the preceding paragraphs.

387. During the Class Period, the Individual Defendants participated in the operation and management of Sportradar and conducted and participated, directly and indirectly, in the conduct of Sportradar's business affairs. Because of their senior positions at and/or control of the Company, the Individual Defendants knew the truth about Sportradar's business, particularly its core operations, compliance with local licenses and regulations, and conduct involving Sportradar clients.

388. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Sportradar's business, and promptly correct any public statements issued by Sportradar that had become materially false or misleading.

389. Because of their positions of control and authority, the Individual Defendants were able to, and did, control the contents of the various press releases, statements, reports, and public filings that Sportradar disseminated during the Class Period concerning the Company's business. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Sportradar to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Sportradar within the meaning of Section 20(a) of the Exchange Act. In these capacities, the Individual Defendants participated in the unlawful conduct alleged herein, which artificially inflated the market price of Sportradar's Shares.

390. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Sportradar.

## COUNT III

**For Violations of Section 11 of the Securities Act**
**(Against All Defendants)**

391. Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above, other than those that allege fraud or scienter, as if fully set forth herein.

392. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants. This Count does not allege, and does not intend to allege, fraud or scienter, which are not elements of a Section 11 claim, and any implication of fraud or scienter is disclaimed.

393. The Registration Statement, which was incorporated in and formed part of the Secondary Offering Documents, contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein non-misleading, and omitted to state material facts required to be stated therein.

394. Sportradar was the registrant for the Secondary Public Offering. As an issuer of securities to the public, Sportradar is strictly liable to Lead Plaintiff and the Class for the misstatements and omissions.

395. The Individual Defendants each signed and/or authorized the signing of the Registration Statement. Each of the Individual Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They had a duty to ensure that such statements were true and accurate, that there were no omissions of material fact that would make the statements misleading, and that the Registration Statement contained all facts required to be stated therein. By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained material

misstatements and/or omissions of material facts. As such, the Individual Defendants are strictly liable to Lead Plaintiff and the Class.

396. Defendants were responsible for the contents and dissemination of the Registration Statement. None of the Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Secondary Offering Documents were complete, accurate or non-misleading.

397. By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

398. Lead Plaintiff and the other members of the Class purchased Sportradar Shares pursuant and/or traceable to the Registration Statement for the Secondary Public Offering and have sustained damages as a result. The price of the Sportradar Shares has declined substantially subsequent and due to Defendants' violations.

399. At the time of their purchases of Sportradar Shares, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein, and could not have reasonably discovered those facts prior to the disclosures herein.

400. Less than one year has elapsed from the time that Lead Plaintiff discovered, or reasonably could have discovered, the facts upon which this claim is based to the time this action was filed. Less than three years has elapsed between the time the securities were offered to the public and the time this action was filed.

## COUNT IV

### For Violations of Section 15 of the Securities Act (Against the Individual Defendants)

401. Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above, other than those that allege fraud or scienter, as if fully set forth herein.

402. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against the Individual Defendants. This Count does not allege, and does not intend to allege, fraud or scienter, which are not elements of a Section 15 claim, and any implication of fraud or scienter is disclaimed.

403. The Individual Defendants each were control persons of Sportradar by virtue of their positions as directors and/or senior officers of Sportradar. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Sportradar.

404. The Individual Defendants each were culpable participants in the primary violations of Section 11 of the Securities Act alleged herein, based on their having signed or authorized the signing of the Secondary Offering Documents and having otherwise participated in the process which allowed the Secondary Public Offering to be successfully completed.

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory damages and equitable relief in favor of Lead Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

## X. JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

Dated: October 14, 2026

Respectfully submitted,

*/s/ Geoffrey C. Jarvis*
Geoffrey C. Jarvis
**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Margaret E. Mazzeo (*pro hac vice*)
Daniel A. Friedman
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
gjarvis@ktmc.com
mmazzeo@ktmc.com
dfriedman@ktmc.com

**BERGER MONTAGUE PC**
Michael Dell'Angelo (*pro hac vice*)
Andrew D. Abramowitz (*pro hac vice*)
Alex B. Heller (*pro hac vice*)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bergermontague.com
aabramowitz@bergermontague.com
aheller@bergermontague.com

*Attorneys for Lead Plaintiff the Arkansas Funds*

**HANDLER MARTIN PLLC**
Amy Martin (*pro hac vice* forthcoming)
Kenneth P. "Casey" Castleberry (*pro hac vice* forthcoming)
1250 Connecticut Ave. NW Suite 700
Washington D.C., 20036
Tel: (202) 261-3563
amy@handlermartin.com
casey@handlermartin.com

*Additional Counsel for Arkansas Public Employees' Retirement System*